IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GLOBAL MOTORSPORT GROUP, INC., et al.,[1] | ) | Case No. 08-10192 (___) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

### DECLARATION OF T. SCOTT AVILA,
### CHIEF RESTRUCTURING OFFICER OF THE DEBTORS,
### IN SUPPORT OF FIRST DAY MOTIONS

I, T. Scott Avila, hereby declare that the following is true to the best of my knowledge, information and belief:

1.      I am the Chief Restructuring Officer of Global Motorsport Group, Inc. ("GMG") and each of the other captioned debtors (collectively, the "Debtors"). I have been the Chief Restructuring Officer ("CRO") of GMG since October 1, 2007, and the CRO of the other Debtors as of the Petition Date. As discussed further below, I was also GMG's CRO during the period from July to December 2005, and am currently a managing partner of CRG Partners Group LLC, the proposed restructuring advisors to the Debtors.

2.      My current duties for the Debtors include general supervision of, and responsibility for, the Debtors' business and financial affairs and activities and reviewing, formulating and assisting with the Debtors' business plans and strategies. I am authorized to make decisions with respect to all aspects of the management and operation of the Debtors'

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Global Motorsport Group, Inc. (6138); Custom Chrome Manufacturing, Inc., dba Santee Industries (2016); Custom Chrome Europe, Ltd. (8828); and Custom Chrome Far East, Ltd. (8827). The address for all Debtors is 16100 Jacqueline Ct., Morgan Hill, CA 95037.

business including, without limitation, organization, human resources, marketing, sales, logistics, finance, administration, oversight, and of the prosecution of these bankruptcy cases. In my capacities with the Debtors, I have general knowledge of the books and records of GMG and the other affiliate Debtors, and am familiar with the Debtors' financial and operational affairs.

3.      I submit this Declaration in support of the "first day" motions of the Debtors (described further below and which are referred to collectively herein as the "First Day Motions"). Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of the Debtors' books and records, relevant documents and other information prepared, collected or provided by the Debtors' employees, or my opinion based on my experience with GMG's as well as the other Debtors' operations and financial conditions. If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents or information, or opinion. I am authorized to submit this Declaration on behalf of the Debtors.

4.      Based on my personal knowledge, and through my review of the Debtors' books, records and other information, I believe that the relief sought by the Debtors in the First Day Motions is necessary to enable the Debtors to continue to operate as debtors in possession during the course of their respective bankruptcy cases and in particular, up through a sale of substantially all of the Debtors' assets, which such sale the Debtors seek to expeditiously effectuate, as discussed more fully herein.

5.      Part I of this Declaration describes the business of the Debtors and the developments that led to the filing of their chapter 11 petitions. Part II sets forth the relevant

facts in support of the First Day Motions. Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the First Day Motions.

## PART I

### Background

6.      On January 31, 2008 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

7.      The Debtors continue to operate their businesses and manage their affairs as debtors in possession pursuant the Bankruptcy Code. No request has been made for the appointment of a trustee of examiner, and no official committee of creditors or equity security holders has yet been appointed.

### Description of the Debtors and Summary of Operations

8.      GMG, a Delaware corporation, is the only operating Debtor and is an international wholesale distributor of after-market motorcycle parts and accessories.[2] Collectively, the Debtors comprise the second largest global supplier of after-market parts and accessories for Harley-Davidson motorcycles. Further, through GMG's indirect subsidiary, Global Motorsport Group GmbH, a corporation organized under the laws of the Federal Republic of Germany ("GMG GmbH"), the Debtors hold a larger market share for Harley-Davidson after-market parts and accessories in Europe than any of their competitors.

9.      In the fiscal year ended January 31, 2007, on a consolidated basis (including foreign affiliates), the Debtors' net sales totaled approximately $133.72 million,

---

[2]     As discussed further herein, the other Debtors are inactive entities.

resulting in an operating loss of approximately $26.35 million and a net loss of more than $51.76 million. In the current fiscal year period through November 2007, on a consolidated basis (including foreign affiliates), the Debtors had net sales of approximately $99.99 million, an operating loss of approximately $4.4 million and a net loss of approximately $31.46 million.

10.     As of November 24, 2007, on a consolidated basis (including foreign affiliates), the Debtors had total assets of approximately $40.98 million (book value), including approximately $8.48 million in accounts receivable (net), and approximately $28.76 million in merchandise inventory (net), and total liabilities of approximately $189.7 million, including approximately $8.6 million in accounts payable, approximately $136 million in notes payable (including the secured debt and subordinated Dodd Debt discussed below), approximately $15.2 million in other accrued liabilities, and approximately $28.8 million in other non-current liabilities.

11.     GMG has two principal operating divisions – Custom Chrome and Motorcycle Stuff. Custom Chrome markets after-market parts for the Harley-Davidson motorcycle market (*i.e.*, people who buy and ride Harley-Davidson motorcycles). Motorcycle Stuff markets after-market parts and accessories for the "metric" market – people who buy and ride Asian and European motorcycles, both on-road and off-road models such as those made by Honda, Suzuki, Yamaha, and BMW, among others. The metric market is 4-5 times larger than the Harley-Davidson market, with a more frequent product update cycle. In addition, GMG's Jammer division markets parts and accessories for the "old school" Harley-Davidson market, which market is comprised of motorcycle enthusiasts devoted to rebuilding, customizing, or creating replicas of early Harley-Davidson models, particularly from the 1960s and 1970s.

These divisions market their products internationally, except that GMG GmbH markets the Debtors' products in Europe.

12.    The Debtors distribute their own proprietary products under various brand names, including Custom Chrome, Jammer, RevTech, Motor Factory, and Santee, as well as products of other noted industry manufacturers, including Dunlop, Champion, Goodrich, and Accel. The Debtors source their products from approximately 400 vendors, and supply as many as 42,000 products to approximately 12,000 dealers in North America, Europe, and Asia.

## The Debtors' Corporate and Equity Structure

13.    GMG has two classes of capital stock. Ableco Holding LLC ("Ableco Holding"), which the Debtors are informed is an affiliate of Cerberus Capital Management LLC ("Cerberus"), owns 80% of GMG's outstanding common stock (800 shares). Global Motorsport Holdings, Inc. ("Holdings"), which the Debtors are informed is a holding company owned by Stonington Partners LLC ("Stonington"), owns the remaining 20% of GMG's outstanding common stock (200 shares).[3] In addition, Stonington Capital Appreciation 1994 Fund, L.P., a Stonington affiliate, owns 150,000 shares of GMG's Series A Preferred Stock.

14.    Each of the other Debtors – (i) Custom Chrome Manufacturing, Inc. ("CC-Manufacturing"), (ii) Custom Chrome Far East Ltd. (Delaware) ("CCFE-Delaware"), and (iii) Custom Chrome Europe, Ltd. ("CC-Europe") – is a wholly owned subsidiary of GMG. CC-Manufacturing is a California corporation and the successor to Santee Industries, which formerly operated a manufacturing facility in Valencia, California. CC-Manufacturing is inactive, having

---

[3]    Stonington and Ableco Holding are unaffiliated.

ceased operating in February 2007, as discussed more fully below. CCFE-Delaware is a Delaware holding company which owns 100% of the equity of Custom Chrome Far East Ltd. (Taiwan) ("CCFE-Taiwan"), a corporation organized under the laws of the Republic of China that formerly performed Asia sourcing services for the Debtors but is now inactive. CC-Europe owns 100% of the equity of GMG GmbH, the Debtors' European marketing arm. At present, GMG GmbH, which is based in Bad Kreuznach, Germany, near Frankfurt, is GMG's only operating (indirect) subsidiary. GMG GmbH has not filed a bankruptcy petition and is not a debtor in these cases.

15.     Certain employees of Cerberus and/or its affiliates have provided and in some cases, continue to provide services to the Debtors. Daniel M. Cook is an employee of Cerberus Operating and Advisory Company LLC ("COAC"), an affiliate of GMG's principal lender and of GMG's majority shareholder (as discussed more fully herein). Mr. Cook's assignment, since September 2006, has been to serve as GMG's full-time Chief Executive Officer. In late January 2008, he was appointed as the CEO of each of the other Debtors as well. Mr. Cook is also a director of each of the Debtors. Mr. Cook's salary, benefits and expense reimbursements related to his work for GMG are paid directly by COAC. He does not receive salary or other payments from GMG or from Administaff, and he does not participate in GMG's benefit plans. Additionally, five of the six directors of GMG – Daniel Cook, Jeffrey Fenton (Chairman since January 2006), Gerry Daniello, Kevin Genda, and Joseph Naccarato – are also employees of either Cerberus, COAC, Ableco and/or affiliates thereof. The other director, Alexis Michas, is a managing partner of Stonington. Mr. Fenton is also the Chairman of the Board of the other three Debtors. The Debtors do not pay any fees or compensation to their

directors. Before the Petition Date, Messrs. Cook, Fenton, and Daniello have received payments for fees and/or reimbursement of expenses for work related to GMG from Cerberus, COAC and/or their affiliates.

16.    In addition to the foregoing, Bryan Rishforth, a then-employee of COAC, acted as a "co-CEO" of GMG from March to September 2006, and Benjamin Humphreys, a Cerberus employee, served as GMG's Acting CFO from June 2006 until late January 2007, at which time he was then named Interim CFO, a position he served in until he resigned in May 2007. Further, from about January 2006 to about July 2007, a number of other employees of and consultants to Cerberus and COAC provided support services to the Debtors, including at times in respect to Asian and European operations, but did so solely as employees of or consultants to Cerberus or COAC, as applicable. They did not hold any positions with the Debtors and, as in the case of Messrs. Rishforth and Humphreys, received compensation or benefits from Cerberus or COAC, and not the Debtors.

### The Debtors' Facilities

17.    The Debtors lease all of their real property facilities. GMG's corporate headquarters are in a 100,000 square-foot facility in Morgan Hill, California, approximately 20 miles south of San Jose. GMG originally owned this building, but entered into a sale-leaseback transaction for it in 1999 with its current landlord. GMG also leases warehouse facilities in Visalia, California and Harrisburg, Pennsylvania, as well as a facility in Cape Girardeau, Missouri, which houses the Motorcycle Stuff division (both operations/sales and warehousing/fulfillment). Prior to the Petition Date, the Debtors had also leased a facility in Fort

Worth, Texas; as discussed below, the Debtors have filed a motion to reject this lease effective as of the Petition Date.

## GMG's Workforce

18.     GMG currently employs approximately 207 employees (the "Employees"), of whom approximately 37% are salaried Employees and approximately 63% are hourly Employees.[4]  Approximately 76 Employees are based at GMG's headquarters in Morgan Hill, California.  The other Employees are based in GMG's Harrisburg, Pennsylvania, Visalia, California, and Cape Girardeau, Missouri facilities (with approximately 23, 36, and 68 Employees, respectively), while four Employees work from their homes in Texas.  None of the other Debtors has any employees.[5]  The Debtors are not party to any collective bargaining agreements.  The Debtors have never suffered a work stoppage or other collective labor dispute.

19.     Commencing in November 2006, GMG outsourced most routine Human Relations functions, previously performed by its in-house HR department, by entering into an agreement (the "Administaff Agreement") with Administaff Companies II, L. P. ("Administaff").  Administaff is an affiliate of Administaff, Inc. which describes itself as a national "professional employer organization."  Under the Administaff Agreement, GMG and Administaff are "co-employers" of the Employees.  In short, Administaff administers GMG's payroll, and GMG Employees participate in benefit plans, including medical insurance, that are available to all of Administaff's clients.  In addition, Administaff provides workers

---

[4]     As discussed herein, GMG and Administaff (as defined herein) are co-employers of all of these Employees. For the ease of reference, these co-employees are referred to herein as the "Employees."

[5]     GMG's indirect German subsidiary, GMG GmbH, has approximately 50 employees.  These employees do not receive compensation from the Debtors and are not implicated by the First Day Motions.

compensation and employment practices liability insurance to GMG. As discussed further below, GMG pays Administaff a fee for these services, which includes reimbursement to Administaff for payments made by Administaff directly to Employees and for Employee benefits.

20.     The Administaff Agreement has permitted GMG to reduce the size of its in-house human resources department and generated savings in workers' compensation and benefit plan costs. GMG believes that its Employees' pay scale and benefits are comparable to those offered by other companies of its size.

21.     In addition to the Employees, GMG currently utilizes the service of several independent contractors (collectively, "Contractors" and together with the Employees, the "Workforce"), who are employed for both short and long term assignments. GMG pays the Contractors directly, not through Administaff.

### The Debtors' Early History and Business Expansion

22.     GMG, then named Custom Chrome Inc., was incorporated as a California corporation in April 1970, as an affiliate of Coast Cycle Accessories, Inc., which at that time was a small independent shop selling used motorcycles and parts and accessories. In 1976, the ownership of Coast Cycle Accessories and GMG (still named Custom Chrome Inc. at that time) diverged, and GMG entered into the aftermarket wholesale business. From 1976 to 1981, GMG's annual revenues grew to approximately $10 million. During this period, it began sourcing many of its products from Asia.

23.     In the 1980s, the Debtors' annual sales grew to $25-30 million. In 1990, GMG acquired Santee Industries, a fabricator of motorcycle frames, exhaust systems, and other

parts, based in Valencia, California. Under the name Custom Chrome Manufacturing, Inc., Santee Industries became a direct, wholly owned subsidiary of GMG.

24. From 1988 to 1998, GMG added distribution centers in Louisville, Kentucky, Harrisburg, Pennsylvania, Fort Worth, Texas (though a 1997 acquisition of Chrome Specialties, Inc.), Jacksonville, Florida, and Visalia, California. During this period, annual sales grew to approximately $123 million. In 1995, GMG acquired its German subsidiary by purchasing an existing German firm (Tom's Motorcycle Parts GmbH). In 1997, in connection with the acquisition of Chrome Specialties, GMG changed its name from Custom Chrome Inc. to Global Motorsport Group, Inc.

