IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| GLOBAL MOTORSPORT GROUP, INC., et al.,[1] | : | Case No. 08-10192 (KJC) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |
| | : | Re: Docket Nos. 20 and 47 |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO THE DEBTORS' MOTION TO APPROVE INTERIM
STIPULATION AND ORDER (I) AUTHORIZING THE DEBTOR TO
INCUR POST-PETITION SECURED INDEBTEDNESS,
(II) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO
BANKRUPTCY CODE SECTIONS 105, 361, 362, 363 AND 364,
(III) GRANTING ADEQUATE PROTECTION, (IV) GRANTING
SECURITY INTERESTS AND SUPER-PRIORITY CLAIMS PURSUANT
TO BANKRUPTCY CODE SECTIONS 361 AND 363, (V) MODIFYING
THE AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING**

The Official Committee of Unsecured Creditors (the "Committee"), by its undersigned counsel, submits this Objection to the Debtors' Motion to Approve Interim Stipulation and Order (I) Authorizing Debtor to Incur Post-Petition Secured Indebtedness, (II) Authorizing the Use of Cash Collateral Pursuant to Bankruptcy Code Sections 105, 361, 362, 363 and 364, (III) Granting Adequate Protection, (IV) Granting Security Interests and Super-Priority Claims Pursuant to Bankruptcy Code Sections 361

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Global Motorsport Group, Inc. (6138); Custom Chrome Manufacturing, Inc. d/b/a Santee Industries (2016); Custom Chrome Europe, Ltd. (8828); and Custom Chrome Far East, Ltd. (8827). The address for all Debtors is 16100 Jacqueline Ct., Morgan Hill, CA 95037.

{00739164;v2}

and 363, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing (the "DIP Financing Motion")[2], and, in support thereof, respectfully states as follows:

## Jurisdiction and Venue

1. The Bankruptcy Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§1408 and 1409.

## Factual Background

2. The Debtors commenced these chapter 11 cases by the filing of voluntary petitions on January 31, 2008 (the "Petition Date"). The Debtors have continued in the possession of their property and have continued to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. No request has been made for the appointment of a trustee or an examiner in this case.

4. On February 6, 2008, the Office of the United States Trustee held an organizational meeting of the largest unsecured creditors in these cases (the "Organizational Meeting"). At the Organizational Meeting, the United States Trustee appointed the following creditors to the Committee pursuant to Section 1103 of the Bankruptcy Code: The Hog Farm, Inc., Perot Systems Corporation, Valwood Centreport, LP, as successor-in-interest to PPF Industrial, c/o RREEF Management Company, Merrill Communication LLC, and David G. Sadler (collectively, the "Committee").

---

[2] Every capitalized term contained herein without a definition shall have the definition contained in the DIP Financing Motion and/or the Interim Order (I) Authorizing Debtors to (A) Use Cash Collateral, and (B) Incur Post-Petition Secured Indebtedness, (II) Granting Security Interests and Super-priority Claims Pursuant to 11 U.S.C. Sections 364(C) & (d), (III) Granting Adequate Protection Pursuant to 11 U.S.C. Sections 361 & 363, (IV) Modifying Automatic Stay and (V) Setting Final Hearing (the "Interim DIP Order").

5. The Debtor Global Motorsport Group, Inc. ("GMG") is an international wholesale distributor of after-market motorcycle parts and accessories. The DIP Financing Motion asserts that the Debtors comprise the second largest global supplier of after-market parts and accessories for Harley-Davidson motorcycles, and that through GMG's indirect, non-debtor subsidiary, Global Motorsport Group GmbH, a corporation organized under the laws of the Federal Republic of Germany ("GMG GmbH"), the Debtors hold a larger market share for Harley-Davidson after-market parts and accessories in Europe than any of their competitors.

6. According to the DIP Financing Motion, GMG and the Debtor Custom Chrome Manufacturing, Inc. d/b/a Santee Industries ("CC-Manufacturing") are "Borrowers" under that certain Pre-Petition Credit Agreement among certain Pre-Petition Lenders and Ableco Finance LLC ("Ableco"). The Debtors state that Ableco is a Pre-Petition Lender and the Pre-Petition Agent for the Pre-Petition Lenders. On information and belief, an Ableco affiliate is the controlling (80%) shareholder of GMG, and another affiliate, Cerberus Capital Management L.P. ("Cerberus"), currently controls and historically has controlled the management of the Debtors. The Debtors allege that the Pre-Petition Obligations owing as of the Petition Date under the Pre-Petition Credit Agreement total in excess of $138 million. The Committee understands that this total consists of $104 million in principle and $34 million in interest, fees, costs and expenses.