25. In December 1998, following a public tender offer for GMG's common stock, Stonington, a New York investment firm, acquired a majority interest in GMG. As discussed below, Stonington subsequently transferred its majority stake to Ableco Holding in 2006.

26. In 2000, the Debtors entered the market for "metric" motorcycle after-market parts and accessories (which includes parts and accessories for brands such as Honda, Suzuki, Yamaha, and BMW, among others) by acquiring Motorcycle Stuff, Inc., based in Cape Girardeau, Missouri.

### Financing & Other Significant Indebtedness

27. GMG and CC-Manufacturing are borrowers (collectively, the "Borrowers") under an Amended and Restated Credit Agreement, dated as of November 22, 2004 (as subsequently amended, the "Credit Agreement"), between themselves and GECC and

Ableco Finance LLC ("Ableco Finance").[6] As discussed below, the other Debtors are guarantors of the Borrowers' obligations. The Credit Agreement amended and restated an existing credit agreement dated as of February 5, 2001, as amended on January 1, 2002. As discussed further below, under the Credit Agreement, GECC and Ableco Finance agreed to advance term and revolving loans (the "Term Loan" and the "Revolver," respectively) totaling more than $100 million in principal. In July 2005, GECC left the lending syndicate, and Ableco Finance and certain of its affiliates acquired all of the Debtors' obligations under the Credit Agreement.

28.     As discussed further below, the Borrowers' obligations under the Credit Agreement are secured by blanket liens in substantially all of the Borrowers' assets, as well as a stock pledge by GMG, pledging its common stock in its subsidiaries, CC-Manufacturing, CCFE-Delaware and CC-Europe. Further, Holdings guaranteed the Borrowers' obligations under the Credit Agreement, pledged all of the common stock of GMG held by Holdings to secure this guaranty, and granted a security interest in substantially all of its other assets.[7] Additionally, GMG's subsidiaries, CCFE-Delaware and CC-Europe, have also guaranteed the Borrowers' obligations under the Credit Agreement, and in connection therewith, CCFE-Delaware and CCE-Europe pledged 65% of their equity interests in CCFE-Taiwan and GMG GmbH, respectively. CCFE-Delaware and CC-Europe also granted a security interest in substantially all their other assets.

---

[6]     As discussed below, Ableco Finance has consented to the use of cash collateral and agreed to serve as agent for Styx Partners LLC and certain other financial institutions which will provide postpetition financing to the Debtors.

[7]     The Debtors believe that Holdings' only material asset is Holdings' stock in GMG.

29.     In January 2006, following defaults under the Credit Agreement, GMG,

Ableco Finance, Stonington, and certain other parties entered into a series of related transactions,

including amendments of the Credit Agreement, under which, among other things (a) Ableco

Finance agreed to advance additional funds to GMG; and (b) Ableco Holding acquired 80% of

GMG's common stock (as a result of which, Stonington, the former majority stakeholder in

GMG, ended up with a minority 20% interest).  At present, as discussed more fully below,

approximately $139 million is due and outstanding under the Credit Agreement as of the Petition

Date.

30.     Other significant indebtedness includes approximately $3.3 million in

unsecured debt (comprised of approximately $2 million in principal and approximately $1.3

million in interest) owed by GMG to Susan Dodd ("Dodd Debt").  The Dodd Debt was incurred

in connection with the Debtors' acquisition in 2000 of the assets of the Motorcycle Stuff

division.  The Debtors believe that the Dodd Debt is contractually subordinated to the prior

payment in full of GMG's obligations under the Credit Agreement and any other current or

future indebtedness to any current or future lender.  However, in late January 2008, Susan Dodd

sued GMG to collect on the Dodd Debt, and her counsel has asserted that the Dodd Debt is not

expressly subordinated to GMG's Credit Agreement obligations owed to Ableco Finance.

31.     In addition to the foregoing, as of the Petition Date, the Debtors owe

approximately $9.81 million in accounts payable and other business debt (excluding the Dodd

Debt) and approximately $155,000 in obligations under capital leases.  As discussed more fully

below, the proposed buyer of substantially all of the Debtors' assets, if it is the successful bidder

and the sale transaction is closed, will assume certain liabilities, including a substantial portion of

the Debtors' prepetition trade debt such as designated lease/contract cure costs and certain vendor claims with priority under Bankruptcy Code section 503(b)(9).

**Events Leading to the Commencement
of the Debtors' Chapter 11 Cases**

**The Debtors' Recent Business Performance and Financial Difficulties**

32.     In recent years, the motorcycle after-market sector has experienced increased competition and little or no growth which have caused degradation in the Debtors' financial performance.  In addition, a number of other factors have contributed to the Debtors' increasing financial difficulties since 2004.  Those factors include, among others: (i) expenses incurred with the acquisition and integration of Chrome Specialties and Motorcycle Stuff; (ii) several costly efforts to upgrade and integrate the Debtors' various computer systems; (iii) the cost of a failed $85 million bond offering in 2004 and the resulting distraction to management; (iv) unexpected difficulties in operating multiple distribution centers across the country; and (v) too much leverage and attendant high interest costs.

33.     From 2002 through early 2006, GMG sold "bike kits" – consisting of a "rolling chassis" (frame and wheels), a drive train (engine and transmission), and all other components necessary to enable the retail customer to assemble a complete motorcycle.   In early 2006, GMG terminated its bike kit program.  Bike kit sales had generated almost $60 million in revenue over the preceding five years, but the lack of adequate internal resources, uncertainty regarding the program's profitability and long-term viability, and other concerns caused management to decide to exit the business.

34.     During late 2005 to early 2006, GMG fell behind on payments of some payables and restricted some inventory purchases. As a result, certain vendors restricted credit terms and GMG's fill rates declined, adversely affecting customer loyalty and revenues.

35.     All of these factors limited the Debtors' access to working capital and made it more difficult for the Debtors to meet their financial covenants under the Credit Agreement.

36.     In 2006 and 2007, GMG undertook several steps in order to reduce expenses and increase revenues. In April 2006, GMG closed its distribution centers in South Bend, Indiana and Jacksonville, Florida and laid off approximately 75 employees. In October 2006, GMG entered into the Administaff Agreement, thereby outsourcing virtually all of its domestic human relations functions. In November 2006, GMG closed CCFE-Taiwan, its former captive Asian sourcing subsidiary, and has turned to an unrelated Taiwanese company for the necessary supplies and products. In January 2007, GMG vacated its Fort Worth, Texas facility, and in February 2007, GMG closed CC-Manufacturing and outsourced most of the fabrication work performed by that subsidiary to unrelated domestic and international vendors (the work that was not outsourced was stopped). As part of the CC-Manufacturing shutdown, approximately 43 employees were laid off. In a further reduction-in-force in May 2007, GMG laid off an additional 48 employees. These efforts, together with additional financing from Ableco, enabled the Debtors to operate on a break-even basis for most of 2007 before restructuring costs, but continuing tight credit from vendors restricted the Debtors' ability to attain the revenues they needed to be successful. Further, the Debtors' restructuring expenses were substantial.

**The Debtors' Exploration of Strategic Alternatives
and Marketing Efforts and Their Bankruptcy Goals**

37.     In Spring 2007, the Debtors decided to evaluate their various strategic

alternatives, utilizing the services of restructuring advisors and other professionals.

38.     As discussed further below, prior to the Petition Date, Corporate

Revitalization Partners ("CRP") provided restructuring services to GMG pursuant to various

engagement agreements during the period from February 2005 to March 2006. I was with CRP

during this timeframe and served as the CRO of GMG from July 2005 to the end of December

2005. In or about March 2007, TRG began providing restructuring services to GMG. Effective

July 2007, TRG and CRP merged to form CRG Partners Group LLC ("CRG"), at which point

CRG provided the restructuring services formerly provided by TRG. I was appointed the CRO

of GMG effective as of October 1, 2007, and the CRO of the other Debtors as of the Petition

Date. These events are discussed more fully below.

39.     In connection with the Debtors' evaluation of their options, on or about

October 16, 2007, GMG also engaged Lincoln International Advisors LLC ("Lincoln") as its

investment banker.

40.     Over the past several months, CRG and Lincoln have assisted the Debtors

in evaluating their options, including the potential sale of some or all of their assets. Lincoln

distributed introductory letters regarding the potential disposition of the Debtors' businesses and

assets and confidentiality agreements to approximately 110 potential buyers or strategic partners.

Approximately fifty parties received an offering memorandum. The Debtors received seven

initial indications of interest, and held five management presentations/visits for prospective buyers. Ultimately, two parties submitted letters of intent.

41.     The Debtors entered into negotiations with the higher bidder (of the two bidders which had submitted letters of intent), but the parties were unable to reach a final sale agreement. Subsequently, the Debtors entered into discussions with another party which had expressed an interest in purchasing the Debtors' assets after the Debtors' receipt of the previously noted letters of intent (and after the Debtors were unable to reach agreement with the prior high bidder). After extensive, arms' length negotiations among the parties, the Debtors reached an agreement with Dae-Il USA, Inc. (Said entity and/or any affiliate thereof implemented for purposes of the sale transaction are referred to herein as the "Proposed Buyer".) Subject to an auction process, the Debtors believe that the proposed sale transaction with the Proposed Buyer will maximize the value of the Debtors' businesses and assets as best as possible under the circumstances, for the benefit of the Debtors and their estates.

42.     The Debtors' main goal in these bankruptcy cases is to proceed with and implement an expeditious sale of substantially all of their assets to the Proposed Buyer or other, higher bidder, with the ultimate goal being to confirm a liquidating plan in these cases.

43.     In the various First Day Motions, the Debtors seek relief on an expedited basis that will help preserve the value of their assets and permit them to conduct these cases efficiently and economically. The basis for each of the First Day Motions is set forth below.

## PART II

### First Day Motions and Applications

**B.      Debtors' Motion for Order Directing Joint Administration
of Related Chapter 11 Cases**

44.     The four Debtors in these cases are affiliated entities.  Joint administration

of these chapter 11 cases (a) is warranted because the Debtors' financial affairs and business

operations are closely related (as discussed above), (b) will ease the administrative burden on the

Court and the parties, and (c) protects creditors of different estates against potential conflicts of

interest.

45.     I am informed that joint administration will permit the Clerk of this Court

to use a single general docket for each of the Debtors' cases and to combine notices to creditors

and other parties in interest of the Debtors' respective estates, which will result in substantial

savings to the estates.  Joint administration also will protect parties in interest by ensuring that

such parties in interest in each of the Debtors' respective chapter 11 cases will be apprised of the

various matters before the Court in all of these cases.

46.     Accordingly, I believe that the relief requested in this motion is in the best

interests of the Debtors' estates.

**C.      Application of the Debtors Pursuant to Section 327(a) of the Bankruptcy Code, Rule
2014 of the Federal Rules of Bankruptcy Procedure and Local Rule 2014-1 for
Authorization to Employ and Retain Pachulski Stang Ziehl & Jones LLP as Counsel
for the Debtors and Debtors in Possession *Nunc Pro Tunc* to the Petition Date**

47.     The Debtors seek to employ the firm of Pachulski Stang Ziehl & Jones

LLP ("PSZ&J") as their bankruptcy counsel with regard to the filing and prosecution of these

chapter 11 cases and all related proceedings.  The Debtors seek to retain PSZ&J as their counsel

because of the Firm's extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code and because of the Firm's expertise, experience and knowledge practicing before this Court. In preparing for its representation of the Debtors in this case, PSZ&J has become familiar with the Debtors' businesses and affairs and many of the potential legal issues which may arise in the context of these chapter 11 cases.

48. The Debtors believe that PSZ&J is both well-qualified and uniquely able to represent the Debtors in these cases and accordingly, the Application should be granted.

**D. Application of Debtors for Order Under 28 U.S.C. § 156(c) Authorizing and Approving the Retention of and Appointing Epiq Bankruptcy Solutions, LLC as Noticing, Claims and Balloting Agent**

49. The Debtors seek entry of an order authorizing the retention of and appointing Epiq Bankruptcy Solutions, LLC ("Epiq"), *nunc pro tunc* to the Petition Date, as claims, noticing and balloting agent (the "Claims and Noticing Agent") for the Debtors and, as applicable, the Clerk of the United States Bankruptcy Court for the District of Delaware (the "Clerk") to, among other things: (i) serve as the Court's notice agent to mail certain notices to the estates' creditors and parties-in-interest, (ii) provide computerized claims, claims objections and balloting database services, and (iii) provide expertise, consultation and assistance with claim and ballot processing and with other administrative information related to the Debtors' bankruptcy cases.

50. The Debtors estimate there will be approximately 1,300 creditors holding claims against the Debtors' estates. Furthermore, the Debtors believe that there are thousands of creditors, former employees, and other parties-in-interest who require notice of various matters,

and in particular, the deadline for filing proofs of claim. Additionally, many of these parties may

file proofs of claim and cast ballots with respect to a liquidating or other plan. The size of the

Debtors' creditor body makes it impractical for the Clerk to send notices and to maintain a

claims register and tabulate ballots.

51. I understand that Epiq is one of the country's leading chapter 11

administrators with experience in noticing, claims processing, assisting with claims

reconciliation and distribution. I believe that Epiq is well qualified to provide the Debtors with

experienced noticing, claims and balloting services in connection with theses cases and has

substantial experience in the matters upon which it is to be engaged. By appointing Epiq as the

Claims and Noticing Agent in these Chapter 11 cases, creditors of the Debtors' estates will

benefit from Epiq's significant experience in acting as a Claims and Noticing Agent in other

cases and the efficient and cost-effective methods that Epiq has developed in its sixteen years of

operation.