7. In the DIP Financing Motion, the Debtors further assert that the Debtor Custom Chrome Far East, Ltd. ("CC-Far East") and the Debtor Custom Chrome Europe, Ltd. ("CC-Europe") have each guaranteed the Pre-Petition Obligations pursuant to Pre-Petition Guaranty Agreements. The Debtors further assert that (i) CC-Far East and CC-

3

Europe pledged 65% of their equity ownership interests in non-debtors Custom Chrome Far East (Taiwan) ("CCFE-Taiwan") and GMG GmbH, respectively, and (ii) each of the Debtors and Holdings executed a security agreement pursuant to which each granted to the Pre-Petition Agent for the benefit of the Pre-Petition Agent and the Pre-Petition Lenders liens upon substantially all of their respective assets.

8. On the Petition Date, the Debtors filed a series of "first day motions" including the DIP Financing Motion, pursuant to which they sought to borrow, on both a secured and superpriority administrative expense basis, up to $3,500,000 from the DIP Lenders and to use the Pre-Petition Lenders' cash collateral (the "Cash Collateral"). Pursuant to the DIP Financing Motion, the Debtors sought entry of interim and final approval orders (collectively, the "DIP Financing Order"). On February 1, 2008, the Court entered the Interim DIP Order [Docket Entry No. 47] approving (i) interim debtor-in-possession financing of up to $2,500,000 to be provided by the DIP Lenders on both a secured and superpriority administrative expense basis and (ii) authorizing the use of Cash Collateral and granting related adequate protection, including Replacement Liens.

9. On the Petition Date, the Debtors also filed a sale procedures motion (the "Bid Procedures Motion") and a corresponding asset sale motion [Docket nos. 17 and 18, respectively]. Under the Bid Procedures Motion, the Debtors request, *inter alia*, that Dae-Il USA, Inc. ("Dae-Il") be accorded the status of "stalking horse bidder" for the purchase of substantially all of the Debtors' assets, and that it receive a number of bid protections and advantages that are often provided to stalking horse bidders in connection with Section 363 sales. The hearing to consider the Bid Procedures Motion was rescheduled for February 14, 2008 at 1:30 p.m. On February 13, 2008, the Committee

filed an objection to the Bid Procedures Motion. The bid procedures are sought in connection with the proposed lighting quick sale of assets by the Debtors within the first month of this bankruptcy (the "363 Sale").

10. The severely limited duration of the proposed financing demonstrates that the proposed 363 Sale and the DIP Financing are closely calibrated to ensure that (i) no viable alternatives can be adequately or reasonably pursued or consummated, (ii) no recovery or dividend will flow to unsecured creditors, and (iii) no chapter 11 plan can or will be proposed, solicited or confirmed. Specific provisions of the Interim DIP Order or the DIP Credit Documents that, if approved, will virtually guarantee that the strategy of the Debtors and lenders is a *fait accompli* include the following:

- authority to use Cash Collateral expires on March 13, 2008, at the latest;
- the proposed Budget runs only through March 12, 2008;
- the DIP Note matures on March 13, 2008, at the latest; and
- Termination Events for the DIP Note and Cash Collateral usage include the failure to obtain entry of a sale procedures order by February 14, 2008; the failure to conduct an auction by March 7, 2008; the failure to obtain entry of a sale order by March 12, 2008; and the failure to consummate a sale by March 14, 2008.

11. Indeed, a finding in the Interim DIP Order implicitly <u>concedes</u> one of the primary infirmities of the DIP Financing by providing that the DIP Loans will be available only up to March 13, 2008 "to fund the DIP Borrowers' working capital needs, to pay professional fees and to conduct and conclude an orderly sale of the Debtors' respective assets. . . ." *See*, Interim DIP Order, ¶K. There is no mention or contemplation of events in these chapter 11 cases beyond March 14, 2008, after the contemplated sales closes. This pre-bankruptcy scheme orchestrated by the Debtors and

5

{00739164;v2}

those interests who control them will not provide (i) any opportunity for a recovery by unsecured creditors, or (ii) the confirmation of a chapter 11 plan.