52. Accordingly, the Debtors believe it is in the best interests of their estates

and their creditors to appoint Epiq as agent for the Clerk.

**E.     Motion of the Debtors Pursuant to 11 U.S.C. § 363 for Entry of an Order
Authorizing the Employment and Retention of CRG Partners Group LLC to
Provide Restructuring Services to the Debtors and of T. Scott Avila as Chief
Restructuring Officer of the Debtors *Nunc Pro Tunc* to the Petition Date**

53. The Debtors seek to employ and retain (a) CRG Partners Group LLC

("CRG") to assist and perform restructuring services for the Debtors in these chapter 11 cases

and (b) me (a managing partner with CRG) as Chief Restructuring Officer of the Debtors, each

*nunc pro tunc* to the Petition Date, on the terms set forth in the motion and in the engagement

letter between the Debtors and CRG dated October 1, 2007, a copy of which is attached to the motion (the "Engagement Letter").

54.     The Debtors are familiar with the professional standing and reputation of CRG. CRG was retained prepetition to provide restructuring services to the Debtors. The Debtors understand that CRG has a wealth of experience in providing advisory services in restructurings and reorganizations and enjoys an excellent reputation for services it has rendered in large and complex chapter 11 cases on behalf of debtors and creditors throughout the United States.

55.     Prior to the Petition Date, Corporate Revitalization Partners ("CRP") provided restructuring services to GMG pursuant to various engagement agreements executed by the parties during the period from February 28, 2005 through March 31, 2006. I also served as the Chief Restructuring Officer of GMG from July 25, 2005 through December 31, 2005. On or about March 2, 2007, The Recovery Group Inc. ("TRG") was initially engaged by and provided restructuring services to GMG (the "TRG Engagement"). On or around May 24, 2007, the TRG Engagement was amended and Robert Glendon, a then-principal of TRG, was appointed as the Chief Restructuring Officer of GMG. Effective July 1, 2007, CRP and TRG merged to form CRG at which point CRG provided the restructuring services formerly provided by TRG under the TRG Engagement. The TRG Engagement was terminated on September 30, 2007 and the parties executed the Engagement Letter on or around October 1, 2007. I was appointed as the Chief Restructuring Officer of GMG effective October 1, 2007 and the Chief Restructuring Officer of the other Debtors effective the Petition Date.

56.     The Debtors believe that the employment of CRG and the CRO under the

terms of the Engagement Letter would inure to the benefit of the Debtors' estates and their

creditors.  Moreover, both CRG and the CRO are clearly qualified for the positions for which

they are being employed.  The Debtors have determined that the compensation terms of the

Engagement Letter are within the range for senior executive officers employed with companies

of comparable size, value and reputation.  Accordingly, the Debtors' decision to enter into the

Engagement Letter reflects an exercise of the Debtors' sound business judgment.

**F.      Application of Debtors Pursuant to 11 U.S.C. §§ 327(a) and 328(a) for Authority to Employ Lincoln International Advisors, LLC as Investment Banker to the Debtors *Nunc Pro Tunc* to the Petition Date**

57.     The Debtors desire to employ Lincoln International Advisors, LLC

("Lincoln") as their investment banker during the pendency of these cases and to obtain approval

of the terms under which Lincoln will be compensated, at the expense of the Debtors' estates and

on the terms set forth in the engagement agreement with Lincoln, dated as of October 16, 2007

(the "Lincoln Engagement Agreement"), a copy of which is attached to the Application.

58.     The Debtors request approval of the employment of Lincoln *nunc pro tunc*

to the Petition Date.  Such relief is warranted by the extraordinary circumstances presented by

these cases.  The complexity, intense activity and speed that have characterized these cases have

necessitated that the Debtors, Lincoln, as well as the Debtors' other professionals, focus their

immediate attention on time-sensitive matters relating to the immediate sale of the Debtors'

assets.

59.     The Debtors chose Lincoln to act as the Debtors' investment banker

because Lincoln has substantial expertise in the sale of troubled companies and is well qualified

to perform these services and represent the Debtors' interests in their chapter 11 cases.

60.     By the Application, the Debtors also request that the Court approve the

compensation arrangements described in the Lincoln Engagement Agreement.  The

compensation arrangements contained in the Lincoln Engagement Agreement are highly

beneficial to the Debtors' estates as they provide certainty and proper inducement for Lincoln to

act expeditiously and prudently with respect to the matters for which it will be employed.

Further, the overall compensation structure described in the Application is comparable to

compensation generally charged by investment banking firms of similar stature to Lincoln for

comparable engagements, both in and out of court. Lincoln's restructuring expertise, as well as

its capital markets knowledge, financing skills and mergers and acquisitions capabilities, some or

all of which may be required by the Debtors during the term of Lincoln's engagement, were

important factors in the calculation of the amount of Lincoln's fees.

**G.     Motion to Approve Interim Stipulation and Order (I) Authorizing Debtors to Incur Post-Petition Secured Indebtedness, (II) Authorizing the Use of Cash Collateral Pursuant to Bankruptcy Code Sections 105, 361, 362, 363, and 364, (III) Granting Adequate Protection, (IV) Granting Security Interests and Super-Priority Claims Pursuant to Bankruptcy Code Sections 361 and 363, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing**

61.     The Debtors seek the entry of the proposed Interim Order[8] attached to the

motion and ultimately, at a final hearing to be set by the Court (the "Final Hearing"), a Final

Order authorizing, among other things, the Debtors to use Cash Collateral and to obtain from

---

[8]     Unless otherwise defined, capitalized terms used in this Section F of the Affidavit have the meanings ascribed to them in the Interim Order.

Ableco Finance, as agent (the "DIP Agent") for Styx Partners LLC and other financial institutions from time to time (the "DIP Lenders") under (x) that certain Revolving Loan Promissory Note (the "DIP Note") in the maximum principal amount of $3.5 million (the "DIP Loan"), (y) that certain Guaranty, dated as of January 30, 2008 (the "DIP Guaranty"), among the Debtors, Europe and Far East and the DIP Agent (for the benefit of the DIP Lenders) and (z) that certain Pledge and Security Agreement, dated as of January 30, 2008 (the "Guarantor Security Agreement"), among the Debtors and the DIP Agent (for the benefit of the DIP Lenders), postpetition financing to fund expenses and disbursements specifically set forth in the approved Budget.

### Debtors' Prepetition Secured Financing

62.     As discussed above, GMG and CC-Manufacturing are borrowers under an "Amended and Restated Credit Agreement," dated as of November 22, 2004 and amended on July 26, 2005, January 3, 2006, and March 14, 2006, pursuant to which the Pre-Petition Lenders made certain loans to the Borrowers as follows (i) revolving loan in an aggregate principal amount of $30 million, (ii) term B loan in the aggregate principal amount of $34 million, (iii) a term C loan in the aggregate principal amount of $15 million, (iv) term D loan in the aggregate principal amount of $15 million, and (v) term E loan in the aggregate principal amount of $10 million. As of the Petition Date, total amounts outstanding under the Pre-Petition Credit Agreement, including pre-petition interest, fees, costs and expenses, is not less than $138,357,024.11 (the "Pre-Petition Obligations").

63.     Holdings, Europe and Far East (collectively, the "Pre-Petition Guarantors") each executed an "Amended and Restated Guaranty," dated November 22, 2004

(the "Pre-Petition Guaranty Agreements") pursuant to which the Guarantors, on a joint and several basis, unconditionally guaranteed the Pre-Petition Obligations due to the Pre-Petition Agent and the Pre-Petition Lenders. In order to secure their obligations under the Pre-Petition Guaranty Agreements, Far East and Europe pledged 65% of their equity interests in GMG GmbH and CCFE-Taiwan, respectively (the "Guaranty Collateral").

64.    To further secure repayment of the Pre-Petition Obligations under the Pre-Petition Credit Agreement and obligations under the Pre-Petition Guaranty Agreements, the Debtors and Holdings (collectively, the "Grantors") also executed an "Amended and Restated Security Agreement," dated as of November 22, 2004 (the "Security Agreement") pursuant to which each Grantor granted to the Pre-Petition Agent for the benefit of the Pre-Petition Agent and the Pre-Petition Lenders first priority liens on and security interests in substantially all of its respective assets, including (i) all Accounts, (ii) all Chattel Paper, (iii) all Documents, (iii) all General Intangibles (including payment intangibles and Software), (iv) all Goods (including Inventory, Equipment and Fixtures), (v) all Instruments, (vi) all Investment Property, (vii) all Deposit Accounts, (viii) all money, cash or cash equivalents, (ix) all Supporting Obligations and Letter-of-Credit Rights, (x) certain commercial tort claims, and all Proceeds of the foregoing (all as defined in the Security Agreement) (collectively, the "Security Agreement Collateral"). The liens on and security interests in the Security Agreement Collateral were duly perfected.

65.    To further secure the Pre-Petition Obligations under the Pre-Petition Credit Agreement and obligations under the Pre-Petition Guaranty Agreements, the Grantors executed an "Amended and Restated Pledge Agreement," dated November 22, 2004 as amended on January 3, 2006 (as amended, the "Pre-Petition Pledge Agreement") pursuant to which each

Grantor pledged to the Pre-Petition Agent for the benefit of the Pre-Petition Agent and the Pre-Petition Lenders certain Pledged Stock and Pledged Indebtedness (each as defined in the Pledge Agreement) (collectively, the "Pledged Collateral," and together with the Security Agreement Collateral and the Guaranty Collateral, the "Pre-Petition Collateral"). The Pre-Petition Agent and the Pre-Petition Lenders have perfected their liens on the Pledged Collateral by possession.

66.     The Debtors admit that: (a) the Debtors do not have (i) any defenses, offsets, demands or counterclaims to the Pre-Petition Credit Agreement or related documents, agreements, and instruments, the Pre-Petition Obligations, or to the validity, priority or perfection of the liens (the "Pre-Petition Liens") on the Pre-Petition Collateral, (ii) the Pre-Petition Liens on the Pre-Petition Collateral are valid, enforceable and perfected first priority, (iii) any claims as debtors or debtors in possession against the Pre-Petition Agent or the Pre-Petition Lenders or (iv) any basis for the disallowance subordination, avoidance or recharacterization of the Pre-Petition Obligations or any basis for avoidance of any transfer of property from the Debtors to the Pre-Petition Agent or the Pre-Petition Lenders pursuant to the Bankruptcy Code or other applicable non-bankruptcy law, and (b) the Debtors are unconditionally liable as of the Petition Date to the Pre-Petition Agent and the Pre-Petition Lenders in an aggregate amount of not less than $138,357,024.11, plus post-petition interest fees and expenses to the extent allowed under the Bankruptcy Code, (c) the Debtors do not possess and will not assert any claim, counterclaim, setoff or defense of any kind of nature of description that would in any way affect the validity, enforceability, allowance and/or non-avoidability of the Pre-Petition Liens or the Pre-Petition Obligations. The Debtors further believe that the Pre-Petition Liens are valid, perfected, enforceable and first priority.

## Debtors' Need for Use of Cash Collateral and the DIP Loan

67.     The Debtors request (i) pending the Final Hearing, emergency authority to use Cash Collateral to satisfy administrative expenses in accordance with the Budget through the contemplated closing of the sale, and on the terms and conditions set forth in the Interim Order, and (ii) at the Final Hearing, final authority to use the Cash Collateral through the remaining term of the Budget on the terms set forth in the Interim Order.  Absent immediate emergency interim relief, the Debtors will not be able to pay their employees, purchase raw materials, satisfy their rent or utilities obligations, or otherwise operate their business.  Without use of the Cash Collateral pending the Final Hearing, the Debtors will be forced to cease operations, resulting in irreparable harm to the Debtors and their creditors.

68.     The Debtors' ability to obtain sufficient working capital and liquidity under the DIP Loan Documents and the use of Cash Collateral is vital to the Debtors' estates and their creditors, so that the Debtors can continue to operate their businesses in the ordinary course. The preservation of the going concern value of the Debtors' businesses is the linchpin to any successful sale.  The Debtors' estates will be immediately and irreparably harmed if the Interim Order is not entered.

69.     In attempting to locate alternative financing, the Debtors have been handicapped enormously by the fact that no new lenders are realistically going to be willing to lend a very small loan on a junior priority basis behind (in lien priority) the enormous amount of Pre-Petition Obligations.

70.     The Debtors understand that the Pre-Petition Lenders will not agree to be "primed" on a consensual basis.  Debtors therefore have had to elect to either (a) negotiate with

Pre-Petition Lenders for a new post-petition facility or engage in priming litigation that, given Debtors' financial condition, Debtors believe they are extremely unlikely to win. Debtors are unwilling to risk their ability to operate on the remote possibility Debtors will prevail in priming litigation. Thus, while Debtors have made some investigation concerning the availability of financing from alternative sources, Debtors have met with no such success and do not believe that any such likely lender exists. Debtors therefore have focused the vast majority of their attention on obtaining post-petition financing from Pre-Petition Lenders.

71.     The terms of the DIP Loan Documents, including the interest rates applicable thereto and intangible factors, are at least as or more favorable to the Debtors as Debtors would be able to locate from alternative sources.