## Objection

12. The proposed financing evidences the travesty of the current path of this bankruptcy. The Debtors are seeking approval on a final basis of the DIP Financing Motion for up to $3,500,000 of secured financing (including $2,500,000 that was approved under the Interim DIP Order) (hereinafter called the "DIP Loan") from the DIP Lenders. The loan proceeds will be used solely to preserve the Debtors' operations until March 13, 2008, a mere one month from now, once the sale closes. The Debtors maintain that without this funding, their estates would be "irreparably harmed." The DIP Loan is limited in duration because it is plainly designed only to afford the Debtors and their controlling Pre-Petition Agent/DIP Agent sufficient time to close their preferred 363 Sale, a sale which, as currently conceived and combined with the DIP Order, will provide no benefit to the general unsecured creditors of the Debtors. Accordingly, the implication of the Debtors' position is any other outcome will cause them "irreparable harm." The Committee opposes the DIP Financing Motion on a number of grounds as further set forth below, which together show this preferred "outcome" would deprive unsecured creditors of a recovery in these cases.

13. <u>Lenders' "grab" of unencumbered assets</u>. The Debtors' initial pleadings assert the existence of over $138 million in pre-petition secured debt and propose a sale of substantially all assets for a mere $16 million and the assumption of certain liabilities. Their proposed financing would encumber all of these assets, including the unencumbered 35% interest of the Debtor CC-Europe in GMG GmbH. Needless to say, the Committee is focused upon protecting and preserving any rights and benefits that

6

{00739164;v2}

could inure to unsecured creditors. First and foremost is the preservation of the Debtors' previously unencumbered assets. As noted, GMG GmbH, a non-debtor, appears to have a thriving, vibrant business in Europe. GMG GmbH is not obligated, and has not pledged its assets, to the Pre-Petition Agent or Pre-Petition Lenders. The equity in GMG GmbH owned by CC-Europe was pledged prepetition by CC-Europe to the Pre-Petition Agent, <u>but only to the extent of 65%</u>. As such, the unencumbered 35% of GMG GmbH's equity could represent real value, and could provide a foundation for a meaningful return to unsecured creditors.[3]

14. Apparently realizing this previously foregone value, Ableco/Cerberus has forced the Debtors to agree that now 100% of the equity in GMG GmbH will be pledged and encumbered to secure the DIP Obligation and will also be encumbered by Replacement Liens. Of course, immediately thereafter, the Debtors propose to sell that equity. The result is that a sale process that is only designed to benefit Ableco will actually be partially funded by the unsecured creditors. While it is too early to state this conclusively, why wouldn't a cessation of operations and liquidation, leaving the entirety of GMG GmbH unencumbered, be the better result for unsecured creditors?

15. In order to preserve some prospect for recovery to unsecured creditors, the 35% of the equity in GMG GmbH, and any other previously unencumbered assets, must remain free of any liens as a condition of this Court's approval of the proposed financing. Otherwise, the purpose of this proceeding will be to facilitate the liquidation of one party's interest in these Debtors.

---

[3] The APA does not include an allocation of sale consideration among the Sale Assets.

{00739164;v2}

16. <u>The DIP Financing, combined with the sale process, serves no purpose but to benefit the Lenders.</u> The chapter 11 process that is being pursued by the Debtors (at the direction of Ableco and Cerberus) will not benefit any party other than Ableco. The financing and sale process in tandem leave open no possibility for viable alternatives, and will result in the quick liquidation of Ableco's positions, leaving little prospect of any recovery to unsecured creditors. Under these circumstances, the Committee has every right to question whether these cases, on their present course, will serve any appropriate chapter 11 purpose.

17. One clear sign that the pre-ordained path is not for a proper purpose is the current course does not provide for there to be a chapter 11 plan. All of the Debtors' pleadings are silent as to what happens after March 13, 2008. On its present course, this case will have "accomplished" the following within a month:

- consummation of a 363 Sale that was negotiated prepetition with all proceeds paid to the lenders;

- postpetition "financing" solely designed to keep the Debtors alive through the 363 Sale;

- encumbering previously unencumbered assets in favor of the Pre-Petition Lenders to enhance the proceeds of that liquidation;

- release the Lenders; and

- no recovery to unsecured creditors.

After all of that, the unsecured creditors supposedly are to "negotiate" with Ableco/Cerberus. Simply, with respect to this issue and issues noted below relating to the Carve-Out and fees of Retained Professionals, the lenders should be required to "pay to play" – which means that the Lenders should pay the administrative expenses of the chapter 11 and assure a recover to unsecured creditors in exchange for the right to use the

{00739164;v2}

chapter 11 process to pursue the 363 Sale. Otherwise, as a key component of this strategy, the DIP Financing Motion should be denied.