72.     Debtors have negotiated the DIP Loan Documents in good faith and at arm's-length basis with DIP Agent and DIP Lenders. Debtors believe that the terms of the loan facility provided under the DIP Loan Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

<u>Interim Authorization</u>

73.     By this motion, the Debtors seek authorization on an interim basis to utilize up $2 million under the DIP Loan and use of Cash Collateral for the purposes set forth in the Budget pending the Final Hearing. The authorization to obtain the DIP Loan and use Cash Collateral pending a final hearing will preserve the value of the Debtors' business only if authorization is granted immediately on short notice. The Debtors must have immediate use of the DIP Loan and Cash Collateral in order to pay their remaining payroll and other expenses and

preserve and maximize the value of their assets. Funds are urgently needed to meet all of the

Debtors' liquidity needs and to administer their chapter 11 cases in an orderly manner. In the

absence of immediate post-petition financing, the Debtors' ability to preserve the value of their

businesses and assets will be immediately and irreparably jeopardized, resulting in significant

harm to the Debtors' estates and creditors.

74.     Based on the foregoing, the Debtors respectfully request that, pending a

final hearing on the motion, the terms and provisions of the DIP Loan and use of Cash Collateral

be implemented and approved on an emergency interim basis, to the extent of authorizing the

Debtors to obtain interim post-petition financing and use Cash Collateral as provided for in

Interim Order.

**H.     Motion of the Debtors Pursuant to Sections 105(a), 327, 328 and 330 of the Bankruptcy Code for an Order Authorizing the Debtors to Retain, Employ and Compensate Certain Professionals Utilized by the Debtors in the Ordinary Course of Business**

75.     The Debtors seek entry of an order by this Court authorizing them to

(a) retain and employ the Ordinary Course Professionals (as defined below) on an "as needed"

basis without the submission of separate, formal retention applications for each Ordinary Course

Professional, and (b) establish procedures to compensate the Ordinary Course Professionals for

postpetition services rendered and expenses incurred.

76.     The Debtors customarily retain the services of various attorneys,

accountants, actuaries, consultants, and other professionals to represent them in matters arising in

the ordinary course of their businesses, unrelated to these Chapter 11 Cases (each an "Ordinary

Course Professional" and collectively, the "Ordinary Course Professionals"). A list of the

Ordinary Course Professionals utilized or expected to be utilized by the Debtors is attached as Exhibit A to the motion. The Ordinary Course Professionals will not be involved in the administration of these Chapter 11 Cases. Rather, they will provide services in connection with the Debtors' ongoing business operations or services ordinarily provided by in-house counsel to a corporation. As a result, the Debtors do not believe that the Ordinary Course Professionals are "professionals" whose retention must be approved by this Court. Nevertheless, out of an abundance of caution, the Debtors seek an order authorizing the retention and payment of all Ordinary Course Professionals during the pendency of these Chapter 11 Cases.

77. The Debtors require the services of the Ordinary Course Professionals in order to continue to operate their businesses as debtors in possession. The work of the Ordinary Course Professionals, albeit ordinary course, is directly related to the preservation of the value of the Debtors' estates, even though the amount of fees and expenses incurred by the Ordinary Course Professionals represents only a small fraction of that value.

78. The operation of the Debtors' businesses would be severely hindered if the Ordinary Course Professionals were delayed in performing their work on behalf of the Debtors while the Debtors (i) submitted to this Court an application, declaration and proposed retention order for each Ordinary Course Professional; (ii) waited until such order was approved before such Ordinary Course Professional continued to render services; and (iii) withheld payment of the normal fees and expenses of the Ordinary Course Professionals until they complied with the compensation procedures applicable to Chapter 11 professionals.

79. Further, a number of Ordinary Course Professionals are unfamiliar with the fee application procedures employed in bankruptcy cases. Some Ordinary Course

Professionals might be unwilling or unable to assume the administrative and cost burden of such

procedures, and may therefore be unwilling to work with the Debtors if these requirements are

imposed, forcing the Debtors to incur additional and unnecessary expenses to retain other

professionals without such background and expertise and at potentially higher rates. The

uninterrupted services of the Ordinary Course Professionals are vital to the Debtors' continuing

operations and their ultimate ability to reorganize. More importantly, the cost of preparing and

prosecuting these retention applications and fee applications would be significant, and such costs

would be borne by the Debtors' estates.

80.     Moreover, I understand that a requirement that the Ordinary Course

Professionals each file retention pleadings and follow the usual fee application process required

of the Chapter 11 professionals would unnecessarily burden the Clerk's office, this Court and the

U.S. Trustee's office with unnecessary fee applications while significantly adding to the

administrative costs of these cases without any corresponding benefit to the Debtors' estates.

The motion proposes a procedure to alleviate such a burden.

## I.     Debtors' Motion for an Order Establishing Procedures for Interim Compensation Pursuant to Section 331 of the Bankruptcy Code

81.     The Debtors seek entry of an administrative order establishing procedures

for the payment of fees and reimbursement of expenses for case professionals retained pursuant

to Court order. The Debtors request that the Court exercise its discretion and allow monthly

compensation for professionals in these cases.

82.     Contemporaneously herewith, as discussed above, the Debtors have filed

an application to retain various professionals. With the likely involvement of professionals for a

statutory committee of unsecured creditors, the professional fee application and review process could be burdensome on the Debtors, the professionals, and the Court. Implementation of compensation procedures as set forth in the motion (the "Compensation Procedures") will provide an efficient structure for disbursing compensation to the professionals and will allow all parties to these cases to monitor the monthly accrual of compensation for each professional. The Debtors will include all payments made to professionals in accordance with the Compensation Procedures in their monthly operating reports identifying the amount paid to each of the professionals.

83.     The procedures requested in the motion will relieve the burden on the Court imposed by alternative interim compensation procedures that require monthly court orders, while preserving all rights of objection, enabling the parties to closely monitor costs of administration, and enabling professionals to maintain a level cash flow. Accordingly, the Debtors submit that approving the Compensation Procedures is in the best interests of their estates, creditors, and other parties-in-interest.

**J.      Motion of Debtors for Order Under 11 U.S.C. §§ 105, 363, 503(B), 1107 and 1108 Authorizing (I) Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Business Forms, (III) Continued Use of Existing Cash Management System, and (IV) Providing Administrative Priority Status to Postpetition Intercompany Claims and (V) Waiver of Section 345(b) Deposit and Investment Requirements**

84.     The Debtors' cash management system (the "Cash Management System") is an integrated network of bank accounts that facilitates the timely and efficient collection, management and disbursement of funds used by in the Debtors' business. Because of the nature

of the Debtors' business and the disruption to the business that would result if they were forced to close these accounts, it is critical that the existing Cash Management System remain in place.

85.     The Cash Management System consists of four bank accounts, each maintained at Wells Fargo Bank ("Wells Fargo") and referred to here as the "Sweep Account," the "Concentration Account," the "Disbursement Account," and the "Payroll Account." A diagram showing the role of each account in the Cash Management System is attached to the motion as Exhibit A. A description of each account appears in Exhibit B, attached thereto.

### The Sweep Account

86.     The Debtors derive all of their revenues from receipts on account of the sale of products to their customers through check, credit card, check and wire transfer payments. All these revenues are deposited daily into the Sweep Account. Each day, the Debtors' senior secured lender, Ableco Finance, sweeps all funds from the Sweep Account and credits the total against the outstanding balance under the Debtors' revolving loan facility with Ableco Finance (the "Revolver"). Ableco Finance then advance funds to the Debtors in accordance with the terms of the Revolver. On a daily basis, between $50,000 and $900,000 in revenues are deposited into the Sweep Account.

### The Concentration and Disbursement Accounts

87.     The Debtors make all disbursements to vendors and others from the Disbursement Account. Each business day, Wells Fargo advises the Debtors of the total amount due on account of checks drawn on the Disbursement Account and presented for payment the previous day (the "Check Presentment Requests"). On the same day, the Debtors inform Ableco Finance of the amount needed for that day's disbursements (the "Funding Request"), which

consists of the sum of the Check Presentment Requests plus any wire transfers that the Debtors intend to issue that day. In connection with Funding Request made to Ableco Finance, the Debtors also present Ableco Finance with a borrowing base certificate demonstrating sufficient borrowing availability under the Revolver to support the Funding Request. Ableco Finance then wires the amount of the Funding Request into the Concentration Account. Wells Fargo automatically transfers funds from the Concentration Account into the Disbursement Account as necessary to honor the previous day's checks and pay that day's wire transfers.

### The Payroll Account

88.     Prepetition, the Debtors used the Payroll Account to process payroll payments through November 2006, at which time, as discussed above, the Debtors entered into an agreement with Administaff, a "professional employer organization." Under that agreement, the Debtors outsourced to Administaff most human-relations functions, including payroll processing. Even with the outsourcing of the Debtors' payroll processing activities, the Debtors periodically issue checks drawn on the Payroll Account for certain payments to employees (such as for employees that are either separated or terminated prior to a regularly scheduled pay date) and that are not payable through the Debtor's agreement with Administaff.

89.     The Debtors seek a waiver of the United States Trustee's requirement that the Bank Accounts be closed and new postpetition bank accounts be opened at depositories authorized by the United States Trustee. If strictly enforced in this case, the United States Trustee's requirement would cause a severe disruption in the Debtors' activities and would impair the Debtors' ability to operate under chapter 11. The Debtors intend to promptly pursue the sale of substantially all of their assets to the Proposed Buyer or alternatively, to a party that

presents a higher and better offer for such assets. Therefore, this relief may only be required for a relatively short time to enable the Debtors' to consummate the proposed sale.

90.     Maintenance of the Bank Accounts will greatly facilitate the Debtors' operations in chapter 11. As noted on Exhibit A to the motion, all payments from the Debtors' customers are deposited into the Sweep Account, including payments made by check, credit card, or wire transfer. Checks and credit card payments are automatically deposited into the Sweep Account. Wire transfers from the Debtors' customers are already set up to deposit such transfers into the Sweep Account. If the Bank Accounts were closed, the Debtors would have to open new accounts and then attempt to arrange alternative payment procedures with each of their customers, which would completely disrupt the flow of the Debtors' receipt of sales revenues and the Debtors' payment of debts incurred postpetition. Such a disruption would severely impact and could irreparably harm the Debtors' ability to operate their business.

91.     To avoid disruptions and delays in the operation of the Debtors' business, the Debtors should be permitted to continue to maintain their existing Bank Accounts and, if necessary, to open new accounts or close unnecessary existing accounts.

92.     To guard against improper transfers resulting from the postpetition honoring of prepetition checks, banks may not honor checks drawn on the Debtors' accounts before the Petition Date, except upon limited court-approved exceptions. Subject to a prohibition against honoring prepetition checks or offsets without specific authorization from this Court, the Debtors request that they be authorized to maintain and continue the use of these accounts in the same manner and with the same account numbers, styles and document forms as those employed during the prepetition period.

93.     If the relief requested by the motion is granted, the Debtors will not pay, and each of their banks where the Bank Accounts are maintained will be instructed not to pay, any debts incurred before the Petition Date other than as specifically authorized by this Court.

94.     The Debtors' Cash Management System constitutes an essential business practice and was created and implemented by the management of the Debtors in the exercise of their business judgment. The widespread use of this particular Cash Management System, moreover, is attributable to the numerous benefits it provides, including the ability to (a) process and timely pay expenses; (b) allow a mechanism for deposits from sales revenues to pay down the Debtors' obligations under the Revolver; (c) ensure cash availability; (d) control and monitor corporate funds; and (e) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate balance and presentment information. In addition, preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that would inevitably be associated with a substantial disruption of the Cash Management System will facilitate and enhance the Debtors' efforts to continue to operate postpetition. Moreover, the Debtors submit that the relief requested is consistent with the relief provided to debtors in a number of other cases pending in this district.

95.     In order to change their existing business forms and checks, the Debtors must first redesign their corporate logo that displays the Debtors' name, to add "Debtor in Possession" label on their business forms (the "Business Forms"). Once a new form is designed, the Debtors' information technology department would then need to implement the modifications on the Debtors' computer systems. The Debtors estimate that this process will take up to six weeks to complete given the time involved in making these modifications, and

which would otherwise divert the efforts of those employees required to effectuate these changes from their current duties and responsibilities.

96.     In the ordinary course of the operation and maintenance of the Cash Management System, the Debtors incur routine bank charges and fees relating to the administration of the Cash Management System. By the motion, the Debtors seek authority, in their sole discretion, to pay any such routine prepetition banking fees owed to Wells Fargo.

97.     As described above, under the Cash Management System, funds generated by the business operations of each participating Debtor flow into various centrally-maintained Bank Accounts.

98.     Prior to the Petition Date, the Debtors, amongst themselves, engaged in intercompany financial transactions in the ordinary course of their businesses (collectively, the "Intercompany Transactions"). These Intercompany Transactions are recorded on the applicable Debtor's general ledger as an intercompany payable, receivable or loan. All of these Intercompany Transactions are made between and among certain Debtors in the ordinary course of the Debtors' business as part of their consolidated Cash Management System.

99.     At any given time, there may be balances due and owing from one Debtor to another Debtor and between certain of the Debtors. These balances represent extensions of intercompany credit made in the ordinary course of business that are an essential component of the Cash Management System. The Debtors maintain records of these transfers of cash and can ascertain, trace and account for these Intercompany Transactions. The Debtors, moreover, will continue to maintain such records, including records of all current intercompany accounts receivable and payable.

100. To ensure each individual debtor will not, at the expense of its creditors, fund the operations of another entity, the Debtors respectfully request that all intercompany claims against a debtor by another debtor arising after the Petition Date as a result of ordinary course intercompany transactions through the Cash Management System (collectively, "Intercompany Claims"), be accorded administrative priority expense status. If Intercompany Claims are accorded administrative priority expense status, each entity utilizing funds flowing through the Cash Management System should continue to bear ultimate repayment responsibility for such ordinary course transactions.

101. As explained in the motion, under the Cash Management System, each day all funds in the Sweep Account are swept automatically by Ableco Finance, and funds are deposited into the Concentration Account only in the amount necessary to pay each day's checks or wire transfers. In this case, therefore, because neither account will ever hold a substantial amount for an extended period, the risk of loss is minimal. Further, all of the Bank Accounts are maintained at Wells Fargo Bank, a federally insured institution. Moreover, the relief requested in the motion is expected to be only for a short period of time in order to allow the Debtors to expeditiously pursue the sale of their assets to a purchaser.