18.  In addition to the foregoing, the Committee asserts that the following terms of the DIP Financing Order and related agreements are objectionable and should be revised or removed, as the case may be:

(a)  The Interim DIP Order cements a clear and virtually unfettered path for the DIP Agent, the DIP Lender, the Pre-Petition Agent and the Pre-Petition Lenders to enforce any and all rights and remedies upon the occurrence of a Termination Event essentially without further input of the Bankruptcy Court. The Interim DIP Order appears to provide the following: (i) upon the occurrence of a Termination Event the Pre-Petition Agent or the DIP Agent may deliver an Enforcement Notice, (ii) from and after the third (3rd) business day (the "Enforcement Date") after delivery of the Enforcement Notice, (iii) the automatic stay is modified without further Court involvement to permit all remedies including foreclosure. The Debtors or the Committee may only prevent such a result by filing a motion and obtaining an emergency hearing before the Enforcement Date. These provisions place a nearly impossible burden on the estate and should be stricken. If the DIP Agent and DIP Lenders want an expedited hearing regarding relief from the automatic stay, that should be sufficient. But any modification of the automatic stay must not occur until the conclusion of any hearing on any such lender motion, to the extent permitted by the Court (Interim DIP Order, ¶11(b));

(b)  Any advances by the DIP Agent and the DIP Lenders in excess of the maximum advance amounts ($2,500,000 on an interim basis and $3,500,000 subject to final approval) should not be permitted to benefit from the protections and rights

9

{00739164;v2}

(including the security interests and superpriority administrative status) granted by any DIP Financing Order – at least not until reasonable notice to the Committee and other parties in interest and further Order of this Court. Given the prospect that borrowing under the DIP Loan may generate encumbrances upon previously unencumbered assets, the Committee is keenly focused on limiting borrowings under the DIP Financing given the great potential harm that might be caused by such borrowings to the recovery rights of unsecured creditors. The DIP Agent and the DIP Lenders have full knowledge of, and control over, the amount of DIP Loan advances and must be strictly constrained to the maximum borrowing/advance amounts under this Court's order. There should be no protections afforded to advances in excess of the imposed limits (Interim DIP Order, ¶5);

(c)   As noted, the Interim DIP Order provides that upon the occurrence of a Termination Event, the automatic stay lifts and the DIP Agent and DIP Lenders are essentially free to pursue any and all remedies. Pursuant to paragraph 7(k) of the Interim DIP Order, the mere filing of a motion by the Debtors to authorize any action "adverse" to the DIP Agent or any DIP Lender, or their rights, would constitute a Termination Event. Such a provision effectively continues postpetition control exerted by Ableco/Cerberus over the Debtors and their operations. This provision should be stricken;

(d)   The DIP Lender should not obtain a lien on or security interest in Avoidance Actions or their proceeds and should not be able to use the proceeds from Avoidance Actions to satisfy superpriority administrative expense claims, if any. *See* Local Rule 2015-2 and letter dated April 2, 1998 by Judge Walsh regarding DIP financing orders. There may be a diminution in the value of the Cash Collateral, given

10

{00739164;v2}

the ongoing losses projected in the budget with respect to operations during the first several weeks of these cases while a sale is pending. However, the Avoidance Actions should not be used as security for such diminution given the fact that it is the choice of the DIP Lenders/Pre-Petition Lenders to force through the Section 363 Sale of the Debtors' assets. No reasonable justification or exigent circumstances have been enunciated by the Debtors for acquiescing to the DIP Lenders on this issue, and it is clear none exist. The DIP Lenders may choose to allow the Debtors to use their Cash Collateral to continue to operate in a chapter 11 prior to such sale, but should not look to Avoidance Actions to cover the shortfall (Interim DIP Order, ¶8(a));

(e) The definition of "Diminution Claim" in the Interim DIP Order is overly-broad. "Diminution Claim" should be limited to any diminution in the value of the Pre-Petition Collateral resulting from the Debtors' use of Cash Collateral. Expanding the term to include diminutions caused by the DIP Obligations and the DIP Liens would result in an improper "double-dipping" by the Pre-Petition Lenders/DIP Lenders (Interim DIP Order, ¶8(b));