102. For the foregoing reasons, it is critical that the Debtors continue to utilize their existing Cash Management System and continue to use their existing Business Forms as set forth herein, without disruption. Accordingly, approval of the Debtors' centralized Cash Management System in its current form is appropriate and in the best interest of the Debtors and their estates. Accordingly, I believe it is appropriate and in the best interests of the Debtors and their estates for the Court to grant the motion.

**K.** **Motion of the Debtors Pursuant to Bankruptcy Code Sections 105(a), 363 and 507(a) for an Order Authorizing the Debtors, in Their Discretion, to (I) Fund Administaff Companies II, L.P. to Pay Certain Prepetition Employee Wages, Benefits and Other Compensation Pursuant to the Parties' Agreement; (II) Transfer Employee Contributions to GMG's 401(k) Plan; (III) Maintain Other Employee Benefits Programs and Pay Related Obligations; (IV) Pay Contractors and Employment Agencies; and (V) Authorize the Debtors' Banks and Other Financial Institutions to Receive, Process, Honor and Pay Certain Checks Presented for Payment and to Honor Certain Fund Transfer Requests**

103.    As discussed above, GMG currently employs approximately 207 employees (the "Employees"). None of the other Debtors has any employees. The Debtors are not party to any collective bargaining agreements.

104.    Starting in November 2006, GMG outsourced most routine Human Relations functions, previously performed by its in-house HR department, by entering into an agreement (the "Administaff Agreement") with Administaff. Under the Administaff Agreement, GMG and Administaff are "co-employers" of the Employees. In short, Administaff administers GMG's payroll, and GMG Employees participate in benefit plans, including medical insurance, that are available to all of Administaff's clients. In addition, Administaff provides workers compensation and employment practices liability insurance ("EPLI") to GMG. As discussed further below, GMG pays Administaff a fee for these services, which includes reimbursement to Administaff for payments made by Administaff directly to Employees and for Employee benefits.

105.    In addition to the Employees, GMG currently utilizes the service of several independent contractors (collectively, "Contractors" and together with the Employees, the "Workforce"), who are employed for both short and long term assignments. GMG pays the Contractors directly, not through Administaff. Typically, Contractors submit invoices to GMG

at or shortly after the end of the week or month and are paid in arrears, usually in the week after the invoice is submitted. At present, the Contractors include (i) GMG's acting Vice-President of Human Services, who bills his services on an hourly basis, (ii) GMG's acting General Counsel, an attorney who submits invoices as a contractor and receives a fixed monthly rate, and (iii) two outside consultants assisting with organizing GMG's participation at annual industry events.

106.    Further, the Debtors use two employment agencies, Act 1 Personnel Services ("Act 1") and Spherion (together with Act 1, the "Employment Agencies"), to provide a handful of temporary workers. Shortly prior to the Petition Date and currently, Act 1 has provided the services of one worker, and Spherion provides approximately 3-5 warehouse workers for the Debtors' Harrisburg facility. Act 1's weekly billing is approximately $728 per week, depending on the hours worked and overtime. Act 1 is paid in arrears and the current amounts owing may total approximately $6,050. Spherion's weekly billing is $1,500-$2,000 depending on the number of workers used. The current billed and unpaid amounts owed to Spherion may total approximately $16,500.

107.    To minimize the personal hardship that the Employees and Contractors will suffer if pre-petition Workforce-related obligations are not paid when due, to maintain Workforce morale during this critical time, and to ensure the continued timely receipt of Administaff's and the Employment Agencies' services, the Debtors seek authority, in their discretion and in accordance with past practice: (a) to advance to Administaff the amount of its Total Service Fee (as defined below), as the Debtors' ordinary prepayment for the full amount of the next payroll (including amounts due on account of prepetition wages, salaries, commissions, incentive pay, Employee benefits and other compensation), and to pay Contractors any

prepetition fees and other compensation (collectively, "Compensation"); (b) to transfer to GMG's 401(k) plan administrator all Employee contributions, including amounts withheld from wages attributable to prepetition services and which are not estate property; (c) to maintain and honor other Employee benefits programs and policies, including vacation and paid-time-off policies (collectively, "Benefits"), and pay any Benefits-related obligations to the extent described herein; (d) to pay in the ordinary course, any prepetition amounts owed to the Employment Agencies, subject to the cap set forth herein; (e) to reimburse certain business expenses incurred prepetition by Employees or Contractors in the ordinary course; and (f) to authorize the Debtors' banks and other financial institutions to receive, process, honor and pay certain checks presented for payment and to honor certain fund transfer requests related to any of the foregoing; provided, however, that the payment of any such obligations or other payments pursuant to this motion shall be in accordance with the terms and limitations imposed by any interim or final order authorizing the Debtors to incur postpetition financing and/or authorizing the use of the cash collateral of their pre or postpetition lenders, as well as any limitations that may be imposed pursuant to any budget approved by any such interim or final orders. Preceding items (a) through (d) are referred to herein collectively as the "Workforce Compensation and Benefits" and are described in detail below.

108.    As discussed below, the relief requested is needed to avoid immediate and irreparable harm to the Debtors and their operations and assets, is critical to the continued administration of these cases until a sale of substantially all of the Debtors' assets is approved and implemented, and is in the best interest of the Debtors and their estates. Generally as to Compensation and Benefits administered by Administaff, GMG does not have the internal

resources necessary to administer Employee payroll and such Benefits and does not believe that, on short notice, it can replace, if necessary, the services provided by Administaff. If Administaff sought to terminate the Administaff Agreement or delayed its processing of payroll and administration of the Benefits discussed herein, the impact on GMG – including possibly the delay in and cost of obtaining a new provider like Administaff (if necessary) or otherwise litigating any disputes with Administaff, the devastating effect on Employee morale (given the potential harm and prejudice to them) if payment of payroll and the other Benefits were to be delayed to any extent, and the significant disruption and diversion of the Debtors' attention and resources – would devastate the prospects of the Debtors in preserving the value of their assets and successfully consummating a sale thereof. Likewise, as to matters administered directly by GMG, any failure to honor the Workforce Compensation and Benefits or any delay in paying or honoring these items, will adversely affect Workforce moral and the Workforce's willingness to continue to provide important services to GMG, putting at risk the Debtors' efforts in these cases.

### Employees' Wages and Other Compensation and the Administaff Process

109. Employees receive payroll payments every other Friday. Each payment is on account of the two-week period ending the preceding Friday. Early in the week before each payday, Administaff determines the amount due, in wages and salary, for that pay period, by accessing GMG's timekeeping system electronically. At the same time, GMG advises Administaff of any non-recurring or variable amounts earned by Employees during that pay period, e.g., commissions or incentive payments. On the Wednesday before each payday, Administaff delivers a detailed invoice (the "Invoice") to GMG, setting forth the "Total Service

Fee" owed to Administaff for the applicable pay period. The calculation of the Total Service Fee is discussed below. GMG audits the Invoice, confirms its accuracy, and prepays the Total Service Fee by direct debit. On the Thursday before each payday, Administaff sends checks, drawn on an Administaff account, to GMG by overnight mail, for distribution on Friday (payday) to GMG Employees who are paid by check, and on Friday, Administaff causes direct payroll deposits to be made into the bank accounts of Employees receiving direct deposits.

110. The payroll checks and direct deposits are net of all applicable withholdings for taxes and other withholdings such as garnishment and child support, (collectively, "Withholding Obligations"). Administaff is responsible for withholding and paying all applicable federal and state taxes (collectively, "Employee Related Taxes") and the other Withholding Obligations (excluding the 401(k) Obligations, discussed below).

111. Administaff's Total Service Fee is calculated as follows. For each pay period, Administaff determines the gross pay due to each Employee. Administaff then increases that amount by an amount (the "Administaff Service Fee Percentage") determined by multiplying the Employee's gross pay by a percentage, calculated for each Employee and determined, in part, by the Employee's tax bracket, the benefits selected by the Employee (such as health insurance), and other factors. The Total Service Fee equals the sum of all the amounts so determined for all Employees receiving payments in that pay period. In short, the Total Service Fee equals the aggregate gross payroll plus the aggregate Administaff Service Fee Percentage for all Employees. The Administaff Service Fee Percentage is intended (i) to reimburse Administaff for the cost of Employee benefits and premiums for workers' compensation and EPLI insurance provided to GMG, and (ii) to compensate Administaff for its

services. It also includes an amount for employer payroll taxes to be paid to the appropriate taxing authorities. As discussed further herein, a portion of Administaff's bi-weekly Invoice (as defined herein)) is to fund the Employee payroll and *de minimis* car allowance amounts for four Employees. GMG believes that it likely realizes net savings by eliminating the cost of carrying its own workers' compensation and EPLI coverage and reducing its in-house HR department, and benefits from avoiding the administrative and other burdens associated with implementing a large HR department and internally handling all Compensation and Benefits matters.

112.    As noted above, on the Thursday before each payday, Administaff makes a direct debit from GMG's Disbursement Account in the amount of the Total Service Fee (less any appropriate credits or other adjustments). By making this direct debit on the day before each payday, Administaff receives prepayment for the reimbursement and fees to which it is entitled with respect to that payroll.

113.    For the most recent pay period, covering the two-week period ended January 18, 2008 and paid out on January 25, 2008, the Debtors' total gross payroll was approximately $340,000 and the Total Service Fee charged by Administaff for that period was approximately $431,000. Thus, the amount payable to Administaff to purchase the Employees' medical and other benefits, to cover premiums for the Debtors' workers' compensation and EPLI insurance, to cover employer payroll taxes, and to pay Administaff for its services was approximately $91,000 ($431,000 less $340,000). Based on information provided by Administaff with respect to a previous payroll, GMG estimates that of the $91,000, approximately 40% was for Social Security, Medicare, and federal and state unemployment taxes, approximately 8.5% was for workers' compensation insurance premiums and related

charges, approximately 29% was for Employee medical benefits, and the balance (approximately 22.5%) was for Adminstaff's services, HR infrastructure and other benefits. Because of certain deductions for 401(k) withholdings (which, as discussed below, GMG itself remits to the 401(k) plan administrator) and other adjustments, the net amount actually debited by Administaff was approximately $415,000.

<u>Employee Benefits and Insurance</u>

114.    Employees who have been employed at least 90 days, including part-time Employees who work at least 30 hours per week, may select from various benefit plans available through Administaff, including several medical, vision and dental plans, life and accidental death and dismemberment (AD&D) insurance, long- and short-term disability insurance, and other standard benefit plans, offered by various providers.

115.    With regard to health insurance, Administaff offers a selection of options to eligible Employees. For example, Employees in California may select from health maintenance organizations (HMOs) offered by providers such as PacifiCare, Kaiser, and Blue Shield, and indemnity plans offered by United Healthcare. Similar options are available for Employee in other states.

116.    Optional dental and vision insurance is offered by, respectively, by two national providers, United Healthcare and Vision Service Plan. Each plan has a deductible and various reimbursement rates, depending on whether the Employee obtains services from an in-network or out-of-network provider.

117.    Administaff offers other benefits plans to Employees, including the opportunity to contribute to a Section 529 College Savings Plan administered by Administaff, an

Adoption Assistance program which provides reimbursement for certain covered adoption expenses, and a commuter benefits program, under which Employees may pay certain eligible commuting expenses with pre-tax dollars.

118.    Administaff also administers benefits under the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), for terminated Employees who elect to receive COBRA benefits.

119.    Other than the Total Service Fee described above, GMG makes no additional payments with respect to the health insurance, dental and vision insurance, and other benefit plans discussed above.

120.    Administaff administers flexible spending accounts ("FSAs") that enable Employees to have funds withheld from their pay on a pre-tax basis to pay for eligible medical and dependent-care costs.

121.    Finally, Administaff provides workers' compensation and EPLI insurance to GMG.  GMG obtains this coverage as part of a pool including other Administaff clients, resulting in substantial cost savings.  The cost for this coverage is included in the Total Service Fee paid to Administaff, as described above.

122.    By the motion, the Debtors seek authorization to permit Administaff to direct debit from GMG's Disbursement Account the Total Service Fee due in connection with GMG's next regularly scheduled payday.  The next payday is Friday, February 8, 2008 and the direct debit is expected to occur on February 6 or 7, 2008.  That payroll will cover payment for the services for the period from Saturday, January 19 (a non-business day) to Friday, February 1. Because of the timing of the commencement of these cases, the next payroll will include

payment for 5 working days (a total of 9 calendar days) of prepetition services from the period Saturday, January 19, 2008 to Sunday, January 27, 2008. While the amounts owed for this payroll period are expected to be generally in line with the most recent prior funding, there will likely be an increase due to more commissions being owed to sales Employees and/or other factors. GMG estimates that the net amount actually debited by Administaff will be no more than $475,000 (as compared to the $415,000 net debit discussed above). Given the timing of the bankruptcy filing, on a strict *pro rata* basis, the Debtors estimate that approximately 80% of this amount (up to approximately $380,000) will relate to the prepetition period. The Debtors do not believe that any Employee will be owed, as of the Petition Date, more than $10,950 on account of prepetition, accrued and unpaid wages, commissions and bonuses, excluding accrued prepetition vacation pay which the Debtors do not seek authority by the motion to cash-out at this point.

123.    As explained below, if Administaff is not permitted to make this direct debit, GMG's Employees will not receive their salary and wages on time, with a potentially disastrous effect on Employee morale and productivity. In addition, Administaff may assert that GMG is in breach of the Admnistaff Agreement, potentially jeopardizing GMG's ability to obtain continued payroll and benefit administrative services from Administaff and potentially interrupting continued workers' compensation and EPLI insurance.