(f) A Section 506(c) waiver is not appropriate in these cases for all of the reasons stated herein. *See* Local Rule 2015-2 and letter dated April 2, 1998 by Judge Walsh regarding DIP financing orders. Here, the lenders have apparently orchestrated the process so as not to leave sufficient funds to pursue a plan or even a return to unsecured creditors (Interim DIP Order, ¶10);

(g) The Carve-Out provisions of the Interim DIP Orders suffer from three (3) infirmities. First, per paragraph 12(a), the Carve-Out Amount is reduced by the amount of any retainers held by Retained Professionals. Needless to say, the

11

{00739164;v2}

Committee's professionals do not hold any such retainers and are thus prejudiced by such a reduction to the Carve-Out Amount. Any retainers held by any of the Debtors' professionals should not reduce the Carve-Out Amount. Second, per paragraph 12(b), funds may not be used to hinder or delay the exercise of remedies by the Lenders. This provision could be interpreted to prevent challenges to improper or unlawful actions by the Lenders. Simply put, a legitimate challenge must be compensable – the Lenders must be willing to pay "full freight" for this bankruptcy proceeding. Third, the Committee's investigation "budget" is limited to $50,000. The complexity of the prepetition relationship, connections and control warrants an increased budget amount;

(h)  Pursuant to the Interim DIP Order and the accompanying Budget, funds available to pay post-petition professional fees of Retained Professionals are fixed with no room for variance. Significant pre-petition planning by and among the Debtors, the Pre-Petition Agent, the Pre-Petition Lenders and their respective professionals occurred before the Committee was formed and it retained professionals, and resulted in an extraordinarily compressed timetable for an asset sale that is presently constructed to deprive unsecured creditors of any recovery. Given the process constructed and the timetables imposed, professionals retained by the Committee have faced the daunting task of getting up to speed and determining and pursuing a strategy best designed to benefit the Committee's constituents. In fairness, the Committee's professionals should not be handicapped by an artificially low budget amount that will apparently be shared with the team of various professionals retained by the Debtors.

(i)  Given (1) the legal and factual complexity of possible claims and/or defenses relating to the Pre-Petition Agent, the Pre-Petition Lenders and their

12

claims due to the length and depth of the management, operational and strategic control exerted by or on behalf of Abelco, that must be investigated by the Committee, and (2) that, if the Debtors and Lenders have their way, this case will result in a quick sale of all assets and operations, the proposed Committee investigation period (60 days from the date of Committee formation) is insufficient. The Committee and its professionals have been, and will continue to be, focused during the first 30-45 days of this case on the Debtors'/lenders' proposed sale and financing. Further, if the sale goes through essentially as demanded by the Debtors/lenders, then there will be no valid reason for any non-statutory deadline on the assertion of claims, and certainly there will be no prejudice to the lenders as the Debtors' existence and further funding needs will be over. This period should extend, at a minimum, 90-120 days from Committee formation;

(j) The terms and provisions of the Interim DIP Order and any final DIP order must control in the event of any contradictions or inconsistencies contained in the DIP Credit Documents (Interim DIP Order, ¶28);

(k) The Debtors should not be enjoined from merely applying to the Bankruptcy Court for an order authorizing the use of Cash Collateral or the Post-Petition Collateral in a manner that does not accord with the DIP Note and the Interim DIP Order. Unforeseen events may develop requiring the Debtors to seek further Court approval to use Cash Collateral or the Post-Petition Collateral consistent with the Bankruptcy Code, and that ability should not be enjoined from the outset of the case (Interim DIP Order, ¶29);

(l) The DIP Agent's and DIP Lender's various professionals' fees, costs and other disbursements should be subject to Court approval, or, at a minimum,

subject to review and a right to object by the Committee and the U.S. Trustee (Interim DIP Order, ¶4(c));

(m)    There should be no ability on the part of the DIP Lenders or the DIP Agent to amend or modify the DIP Loan Documents without the consent of the Committee, unless such amendment is of a non-material nature;

(n)    The terms of any final DIP order must supersede the Interim DIP Order; and

(o)    The DIP Note currently provides that the sale proceeds are to be turned over immediately to the Secured Lender. This provision should be modified to state that the sale proceeds should not be turned over until (i) confirmation of a plan of reorganization or (ii) further order of the Court.