Paid Time Off

124.    GMG offers paid time off ("PTO") to full-time Employees, who have completed at least 90 calendar days of employment, for: (i) holidays; (ii) sick leave; (iii) vacation time; (iv) bereavement leave; and (v) jury duty.

125.     With respect to vacation pay, Employees earn vacation time weekly and can carry over or accrue up to 175% of their annual permitted vacation time to the next year. Prepetition, Employees terminated as the result of a reduction in force were entitled to a cash payment (from Administaff) for accrued vacation pay. Prepetition, GMG also paid accrued vacation pay to (i) Employees who were terminated for cause, in those states where such payment is required by law, and (ii) Employees in California who voluntarily left GMG (resigning Employees in other states did not receive accrued vacation pay). Prepetition, if a resigning or terminated Employee was entitled to vacation pay, Administaff would remit the appropriate check to the Employee, and immediately debit GMG's Disbursement Account for the amount of the check and corresponding Administaff Service Fee Percentage. GMG's practice did not include paying other accrued PTO, other than accrued vacation pay, to resigning or terminated Employees as noted. The Debtors estimate that, as of January 11, 2008, the total accrued vacation pay for all Employees was approximately $334,000.

126.     The Debtors seek authority to honor their existing PTO policies solely to permit continuing Employees to use their prepetition accrued PTO in the ordinary course of business. The Debtors do not, at this time, seek authority to pay any claims for accrued prepetition PTO.

Business Expense Reimbursement

127.     GMG reimburses both Employees and Contractors for pre-approved business-related expenses incurred in the ordinary course of business, such as travel, meals, tools, supplies, and relocation expenses. GMG makes these payments directly from its Disbursement Account, not though Administaff.

128.    Employees are required to submit expense reports during the first week in the month after the month in which expenses are accrued. They submit their reports to their supervisors, who review and, if approved, forward them to GMG's Accounts Payable for payment by GMG. Generally, expense-reimbursement payments are made in the week after submission.

129.    GMG estimates that current outstanding reimbursable Employee expenses do not exceed $20,000. By this motion, GMG seeks authorization to reimburse these expenses, in the aggregate not to exceed that amount, in the ordinary course of business.

### 401k Plan

130.    GMG Employees may participate in a 401(k) retirement plan (the "401(k) Plan"), administered by The Principal Financial Group ("Principal"). For each pay period, Administaff records the amount to be withheld from the salary or wages of all participating Employees and deducts that aggregate amount from the Total Service Fee. Thus, GMG retains the aggregate amount of Employee contributions and, on each payday, promptly remits that amount to Principal. GMG does not make any matching or other contribution to the 401(k) Plan. GMG estimates that, on the next payday, approximately $17,000 in 401(k) Plan contributions will need to be remitted to Principal. Given the timing of the bankruptcy filing, on a strict *pro rata* basis, the Debtors estimate that approximately 80% of that amount may be attributable to prepetition services.

131.    GMG requests authority to maintain the 401(k) Plan and to pay to Principal the full amount of Employee contributions due on the next payday. The 401(k) contributions constitute funds withheld from the contributing Employees' salaries or wages, and

any failure by GMG to properly remit in full and in a timely manner these monies that do not belong to the estate would severely prejudice Employees and harm the morale of the Workforce.

132.     Further, GMG is responsible for audits of the 401(k) Plan, and it is expected that next year that GMG will have an audit completed of prior year(s), including the fiscal year ended January 31, 2007. Out of an abundance of caution, while no audit is yet underway, GMG seeks authority to pay, in its sole discretion, any prepetition audit fees and to pay any postpetition audit fees in the ordinary course of business. GMG estimates that each audit of a prior year may cost approximately $20,000.

<u>Tuition Reimbursement Program</u>

133.     Under GMG's educational assistance program (the "Tuition Reimbursement Program"), GMG will reimburse Employees with at least 12 months of service for expenses incurred in connection with pre-approved outside education, including tuition, books, transportation, and other similar expenses, in an amount up to $5,250/year per Employee. The reimbursement is made after the Employee has satisfactorily completed the course. GMG makes these payments directly from the Disbursement Account, not through Administaff.

134.     At present, GMG does not believe it owes any amounts on account of prepetition tuition reimbursement obligations. But at least one Employee has enrolled in a pre-approved degree program for the Spring 2008 semester and, assuming satisfactory completion, will be entitled to reimbursement at the end of the semester. Accordingly, out of an abundance of caution, the Debtors seek authority to pay in their discretion any prepetition amounts (if and to the extent that they may constitute prepetition claims) that may become payable under the Tuition Reimbursement Program, up to a maximum payout of $5,250. Further, the Debtors seek

authority to continue, in their sole discretion, the Tuition Reimbursement Program in the ordinary course.

### Payment of Wages and Salaries Through Administaff

135.     The Debtors' Employees and Contractors are critical assets necessary to both the Debtors' operations and the successful prosecution and administration of these chapter 11 cases. Additionally, I am informed and the Debtors believe that all or virtually all unpaid wages and other compensation that the Debtors seek to pay in this motion are entitled to priority status under the Bankruptcy Code and individually do not exceed $10,950.

136.     Some GMG Employees live from paycheck to paycheck, rely exclusively on receiving their full compensation or reimbursement of their expenses to pay their living expenses, and may suffer significant financial hardship if the Debtors are not permitted to pay their Compensation in full, when due.

137.     As explained above, all Employees receive their salaries, wages, and other payments from Administaff. GMG prepays Administaff by permitting Administaff to direct debit the amount of its invoice – the Total Service Fee – from GMG's Disbursement Account on the day before payday. If Administaff is not permitted to make this direct debit, GMG's Employee will not receive their wages and salaries timely.

138.     GMG does not have the internal resources necessary to administer payroll and benefits and does not believe that, on short notice, it can replace the services provided by Administaff. If Administaff sought to terminate the Administaff Agreement, the effect on GMG – including potentially the cost of finding a new provider, the effect on Employee morale of delayed or inaccurately calculated payrolls, the threat of interrupted benefits, the risk to workers'

compensation and EPLI coverage, and the enormous disruption and diversion of management attention and resources – would be disastrous.

139.    Under these circumstances, GMG believes that permitting Administaff to make a direct debit in the full amount of its Total Service Fee, inclusive of any prepetition accrued amounts, in connection with the next payroll is necessary to avoid immediate and irreparable harm to, and is in the best interest of, the Debtors and their estates.

Contractors

140.    GMG pays its Contractors the amount of their invoices, as submitted, with checks drawn on GMG's Disbursement Account. The Contractors are not paid through Administaff. GMG believes that, as of the Petition Date, it is current on all amounts owed to Contractors, but it is possible that some amounts may be owing to Contractors on account of unsubmitted invoices for prepetition services or expenses. If so, GMG seeks authorization to pay no more than an aggregate of $10,000 to its Contractors on account of such services or expenses. The Contractors have substantial institutional knowledge of GMG's operations and perform a variety of essential functions – including HR and legal services, services in connection with the production of GMG's new 2008 catalog, and other marketing services. A failure to pay them timely for all services performed may adversely affect their morale and willingness to continue to provide these essential services to GMG.

Commissions and Incentive Pay

141.    The Debtors also seek to pay Employees sales commissions and non-insider incentive pay. Approximately 89 of GMG's Employees are in sales, and approximately 50 of these Employees receive a portion of their compensation in sales commissions. For the

two-week pay period ended January 18, 2008, approximately $42,000 in sales commissions was paid to GMG Employees. Additionally, some non-executive Employees at GMG's warehouse facilities are eligible for incentive pay, based on meeting performance targets. These incentive payments are typically small amounts – often $5-$50 per employee. For the two-week pay period ended January 18, 2008, approximately $1,500 in such incentive pay was paid to GMG Employees.

142.    Virtually all of GMG's revenues derive from sales generated by its sales force, based, in part on relationships between GMG's sales Employees and customers. The continuing efforts of GMG's sales staff are critical to preserving the value of the Debtors' business and the estates. Commissions constitute a significant portion of sales Employees' overall compensation and are directly related to the sales that they generate on the Debtors' behalf. Incentive pay is payable solely to non-executive warehouse Employees and is earned by meeting specified performance targets. Although the amounts are small – often ranging from $5-50 per employee per pay period – they are important to the Employees who earn them. GMG believes that the prompt, timely payment of these small incentive bonuses will encourage eligible warehouse Employees to continue to meet these important performance targets.

143.    Accordingly, the Debtors believe that the payment of commissions and incentive bonuses earned prepetition is proper and required to avoid immediate harm to, and is in the best interest of, the estates. The Debtors seek authority to make such payments in the ordinary course up to a maximum aggregate amount of $50,000 in prepetition commissions and bonuses, and to continue paying such commissions and bonuses in their discretion and in the ordinary course of business.

## Withholding Obligations

144. The Withholding Obligations, which I am advised do not constitute property of the Debtors' estates, principally represent employee earnings that governments (in the case of taxes), Employees (in the case of voluntary Withholding Obligations), and judicial authorities (in the case of involuntary Withholding Obligations), have designated for deduction from Employee paychecks.[9] The failure to withhold these amounts and transfer them as required may cause hardship to Employees and others (for example, if garnished amounts for alimony or child support are not timely paid). I understand that these amounts are not property of the estate – they have been withheld from Employees' paychecks and should be transferred promptly.

145. Further, the Debtors submit that with respect to the Employee Related Taxes that constitute "trust fund" taxes, the payment of such taxes by Administaff to the appropriate governmental authorities,[10] with funds advanced by the Debtors, will not prejudice other creditors because I am informed that the relevant taxing authorities would have a priority claim under bankruptcy law for those amounts.

### Expense Reimbursement, PTO, and Tuition Reimbursement Plan Payments

146. The Debtors seek authorization to rcimburse all approved Employee expenses, including prepetition expenses in an aggregate amount up to $20,000, to honor their existing PTO policies solely to permit continuing Employees to use their prepetition accrued

---

[9] As discussed above, under the Administaff Agreement, Administaff collects and pays all amounts related to Withholding Obligations, with funds advanced by the Debtors.

[10] Administaff is responsible for the payment of all applicable federal and state taxes after funding by the Debtors.

PTO in the ordinary course of business, and to make Tuition Reimbursement Plan payments up to a cap of $5,250, all in accordance with past practice.

147.    Employees would be understandably aggrieved if they had to cover approved business expenses. Similarly, knowing that the Debtors will honor PTO accruals, including prepetition vacation and sick pay accruals, will eliminate a possible source of Employee concern. The anticipated Tuition Reimbursement Plan payments are small but provide a benefit to the Debtors, by rewarding Employee initiative and helping retain motivated and valuable Employees. Accordingly, the Court should authorize the Debtors to make these payments and honor their policies in accordance with past practice and in their discretion.

148.    GMG's Employees and Contractors have an intimate knowledge of the operation of the Debtors' businesses and are critical components to the administration and prosecution of the Debtors' chapter 11 cases. Without doubt, any deterioration in the morale and welfare of the Debtors' Workforce at this critical time would adversely affect the Debtors and their ability to maximize the value of their assets for the benefit of all creditors.

<u>Other Employee Benefits</u>

149.    As detailed above, GMG, through Administaff or directly, offers various other Benefits to the Employees. The Debtors seek to continue to honor the Benefits as described in the motion and to pay all expenses incurred in connection therewith, including prepetition expenses associated with the Benefits. The Debtors believe that if they are unable to honor accrued Benefits or if there is any delay, Employee morale and loyalty will be jeopardized at a time when Employee support is absolutely critical. The Debtors believe that any uncertainty

or delay will cause significant anxiety at the moment the Debtors need the Employees to perform their jobs at peak efficiency.

<u>Employment Agencies</u>

150.    The Debtors also seek authorization to pay, in their discretion, prepetition amounts owed to the Employment Agencies, Act 1 and Spherion, up to an aggregate cap of $22,550.  As discussed above, these Employment Agencies provide approximately 4-6 workers to the Debtors, which workers GMG values and provide benefit to GMG's operations.  If the prepetition amounts are not paid in the ordinary course to the Employment Agencies, GMG is concerned that these parties may cease to provide these workers and other services to GMG, given there are no written long-term agreements.  Regularly, GMG needs temporary workers to assist in its operations, and these workers furnished by Act 1 and Spherion are familiar with GMG's operations and provide services that GMG wishes to retain.  Moreover, the Employees who work with such persons view and treat them as part of the workforce, and termination of these workers may have an adverse effect on Employee morale.  Accordingly, in order to ensure uninterrupted services from these parties for the benefit of GMG, GMG believes that the requested relief is justified and should be granted.

151.    Based on all of the foregoing, I believe that the granting of the motion is critical to the Debtors' efforts to preserve and maximize value for creditors and is in the best interest of the Debtors and their estates.

**L.      Motion for Entry of an Order Pursuant to Sections 105(a), 363(c), 1107(a), and 1108 of the Bankruptcy Code Authorizing the Debtors to Honor Prepetition Obligations to Customers and to Otherwise Continue Customer Practices and Programs in the <u>Ordinary Course of Business</u>**

152.      Prior to the Petition Date, and in the ordinary course of their businesses,

the Debtors engaged in certain practices to maximize sales, engender customer loyalty, and

develop and sustain brand loyalty and a positive reputation in the marketplace. These practices

include, but are not limited to, the issuance of gift certificates redeemable for the Debtors'

products (the "Gift Certificate Program"), and warranties issued for certain of the Debtors'

products (the "Warranty Program" and, together with the Gift Certificate Program, the

"Customer Programs"). The Customer Programs are designed to create incentives for continuing

and increased sales to the Debtors' customers and are typical of the programs implemented by

distribution companies such as the Debtors. The common goals of the Customer Programs are to

meet competitive pressures, ensure customer satisfaction, and generate brand loyalty and

goodwill for the Debtors, thereby retaining current customers, attracting new ones, and

ultimately enhancing net revenue.