## Legal Authority

19.    The facts of these cases are quite similar to the facts presented in the case of *In re Duro Industries, Inc.*, (2004 Bankr. Lexis 1235, Bankr. Mass. 2004). In *Duro*, the court vacated a DIP financing agreement and dismissed the bankruptcy case because the lender had attempted to use the bankruptcy process for its own purposes, to the complete exclusion of the estate's unsecured creditors. As here, the *Duro* case was driven purely by the secured creditors' desire to quickly sell the debtor as a going concern.

20.    In *Duro*, the pre-petition secured creditor and the DIP lender were the same entity, and it appeared likely from the start of the chapter 11 case that there existed little or no value for unsecured creditors. *Duro*, at *1-*2. The Duro DIP financing agreement was ninety (90) days in duration, and provided for an early termination if the debtor failed to file a motion to sell virtually all of its assets within forty-five (45) days of

14

{00739164;v2}

the petition date. *Id.* at *2. The court observed that it was "clear that the entire purpose of the chapter 11 case was to effect a Section 363 sale of the Debtor as a going concern, and to complete that sale in very short order." *Id.* at *5. As in this case, the stated rationale for a quick sale was that the debtor in *Duro* was continuing to lose money and was projected to lose money during the initial ninety (90) day period following the petition date.

21. In the *Duro* case, as here, the DIP lender sits in a variety of positions, including that of controlling shareholder in the debtor, pre-petition secured lender and DIP lender (in *Duro*, the lender was additionally the proposed 363 purchaser). At the final hearing on the financing motion, the creditors' committee and the DIP lender reached an agreement whereby the committee agreed to withdraw its various objections to the proposed DIP financing based upon what it thought was a deal that would potentially provide a recovery to the unsecured creditors. *Id.* at *8. According to the court, this settlement was instrumental in giving the bankruptcy case a purpose because the unsecured creditors had a stake in the outcome of the Section 363 sale. *Id.* at *8-*9.

22. Subsequent events, however, caused the *Duro* committee to seek to vacate the DIP financing order while accusing the DIP lender of acting improperly. *Id.* at *9-*10. The court agreed with the committee and vacated the DIP financing order, stating that "where there is no equity in the assets for the estate, the sale that the lender contemplates should not be permitted to occur in bankruptcy unless the lender guarantees a meaningful dividend for unsecured creditors." *Id.* at *16. The court added that "where all equity in a debtor's assets belongs to a secured creditor, with no appreciable

15

expectation of a remainder for unsecured creditors, the liquidation of the assets serves no bankruptcy purpose and should not be permitted to occur in bankruptcy." *Id.*

23. As the court stressed in *Duro*, there must be a purpose to a chapter 11 case which goes beyond lining the pocket of the secured lender. When the unsecured creditors appeared to have an opportunity to obtain some value in the case, the chapter 11 case had a reason for being and served a proper purpose. When no effort was made to create value for anyone other than the secured creditor, the court determined that the chapter 11 case should be dismissed. *Id.* at *17. Similarly, in these cases there appears to be no purpose to the cases beyond assisting the secured lender/controlling shareholder to quickly effect a sale orchestrated pre-bankruptcy, grab any and all previously unencumbered assets, and liquidate its positions. All of this is to be done at the expense of the unsecured creditors and without any prospect for further activity in the chapter 11 cases.

24. Thus, the relief sought in the DIP Financing Motion should be denied unless there is a realistic potential for a meaningful recovery by the unsecured creditors in these cases.

## Reservation of Rights

25. The Committee reserves all of its rights to object to any and all other provisions of any such revised documents.

## Conclusion

26. For all of the above-stated reasons, the Committee respectfully requests that the Bankruptcy Court deny the DIP Financing Motion and grant the Committee such other and further relief as is just and equitable.

Dated: February 19, 2008  
       Wilmington, Delaware

BAYARD, P.A.

By: _/s/ Kathryn D. Sallie_  
Jeffrey M. Schlerf (No. 3047)  
Eric M. Sutty (No. 4007)  
Kathryn D. Sallie (No. 4600)  
222 Delaware Avenue, Suite 900  
Wilmington, Delaware 19899  
Tel: (302) 655-5000  
Fax: (302) 658-6395

and

ANDREWS KURTH LLP  
James Donnell, Esquire  
450 Lexington Avenue, 15th Floor  
New York, New York 10017  
Tel: (212) 850-2800  
Fax: (212) 850-2929

and

John J. Sparacino, Esquire  
600 Travis, Suite 4200  
Houston, Texas 77002  
Tel: (713) 220-4200  
Fax: (713) 220-428

Proposed Counsel for the Official  
Committee of Unsecured Creditors