153.      During the postpetition period, the Debtors need to continue those

Customer Programs to preserve critical business relationships, customer loyalty, and goodwill

for the benefit of their estates. As discussed herein, it is in the best interests of the Debtors, their

estates and creditors, to honor, in the Debtors' discretion, their prepetition obligations under the

Customer Programs, and to continue the Customer Programs in the ordinary course of business.

As discussed above, the Debtors intend to promptly effectuate the sale of substantially all of their

assets pursuant to the highest and best offer received therefor. Thus, it is critical the Debtors maintain customer loyalty during this process pending completion of the proposed sale.

154.    The following describe the Debtors' Customer Programs:[11]

## Gift Certificate Program

155.    Although the Debtors do not sell their products directly to end-user customers, the Debtors do issue gift certificates that are redeemable by end-user customers at any authorized dealer of the Debtors' products. The Debtors may issue a gift certificate to a dissatisfied retail customer to resolve a dispute or to permit the customer to obtain a replacement or substitute product. The Debtors also may issue gift certificates to retail dealers for distribution to end-user customers in connection with a particular promotional or sales event.

156.    In each case, the end-user customer redeems the gift certificate at the location of one of the Debtors' authorized dealers. When the dealer reports to the Debtors that a gift certificate has been redeemed, the Debtors give the dealer a credit for the dollar amount of the redeemed certificate. The retail dealer can use the credit to purchase products from the Debtors' catalog at standard wholesale prices. As of the Petition Date, the Debtors estimate that there were approximately $170,000 in outstanding gift certificates issued under the Gift Certificate Program.

## Warranty Programs

---

[11]    In addition to the Customer Programs described herein, the Debtors, in the ordinary course of business, offer volume discounts to one or more of their customers who order large quantities of the Debtors' products. No prepetition amounts are owed under this program and the Debtors seek authority, solely out of an abundance of caution and in their sole discretion, to continue this program postpetition.

157.     The Debtors' Warranty Program is comprised of two types of programs: (i) a warranty program with respect to engines and to transmissions sold by the Debtors (the "Engine and Transmission Warranty Programs") and (ii) a warranty program pursuant to which the Debtors repair or replace certain other allegedly defective products not covered under the Engine and Transmission Programs, including tires, wheels, frames and headgear, among other products (the "Other Product Warranty Program"). The Debtors estimate that they incur approximately $400,000 annually in expenses incurred in honoring Warranty Programs.

158.     The Engine and Transmission Warranty Programs. The Debtors maintain their Engine and Transmission Warranty Program for the benefit of their end-user customers. The term of the warranty varies with respect to engines, but most are for three years after the date of the purchase, or 30,000 miles, whichever occurs first. The end-user customer seeking warranty service must take the engine to the retailer, who then contacts the Debtors. If the Debtors and the retailer agree that the engine and alleged defect are subject to the warranty, the engine is returned to the Debtors for replacement for repair or replacement. During the first eighteen months of the warranty period, the Debtors reimburse the retailer for the cost of shipping, labor, removal and reinstallation of the engines (the "Removal and Shipping Costs"). After the expiration of eighteen months from the sale of the motorcycle, the retail customer is then responsible for Removal and Shipping Costs. The Debtors also authorize and reimburse selected dealers to perform the warranty and repairs described above. In addition, GMG warrants its proprietary RevTech brand transmissions to be free of manufacturing defect for five years or 50,000 miles, whichever occurs first. During the first year of the warranty period, GMG

will cover the shipping and labor (removal and reinstallation) costs. Finally, GMG also warrants for a period of one year its gear sets that are sold and used for transmission parts.

159. <u>Other Product Warranty Programs</u>. In addition to the Engine and Transmission Warranty Program, the Debtors maintain their Other Product Warranty Program.[12] With respect to defective products covered under the Other Product Warranty Program, other than chromed products, the Debtors repair or replace any allegedly defective product purchased within one year of the date of sale. For chromed products covered under the Other Product Warranty Program, such as certain types of wheels or exhaust products, the Debtors may either repair or alternatively replace any allegedly defective product purchased within six months from the date of sale. In all cases, the Debtors will not repair or replace any products that, in the Debtors' sole determination, have been damaged due to misuse or improper maintenance. The Debtors believe that the Other Product Warranty Program is consistent with similar programs in their industry and is necessary to attract and retain customers and to preserve the value of their business as a going concern.

160. The Debtors strongly believe that the continuation of the Customer Programs is imperative to their business and that the Debtors' failure to honor their obligations under the Customer Programs would have a disastrous impact upon customer loyalty and goodwill. The loyalty and continued patronage of the Debtors' customers is critical to the Debtors' goal of maximizing the value of their estates.

---

[12] The Debtors also voluntarily assist purchasers of certain products manufactured and sold by the Debtors on behalf of third party motorcycle sellers with respect to any applicable warranty coverage offered by such sellers. However, no cash is expended in connection with this assistance and, therefore, no prepetition amounts are owed under this program.

161. Further, the Debtors submit that the relief requested herein represents a sound exercise of the Debtors' business judgment. If the Debtors cannot maintain their Customer Programs and honor prepetition obligations in connection therewith and consistent with their past business practices, customers will likely lose confidence in the Debtors, thereby impairing the Debtors' ability to maintain their business operations for the benefit of their creditors. The Debtors' failure to honor the Customer Programs would significantly disadvantage the Debtors in the marketplace in which such programs are commonplace. At this critical juncture, the Debtors simply cannot risk any loss of customer confidence as a result of the Debtors' failure to honor prepetition obligations to customers or discontinuing their Customer Programs. The relief requested herein will protect the Debtors' goodwill during this critical time as the Debtors are attempting to expeditiously sell substantially of their assets. Consequently, the Debtors' estates and creditors will benefit if the requested relief is granted.

162. Accordingly, the Debtors request that they be authorized, in their business judgment and at their discretion, to (a) perform and honor their prepetition obligations under the Customer Programs as they deem appropriate, and (b) continue, renew, replace, implement new and terminate such of the Customer Programs as they deem appropriate, in the ordinary course of business, without further application to the Court, provided, however that the payment of any such obligations or payments pursuant to the motion shall be in accordance with the terms and limitations imposed by any interim or final order authorizing the Debtors to incur postpetition financing and/or authorizing the use of the cash collateral of their pre or postpetition lenders, as well as any limitations that may be imposed pursuant to any budget approved by any such interim or final orders. Any delay in the relief sought indeed, even being forced to advise

customers that further judicial relief is necessary, could result in the Debtors' losing a substantial portion of their customer base, diminish the value of their assets, and severely harm their prospects for a successful reorganization.

**M.** **Motion of the Debtors for an Order (i) Authorizing the Debtors to Pay Prepetition Sales and Use and Similar Sales Taxes and Regulatory Fees in the Ordinary Course of Business and (ii) Authorizing Banks and Financial Institutions to Honor and Process Checks and Transfers Related Thereto**

163. By this motion, the Debtors seek authority to pay, in their sole discretion, prepetition Sales Taxes and Regulatory Fees (as defined below) owed to the Taxing and Regulatory Authorities (as defined below), including, without limitation, Sales Taxes and Regulatory Fees subsequently determined upon audit to be owed for periods prior to the Petition Date, in an aggregate amount (excluding amounts paid prepetition by checks that have not yet cleared on the Petition Date) not to exceed $15,000, which is the aggregate maximum sum that the Debtors currently believe may be due on account of prepetition Sales Taxes and Regulatory Fees.

164. In addition, to the extent any check issued or electronic transfer initiated prior to the Petition Date to satisfy any prepetition obligation on account of Sales Taxes or Regulatory Fees has not cleared the applicable banks or financial institutions (the "Banks") as of the Petition Date, the Debtors request the Court to authorize the applicable Banks, when requested by the Debtors in their sole discretion, to receive, process, honor, and pay such checks or electronic transfers initiated prior to the Petition date, provided that there are sufficient funds available in the applicable accounts to make such payments. The Debtors also seek authorization to issue replacement checks, or to provide for other means of payment to the Taxing and

Regulatory Authorities, to the extent necessary to pay such Sales Taxes and Regulatory Fees outstanding and owing for periods prior to the Petition Date.

165.    In connection with the normal operation of their business, the Debtors pay an assortment of sales and use, and similar types of taxes (the "Sales Taxes") to various federal, state, and local taxing authorities (collectively, the "Taxing Authorities") and pay various business license fees and taxes, business and occupation taxes, and regulatory fees (together, the "Regulatory Fees") to federal, state, and local regulatory authorities (collectively, the "Regulatory Authorities," and together with the Taxing Authorities, the "Taxing and Regulatory Authorities"), Sales Taxes and Regulatory Fees include, without limitation, the following:

166.    <u>Sales and Use Taxes</u>:  In the normal course of their business, the Debtors collect and remit or otherwise pay Sales Taxes to the Taxing Authorities.  The Debtors may incur sales tax obligations when they purchase certain items which may not be subject to sales tax in the state of origin, but are subject to sales tax in the state where the item is shipped.  For example, the Debtors may place an order for office supplies with a vendor in State A and request that the supplies be delivered to the Debtors' location in State B.  Supplies are not subject to sales tax in State A, the vendor's home state, but are subject to sales tax in State B, the Debtors' state.  In such cases, the vendor does not collect the sales tax.  Instead, the Debtors would be required to pay the sales tax, and the Debtors remit the sales tax to State B.  Sales Taxes are paid in the ordinary course of the Debtors' business and are calculated based upon statutorily mandated percentages.

167.    In addition, the Debtors incur Sales Taxes from the sale of their products to their employees and from the conversion of certain inventory for use by the Debtors

themselves, such as goods consumed in research and development tests conducted by the Debtors. Generally, the Debtors remit the Sales Taxes quarterly to the applicable Taxing Authorities. Such Sales Taxes could include both amounts not yet due and amounts paid by checks sent prior to the Petition Date that have not cleared the Debtors' bank accounts on the Petition Date, though the Debtors are not aware of any such checks that have not cleared. The Debtors estimate that current unpaid prepetition Sales Tax amounts total no more than $10,000. The Debtors seek authority, in their discretion, to pay any such unpaid Sales Taxes.

168. <u>Regulatory Fees</u>: Certain municipal and county governments require the Debtors to pay Regulatory Fees. The requirements for a company to obtain a business license and the manner that the Regulatory Fees are calculated vary greatly according to the local tax and regulatory laws. Prepetition, the Debtors incurred Regulatory Fees in connection with their operations in California, Pennsylvania and Washington. The Debtors estimate that certain Regulatory and Taxing Authorities may assert up to $5,000 in accrued Regulatory Fees that are due or that have accrued but remain unpaid as of the Petition Date with respect to the Debtors' operations and business conducted in these states. The Debtors seek authority, in their sole discretion, to pay any unpaid Regulatory Fees.

169. As set forth in the motion, to the extent that the Debtors have collected sales and use taxes from third parties, I am informed that such amounts are not part of the Debtors' estates applicable bankruptcy law. Rather, I am advised that such amounts constitute "trust fund" taxes that are held for the benefit of the Taxing Authorities. Accordingly, because payment of the sales and use taxes contemplated herein does not implicate property of the estates, such payments will not otherwise be available to the Debtors' estates or their creditors.

170. Moreover, I am advised that many state statutes, including those of certain states in which the Debtors do business, hold officers and directors of collecting entities personally liable for sales and use taxes owed by those entities. To the extent that any sales and use taxes remain unpaid by the Debtors, the officers and directors of the Debtors may be subject to lawsuits or criminal prosecution during the pendency of these Chapter 11 cases. Any such lawsuit or criminal prosecution (and the ensuing potential liability) would distract the Debtors and their officers and directors in their attempt to implement a successful reorganization strategy, to the detriment of all parties in interest in these chapter 11 cases and could result in indemnification claims.

171. In addition, I am advised that it is likely that some of the Sales Taxes and Regulatory Fees are entitled to priority payment status under applicable bankruptcy law.

172. Based on the foregoing, I believe that the motion is in the best interests of the Debtors and estates and should be granted.

**N.     Motion of the Debtors for an Order Providing that Creditors' Committees Are Not Authorized or Required to Provide Access to Confidential Information of the Debtors or to Privileged Information**

173. The Debtors seek entry of an order of the Court confirming that the Bankruptcy Code does not authorize or require any Creditors Committee appointed in these cases to provide access to the Debtors' confidential information (as described in the motion, "Confidential Information") to any creditor that such committee represents. Furthermore, the Debtors seek entry of an order clarifying that any Creditors Committee is not authorized or required to provide access to information subject to the attorney-client or some other state, federal, or other jurisdictional law privilege, whether such privilege is solely controlled by the

committee or is a joint privilege with the debtor or some other party (collectively, "Privileged Information"), to any creditor that such Creditors Committee represents. I believe that the relief requested will help ensure that confidential, privileged, proprietary and/or material non-public information will not be disseminated to the detriment of the Debtors' estates and will aid the Creditors Committee in performing its statutory function.

174. The public dissemination of the Debtors' Confidential Information likely would cause serious harm to the Debtors' estates. Confidential Information of the Debtors, such as compensation levels or other employee information, is of a sensitive nature, and public disclosure of such information would cause morale and similar problems for the Debtors, as well as potentially violate federal and state privacy laws. Further, any documents of the Debtors that contain private consumer information must be protected in accordance with state and federal law. If the Debtors were to disclose such information to the Creditors Committee without adequate measures to protect such information, they may become liable to previous borrowers and other individuals in their records system. Of course, if there were a risk that Confidential Information given by the Debtors to the Creditors Committee would have to be turned over to any creditor, the Debtors would be highly discouraged from giving Confidential Information to a Creditors Committee in the first place. In fact, the Debtors might conclude that they could not give such information to the committee at all.

175. Accordingly, the motion is in the best interest of the estates and should be granted.

**O.** **Motion for Order Under Section 365(a) and 554(a) of the Bankruptcy Code Authorizing the Debtors to (1) Reject a Certain Unexpired Lease of Nonresidential Real Property, and (2) Abandon Any Personal Property Located at Such Premises**

176.     The Debtors seek an order authorizing them to (1) reject, effective as of the Petition Date, a certain unexpired lease of nonresidential real property, more particularly described on Exhibit A to the motion (the "Rejected Lease"), between the Debtors and a third party, and (2) abandon any personal property located at such premises.

177.     The Debtors have determined that the Rejected Lease is unnecessary to the continued operation of the Debtors' business, has no value to the estate, and should be rejected. The annual rent payable by the Debtors on account of the Rejected Lease totals approximately $429,000.00. The Debtors seek to reject the Rejected Lease effective as of the Petition Date in order to avoid the possibility of incurring administrative expenses related to the Rejected Lease. Rejection of the Rejected Lease at this time will eliminate an under-performing asset, saving cash. Rejection effective as of the Petition Date is appropriate where, as here, the Debtors: (i) vacated the location relating to the Rejected Lease and/or notified the affected landlord that the Debtors do not intend to further occupy the location; (ii) served notice of the motion on the landlord on the next business day following the Petition Date; and (iii) will not withdraw the Rejected Lease from the motion absent the consent of the landlord.

178.     Further, the premises related to the Rejected Lease may contain various items of personal property owned by the Debtors. The Debtors believe that the costs associated with liquidating any remaining personal property assets at the premises will likely approach or exceed the value of such assets. Accordingly, the Debtors believe that the personal property at

this location has inconsequential value to the estate and should be abandoned as of the date of rejection.

179.    Based on the foregoing, the motion is in the best interest of the Debtors, the estates and their creditors and should accordingly be approved.

**P.    Motion of Debtors for Order Authorizing the Payment of Pre-Petition Claims of Logistics Support Providers, Freight Forwarders, Shippers, Warehouses and Similar Claimants**

180.    On any given day, GMG receives, at its three national distribution centers in Visalia, California, Cape Girardeau, Missouri, and Harrisburg, Pennsylvania, hundreds of deliveries of product from its domestic and international vendors and ships hundreds of orders from these distribution centers to its customers. GMG's business depends on, among other things, its ability (a) to receive timely and maintain a current inventory of high-demand products at each distribution center, and (b) to fill its customers' orders with next-day delivery (or as close to next-day delivery as possible).

181.    To meet these goals, GMG utilizes a complex network of domestic and international shippers and carriers, logistics support providers, freight forwarders and, potentially in some cases, warehouses and temporary storage facilities. In particular, GMG depends upon the services of (a) Kuehne + Nagel, Inc. ("K+N"), an international sea and air freight forwarder, which is responsible for arranging the delivery of almost all internationally sourced products to GMG, and (b) IntraVex LLC ("IntraVex"), a logistics support provider that, among other things, consolidates, audits, and forwards in a single weekly invoice to GMG all charges for domestic and international deliveries (including K+N's invoice and invoices of other shippers and carriers).

182. GMG obtains and pays for transportation and related services as follows:

(a) <u>Domestic Shipments</u>: GMG instructs its domestic vendors to use the most efficient carriers to transport goods and supplies to GMG's warehouse and distribution centers. GMG has a schedule of recommended carriers organized by the state of the shipment's origin and destination. In most cases, the designated carrier is either UPS or FedEx. The vendors typically ship to GMG's distribution centers by "consignee billing" – that is, for payment of shipping charges by GMG. After delivery of the shipment, the shipper transmits its invoice (electronically or by other means) to IntraVex. In addition, invoices for all shipping of goods by GMG to its retailer customers – mostly by UPS and FedEx – are electronically transmitted by the shipper to IntraVex.

(b) <u>International Shipments</u>: GMG receives goods and supplies from foreign countries; it does not ship its goods internationally. For small shipments, GMG instructs international vendors to use UPS or FedEx and provides them with a billing number. These shippers send their invoices to IntraVex. For most shipments, GMG instructs international vendors to contact K+N, which is responsible and arranges for shipping by carriers from the vendor to the United States and then from the port of entry to GMG's warehouses. As part of its services for GMG, K+N may utilize warehouses and storage facilities in some instances to temporarily house GMG's goods or supplies. To the extent that such warehouses and similar facilities are used, K+N includes the corresponding charges in its invoices. K+N subsequently transmits all of its shippers' and related and other invoices to IntraVex (which may include in the amounts payable charges for customs duties, dock facilities, and warehousing/storage). GMG does not have any written agreement with K+N.

(c)     IntraVex: IntraVex processes and audits all invoices from domestic shippers and from K+N. GMG believes that, because it cannot handle such tasks internally, IntraVex's services (dealing with hundreds of invoices) are critical and payment of IntraVex's fees and charges are reasonable and justified in GMG's business judgment. Each week, IntraVex sends an electronic invoice to GMG that aggregates all GMG shipping and related costs, including customs fees. Generally, GMG pays each IntraVex invoice in arrears three to four weeks after receipt. IntraVex, in turn, remits the appropriate amounts to K+N and the other shippers/carriers and service providers. At present, IntraVex's weekly billings are approximately $60,000-$90,000, comprised of portions for compensation of K+N's services and/or reimbursement of K+N's fees (including costs for shippers, carriers and other services arranged for by K+N for GMG's benefit), for compensation of IntraVex for its services, and for payment of other shippers' and carriers' charges billed for GMG shipments (such bills having been transmitted to IntraVex). During GMG's busy season (late winter through mid-Summer), IntraVex's weekly invoice may be as high as $250,000. GMG does not have a written agreement with IntraVex.

183.     GMG is concerned that if IntraVex, K+N and other applicable shippers and service providers do not receive the full amount of its prepetition invoices timely, and in accordance with past practice, these parties will stop providing services. Further, if the shippers and carriers, including those which had submitted GMG invoices to IntraVex, are not timely paid (through IntraVex or directly by GMG), these parties may in turn cease to provide shipping and other services to GMG as they had done prepetition. As discussed further herein, GMG is in critical need of IntraVex's and K+N's services and cannot readily, economically or quickly

replace IntraVex and K+N with another party. Further, the shippers, carriers and, if any, warehouse operators with possession or control of GMG's goods or supplies may assert a possessory lien, thereby freezing up the shipment and delivery of such property.

184.    Together, IntraVex, K+N, and the other shippers, carriers and warehouse operators which handle GMG's goods and supplies ensure that GMG's delivery and transport network runs smoothly and efficiently. The Debtors lack the ability to handle shipping logistics themselves. Thus, without the services and support provided by IntraVex, K+N and the other parties, the Debtors' shipping and delivery system will grind to a halt.

185.    Based on historical billings and other information, the Debtors estimate that, as of the Petition Date, they may owe for approximately three weeks of billings, totaling approximately $180,000 to $270,000 to (1) IntraVex, which billings include (a) amounts for IntraVex's services, (b) amounts on account of K+N billings for shipping related services and charges (thus, such amount is owed to K+N), and (c) amounts owed on account of other shipper and carrier invoices (thus, such amount is owed to the applicable shipper or carrier), and (2) other miscellaneous carriers, shippers and service providers (all of the foregoing claims are referred to herein as the "Obligations"). Based on the foregoing, the Debtors seek authority to pay in their discretion up to $300,000 in Obligations in the aggregate. Based on prior billing information, the Debtors estimate that only a relatively small percentage of the prepetition aggregate amount of Obligations that may be owed is owed for IntraVex's and K+N's services, and that most of the aggregate amount may owed for the services and charges of various other shippers, carriers and freight forwarders, including potentially UPS, Fedex, California Overnight, Conway, Dayton Freight Lines, Pitt Ohio Express, Roadway, DHL Danzas Air & Ocean,

Hellman Worldwide, KLX, Numark, Old Dominion Freight Line, SAIA Motor Freight, and Estes Express Lines.

186.    The Debtors firmly believe that the (i) continuation of their positive relationships with IntraVex, K+N, and the other shippers and carriers is imperative to the Debtors' continued business operations and efforts in these cases and (ii) payment of the Obligations is essential to preserve and maximize the value of the Debtors' estates. As discussed above, the Debtors' request to pay the Obligations is necessary and appropriate here because the failure to satisfy said Obligations could have a material adverse effect on the Debtors' day-to-day business operations and relationships with their customers and vendors, as well as their efforts in these chapter 11 cases. In that regard, the Debtors submit that the total amount to be paid if this motion were granted is relatively small compared to the importance and necessity of IntraVex, K+N and the other shippers/carriers to the Debtors' business operations and the direct and indirect losses that the Debtors would suffer as a consequence of such parties' refusal to either (as applicable) deliver inventory or other goods or materials to the Debtors or their customers, or provide critical logistical and shipping related support and services. Moreover, the Debtors do not believe that there are viable, cost-effective and/or timely alternatives to these parties that the Debtors have used prior to the Petition Date. The Debtors believe that, if prompt payment of the Obligations is not made in the ordinary course of business, many of these parties, including IntraVex and K+N, may immediately cease to provide services to the Debtors and some shippers and carriers may potentially assert liens in the goods and supplies at issue, threatening to severely hinder, delay or cripple the Debtors' supply, shipping and delivery system.

187. It is essential for the Debtors' business operations and efforts that the Debtors maintain a reliable and efficient supply and distribution network. Because the Debtors are dependent on third parties for the delivery of materials and supplies to their warehouse/distribution facilities and new inventory to their customers, it is essential that the Debtors' bankruptcy case not be a reason or excuse for any such party to cease timely performing or delaying delivery services or to retain goods in their possession on account of unpaid pre-petition claims. If the Debtors and their customers are unable to receive deliveries on a timely and uninterrupted basis, the Debtors' operations may be impeded with devastating consequences. Disruption in the continuous flow of the Debtors' goods and supplies will likely result in shortages of inventory and supplies necessary to the Debtors' business, adverse responses from the Debtors' customers, a significant loss of credibility and customer goodwill, and loss of revenue, thereby causing substantial harm to the Debtors' business and efforts to maximize the value of their assets for the benefit of the estates.

188. Further, absent the relief requested, the Debtors will be required to expend substantial time and resources (i) convincing those parties holding GMG's goods and supplies that they should not assert a lien or hold this property in transit; (ii) attempting to persuade certain shippers and carriers to release goods held and/or not detain future shipments; (iii) locate replacement vendors for those that cease doing business with GMG; and (iv) convincing such parties of GMG's authority and ability to make certain payments.

189. Accordingly, for the reasons discussed above, I believe that paying the Obligations is critical and is necessary to avoid immediate and irreparable harm to, and is in the best interests of, the Debtors, the estates and their creditors.

**Q.  Motion of the Debtors for an Order Under Section 366 of the Bankruptcy Code (i) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service, (ii) Deeming Utilities Adequately Assured of Future Performance, and (iii) Establishing Procedures for Determining Adequate Assurance of Payment**

190.    In the normal course of business, the Debtors have relationships with various utility companies and other providers (each a "Utility Provider" and, collectively, the "Utility Providers") for the provision of telephone, gas, electricity and related services (the "Utility Services"). The Utility Providers include, without limitation, the entities set forth on the list attached to the motion as Exhibit A. The Debtors estimate that its average monthly payments to the Utility Providers aggregate approximately $102,000.00.

191.    Because uninterrupted Utility Services are critical to the Debtors' ongoing operations, the Debtors seek the entry of an order: (a) prohibiting the Utility Providers from altering, refusing or discontinuing services; (b) deeming Utility Providers adequately assured of future performance; and (c) establishing procedures for determining adequate assurance of future payment.

192.    In order to provide adequate assurance of payment for future services to the Utility Providers, the Debtors propose to make a deposit (a "Utility Deposit") equal to 50% of the Debtors' estimated cost of their monthly utility consumption to each Utility which the Debtors intend to continue to utilize during the course of these cases. The Debtors estimate that the Utility Deposits, in the aggregate, will total approximately $51,000.00. The Debtors propose to make Utility Deposits to each of the Utility Providers specified on Exhibit A to the motion within ten (10) days after the entry of an interim order granting this motion, pending further

order of the Court, for the purpose of providing each Utility Provider with adequate assurance of payment of its postpetition date services to the Debtors.

193.    In addition, the Debtors seek to establish reasonable procedures as set forth in the motion (the "Procedures") by which a Utility Provider may request additional adequate assurance of future payment, in the event that such Utility Provider believes that its Utility Deposit does not provide it with satisfactory adequate assurance.

194.    The Debtors cannot continue to operate without continued Utility Services.  If any of the Utility Providers alter, refuse or discontinue service, even for a brief period, the Debtors business operations would be severely disrupted.  In contrast, the Utility Providers will not be prejudiced by the continuation of their services and will be paid all postpetition utility charges.  It is therefore critical that Utility Services continue uninterrupted.

### Conclusion

195.    For all of the foregoing reasons, I respectfully request that the Court grant the relief requested in each of the First Day Motions and applications filed concurrently herewith.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 31 day of January 2008 at Morgan Hill, California

GLOBAL MOTORSPORT GROUP, INC.,
CUSTOM CHROME MANUFACTURING, INC.,
CUSTOM CHROME FAR EAST LTD., and
CUSTOM CHROME EUROPE, LTD.

By: _____
T. Scott Avila, Chief Restructuring Officer