# Exhibit 1

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (the **"Agreement"**) is made and entered into as of this 28th day of January, 2008, by and between Dae-Il USA, Inc., a Delaware corporation (the **"Buyer"**), on the one hand, and Global Motorsport Group, Inc., a Delaware corporation (**"GMG"**) and Custom Chrome Europe, Ltd., a Delaware corporation (**"CCE"**). GMG and CCE are herein referred to collectively as the **"Seller."** The Buyer and Seller are hereinafter referred to collectively herein as the **"Parties"** and each a **"Party."**

### RECITALS

A.    Seller is in the business of distributing premium third-party and branded motorcycle parts and accessories both in North America and abroad, including in Europe (the **"Business"**).

B.    Promptly following the mutual execution and delivery of this Agreement, Seller will be filing a voluntary petition on or around January 30, 2008 (the **"Petition"**) for reorganization relief pursuant to Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (as amended, the **"Bankruptcy Code"**), in the United States Bankruptcy Court of Delaware (the **"Bankruptcy Court"**), which case shall be administered pursuant to order of the Bankruptcy Court (the **"Bankruptcy Case"**).

C.    Seller wishes to sell to Buyer, pursuant to Sections 363 of Bankruptcy Code, substantially all of the assets of Seller, all at the price and on the other terms and conditions specified in detail below, and Buyer wishes to so purchase and acquire such assets from Seller.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.  Transfer of Assets.

1.1    Purchase and Sale of Assets. Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, upon the terms and subject to the conditions contained in this Agreement, at the Closing, Seller shall sell, assign, transfer and convey, or cause to be sold, assigned, transferred and conveyed, to Buyer, and Buyer shall purchase and accept all of Seller's right, title and interest in, to and under all Seller's and its Subsidiaries' assets and properties used in connection with the operation of the Business (provided that the assets and properties of the German Subsidiary will not be purchased directly by Buyer, but rather will effectively be transferred to Buyer by virtue of Buyer's acquisition of the Affiliate Equity (as defined below)) (but excluding the Excluded Assets, as defined in Section 1.2 below) including, without limitation, the assets and properties described in this Section 1.1 (collectively, the **"Assets"**). The Assets shall be transferred and sold to Buyer free and clear of all pledges, security interests, Liens, Claims, options, charges, Encumbrances, and restrictions (other than the Assumed Liabilities and Permitted Encumbrances). The Assets that are being sold and transferred by Seller at Closing shall be conveyed to and accepted by Buyer on an "as is," "where is" and "with all faults" condition, free of any warranties or representations whatsoever, whether express or implied. Seller specifically disclaims any implied warranty of

merchantability or fitness for a particular purpose of the Personal Property (as defined below), the Inventory (as defined below) or any other portion of the Assets. Further, Buyer hereby expressly acknowledges that Seller has given no representations or warranties or other assurances whatsoever to Buyer regarding compliance of or by the Seller, the Business or the Assets with any applicable law, statute, rule, regulation or requirement. The Assets shall include, without limitation, each of the following:

 1.1.1 Designated Contracts. All Seller's right, title and interest in and to (i) the lessee's interest under any of the real property leases described on **Schedule 1.1.1-(i)** attached to this Agreement and incorporated herein by this reference (collectively, the **"Real Property Leases"**), (ii) the lessee's interest under any of the equipment, personal property and intangible property leases, rental agreements, licenses, contracts, agreements and similar arrangements, if any, described on **Schedule 1.1.1-(ii)** attached to this Agreement and incorporated herein by this reference (collectively, the **"Other Leases"**), and (iii) any of the other contracts, leases, orders, purchase orders, licenses, contracts, agreements and similar arrangements described on **Schedule 1.1.1-(iii)** attached to this Agreement and incorporated herein by this reference (collectively, the **"Other Contracts"** and together with the Real Property Leases and Other Leases, the **"Designated Contracts"**) ; provided, however, that Buyer shall have the right in its sole and absolute discretion to notify the Seller in writing no later than the Business Day immediately preceding the Sale Hearing of any Contract that Buyer does not wish to assume, in which case such Contracts shall not be deemed Designated Contracts; provided, further, for avoidance of doubt, Buyer's determination not to assume any particular Contract shall limit only Buyer's obligations under clause (iii) of the definition of "Assumed Liabilities.". The Designated Contracts shall include, without limitation, the Inventory Rights Purchase Agreement dated November 28, 2006 among Seller, Argent Trading LLC and Mervyn's LLC (the **"Argent Agreement"**).

 1.1.2 Personal Property. All of those items of equipment and tangible personal property owned by Seller and heretofore used in connection with the Business, including, without limitation, all such furniture, vehicles, machinery, equipment, tools, spare parts, computers, fixtures and furnishings and other items of tangible personal property listed or described on the schedule provided to Buyer on or about January 22, 2008, and with a net book value as set forth on **Schedule 1.1.2** attached to this Agreement and incorporated herein by this reference (collectively, the **"Personal Property"**). As used herein, "Personal Property" does not include the Inventory (as defined below). The Personal Property shall also expressly exclude any equipment or other tangible property held by Seller pursuant to a Contract where Buyer does not assume the underlying Contract relating to such personal property at the Closing.

 1.1.3 Intangible Property. All intangible personal property owned or held by Seller and heretofore used in connection with the Business, but in all cases only to the extent of Seller's interest therein, together with all books, records and like items pertaining to the Business, including, without limitation, the names "Global Motorsports," "RevTech," "Motor Factory," "Santee," "Custom Chrome," "Motorcycle Stuff," and "Jammer," the goodwill of the Business, Intellectual Property, catalogues, customer lists and other customer data bases, correspondence with present or prospective customers and suppliers, advertising materials, software programs, and telephone exchange numbers identified with the Business and any right, title and interest of Seller

in and to those items described on **Schedule 1.1.3** attached hereto and incorporated herein by this reference (collectively, the **"Intangible Property"**). As used in this Agreement, Intangible Property shall in all events exclude: (i) any materials containing privileged communications or information about employees, disclosure of which would violate an employee's reasonable expectation of privacy and any other materials which are subject to attorney-client or any other privilege, and (ii) any software or other item of intangible property held by Seller pursuant to a Contract where Buyer does not assume the underlying Contract relating to such intangible personal property at the Closing. In the case of the intangible personal property indicated on Schedule 1.1.3 as requiring the consent of a third party for assignment, such intangible personal property shall be assigned and transferred to Buyer, and shall become Intangible Property, only upon such consent having been obtained or such consent no longer being required by virtue of the Sale Order.

  1.1.4 Deposits, Etc. All cash deposits and prepaid items relating to or arising in connection with Designated Contracts assumed and assigned to Buyer pursuant to this Agreement and Designated Trade Obligations including, without limitation, all such deposits and prepaid items listed or described on the schedule provided to Buyer on January 23, 2008 and with a total amount as set forth on **Schedule 1.1.4** attached to this Agreement and incorporated herein by this reference (collectively, the **"Deposits"**).

  1.1.5 Accounts Receivable. All accounts and notes receivable (whether current or non-current) and all causes of action specifically pertaining to the collection of the foregoing, in each case to the extent arising out of the operation of the Business (collectively, the **"Accounts Receivable"**), including, without limitation, to the extent not collected prior to the Closing, those set forth on the accounts receivable aging report provided to Buyer on January 28, 2008 and with a total amount as set forth on **Schedule 1.1.5** attached to this Agreement and incorporated herein by this reference.

  1.1.6 Inventory. All supplies, goods, materials, work in process, inventory and stock in trade owned and held by Seller for use in connection with the operation of the Business (collectively, the **"Inventory"**), including, without limitation, to the extent not utilized or shipped prior to the Closing and not duplicative, those described on the inventory by category report provided to Buyer on January 14, 2008 and with a total amount as set forth on **Schedule 1.1.6** attached to this Agreement and incorporated herein by this reference.

  1.1.7 Vendor Items. All promotional allowances and vendor rebates and similar items relating to the operation of the Business (collectively, the **"Vendor-Related Assets"**).

  1.1.8 Claims, Etc. All claims, prepayments, warranties, guarantees, refunds, reimbursements, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature to the extent relating to the other Assets or the Assumed Liabilities (collectively, the **"Assigned Claims"**).

1.1.9    Equity in Subsidiary.  All right, title and interest in all equity interests (the **"Affiliate Equity"**) of Global Motorsport Group GmbH (the **"German Subsidiary"**).

1.1.10    Other Rights.  All rights, privileges, claims (including warranty claims, to the extent transferable), Avoidance Actions (other than Excluded Avoidance Actions), offsets, demands, chooses in action and indemnification rights of Seller against or with respect to (including all of Seller's rights under any indemnification agreements) any party to any Designated Contract assumed and assigned to Buyer pursuant to this Agreement, any Designated Trade Obligation or any Transferred Employee in connection with and/or otherwise related to the Business, any of the Assets and/or any of the Assumed Liabilities (to the extent that Buyer assumes at the Closing all of Seller's Liabilities to the holders of such Assumed Liabilities) and arising prior to (or related to facts, circumstances and/or events arising prior to) the Closing, whether choate or inchoate, known or unknown, contingent or noncontingent.

1.2    Excluded Assets. Notwithstanding anything to the contrary in this Agreement, the Assets shall exclude all of the following (collectively, the **"Excluded Assets"**): (i) those items expressly excluded pursuant to the provisions of Section 1.1 above; (ii) all cash or cash equivalents; (iii) Seller's rights under this Agreement and all cash and non-cash consideration payable or deliverable to Seller pursuant to the terms and provisions hereof; (iv) insurance proceeds, claims and causes of action with respect to or arising in connection with (A) any Contract which is not assigned to Buyer at the Closing, or (B) any item of tangible or intangible property not acquired by Buyer at the Closing; (v) any Real Property Lease, Other Lease, or Other Contract to which Seller is a party which is not assumed by Buyer pursuant to Section 1.1.1. hereof and any Real Property Lease, Other Lease, or Other Contract with respect to which the counterparty thereto does not grant its consent to assignment to Buyer if such consent is required thereunder (provided that any such Real Property Lease, Other Lease, or Other Contract shall cease to be an Excluded Asset once such consent is granted or is no longer needed by virtue of the Sale Order) (collectively, **"Excluded Contracts"**), (vi) other than the Affiliate Equity, all securities, whether capital stock or debt, of Seller and its Subsidiaries; (vii) tax records, minute books, stock transfer books and corporate seal of Seller; (viii) all tax refunds, rebates, credits and similar items relating exclusively to the operation of the Business and to any period, or portion of any period, on or prior to the Closing Date , (ix) all bank accounts, safety deposit boxes, lock boxes and the like relating exclusively to the operation of the Business, (x) all rights, claims and causes of action of Seller against former officers, directors, employees, shareholders, members, principals, agents, and representatives of Seller relating to actions or events on or prior to the Closing, (xi) all Excluded Avoidance Actions; and (xii) those additional assets, if any, listed on **Schedule 1.2** attached hereto and incorporated herein by this reference.

1.3    Instruments of Transfer.  The sale, assignment, transfer, conveyance and delivery of the Assets to Buyer shall be made by deeds, assignments, bill of sale, and other instruments of assignment, transfer and conveyance provided for in Section 3 below and such other instruments as may reasonably be requested by Buyer to transfer, convey, assign and deliver the Assets to Buyer, but in all events only to the extent that the same do not impose any monetary obligations upon Seller not reimbursed by Buyer, or in any other respect increase in any material way the burdens imposed by the other provisions of this Agreement upon  Seller.

4

## 2. Consideration.

### 2.1 Purchase Price.

2.1.1 The consideration to be paid by Buyer to Seller for the Assets (the **"Purchase Price"**) shall be (i) an amount equal to Sixteen Million Dollars ($16,000,000.00) payable to the Seller (the **"Cash Purchase Price"**), subject however to adjustment in accordance with Section 2.1.2 below, plus (ii) the assumption and payment by the Buyer of the Cure Costs, (iii) the assumption and payment by the Buyer of the Designated Trade Obligations, and (iv) the assumption by Buyer of all other Assumed Liabilities.  On the Closing Date, Buyer shall pay and deliver the Cash Purchase Price by wire transfer to GMG.

2.1.2 The Purchase Price shall be subject to adjustment as follows: At least two business days prior to the date of the Closing, Seller shall deliver to Buyer a written statement (which statement shall be certified by the GMG's Chief Executive Officer and Chief Financial Officer) (the **"Closing Statement"**) setting forth (i) the balance of the Seller's accounts receivable, excluding the accounts receivable of the German Subsidiary and excluding the Argent Receivables (as defined below) (the **"Accounts Receivable Balance"**); (ii) the aggregate unpaid balances of the Post-Petition Product Payables and Post-Petition G&A Payables; (iii) the balance of Seller's Designated Trade Obligations, (iv) the total amount receivable by the Company pursuant to the Argent Agreement (the **"Argent Receivables"**), (v) the balance of Seller's Net Merchandise Inventory, plus (A) all Net Merchandise Inventory sold by Seller pursuant to the Argent Agreement subsequent to the date hereof and prior to the Closing Date up to a maximum of $1,000,000, plus (B) all Net Merchandise Inventory shipped by Seller to the German Subsidiary between the Petition Date and the Closing Date and not paid for by the German Subsidiary prior to the Closing Date, but excluding all other the Net Merchandise Inventory of the German Subsidiary (the **"Inventory Balance"**), (vi) the net change in aggregate Deposits between December 31, 2007 and the Closing Date (the **"Deposit Change"**), and (vii) the aggregate Accrued Vacation Obligations with respect to all Transferred Employees, in each case as of the Closing Date, and in each case as determined in accordance with generally accepted accounting principles consistently applied and in accordance with Seller's customary accounting practices.

(a) In the event and to the extent that the Accounts Receivable Balance is less than $6,660,409.63, then the Purchase Price shall be reduced by the difference between the Accounts Receivable Balance and $6,660,409.63.  In the event and to the extent that the Accounts Receivable Balance is greater than $6,660,409.63, then the Purchase Price shall be increased by the difference between the Accounts Receivable Balance and $6,660,409.63.

(b) The Purchase Price shall be reduced by the aggregate unpaid balance of the Post-Petition Product Payables;

(c) In the event that the unpaid Post-Petition G&A Balance exceeds $300,000, the Purchase Price shall be reduced by the difference between the aggregate unpaid balance of the Post-Petition G&A Payables and $300,000.

(d)     In the event that the Inventory Balance reflected on the Closing Statement is less than $18,817,186.56, then the Purchase Price shall be reduced by the difference between $18,817,186.56 and the Inventory Balance.  In the event that the Inventory Balance reflected on the Closing Statement is greater than $18,817,186.56, then the Purchase Price payable by Buyer shall be increased by the difference between $18,817,186.56 and the Inventory Balance.

(e)     In the event that the Argent Receivables reflected on the Closing Statement are less than $1,000,000, then the Purchase Price shall be reduced by the difference between $1,000,000 and the Argent Receivables.

(f)     The Purchase Price shall be increased by the amount of any positive Deposit Change and decreased by the amount of any negative Deposit Change.

(g)     The Purchase Price shall be reduced by two thirds (2/3) of the aggregate Accrued Vacation Obligations for all Transferred Employees.

2.2     Deposit.

2.2.1     No later than January 30, 2008 (the "**Deposit Date**"), the Buyer shall deliver, in immediately available good funds of the United States of America, a deposit in the amount of One Million Dollars ($1,000,000) (the "**Good Faith Deposit**") to Wilmington Trust Company ("**Escrow Holder**").

2.2.2     The Escrow Holder shall hold the Good Faith Deposit pursuant to joint escrow instructions to be delivered to the Escrow Holder on or before the Deposit Date.  In turn, the Escrow Holder shall immediately deposit the Good Faith Deposit into an interest-bearing account.  The Good Faith Deposit shall be refundable in full (together with all interest accrued thereon) to Buyer upon any termination of this Agreement, other than a termination by Seller pursuant to Section 10.1(d) hereof (a "**Buyer Default Termination**").  At the Closing, the Good Faith Deposit (and any interest accrued thereon) shall be credited and applied toward payment of the Purchase Price.  If this Agreement is terminated other than pursuant to a Buyer Default Termination, the Escrow Holder shall return to Buyer the Good Faith Deposit (together with all interest accrued thereon).  In the event of a Buyer Default Termination, Escrow Holder shall immediately disburse the Good Faith Deposit and all interest accrued thereon to Seller to be retained by Seller for its own account.  Buyer and Seller shall each pay one-half of the Escrow Holder's escrow fees and charges.

2.3     Assumed Liabilities, Environmental Release and Indemnification.

2.3.1     Effective as of the Closing Date, Buyer shall assume all Assumed Liabilities.

2.3.2     All Liabilities of Seller other than the Assumed Liabilities, including, without limitation: (i) Liabilities for any taxes of any kind relating to or attributable to any period (or any portion of any period) ending on or prior to the Closing Date levied or imposed upon or in respect of the Assets or the Seller; (ii) other than the portion of the Accrued Vacation

Obligations assumed by Buyer, any Liabilities of Seller incurred or made to any current or former employee of Seller; (iii) any obligations or liabilities based on performance or non-performance under the Contracts other than Designated Contracts prior to the Closing; (iv) any accounts payable other than the Designated Trade Obligations and the Post-Petition G&A Payables, (v) any life insurance loans on any executive or employee of Seller or its Affiliates; (vi) any sales commissions or similar fees or compensation; (vii) any indebtedness or obligation to any Affiliate of Seller; and indebtedness or obligation of the German Subsidiary to Seller or any Affiliate of Seller, all of which indebtedness and obligations shall be deemed irrevocably waived and released by Seller or such Affiliate as of the Closing; and (viii) any Liabilities, obligations or commitments of Seller under this Agreement and the Ancillary Agreements, are collectively referred to as the "**Excluded Obligations.**" Notwithstanding anything in this Agreement to the contrary, Buyer does not and shall not assume (or intend to assume) or agree to pay, perform, fulfill or discharge any Excluded Obligations, and all Excluded Obligations shall be retained by Seller.

      2.4    <u>Purchase Price Allocation</u>.  Buyer and Seller agree that, no later than three (3) Business Days prior to the Closing, they shall mutually agree in writing upon the allocation of the Purchase Price and Assumed Liabilities (to the extent taken into account under Section 1060 of the Code) among the Assets in accordance with Treasury Regulation 1.1060-1 (or any comparable provisions of state or local tax law) or any successor provision.  Buyer and Seller shall report and file all tax returns (including any amended tax returns and claims for refund) consistent with such mutually agreed Purchase Price allocation, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any taxing authority or any other proceedings).  Buyer and Seller shall file or cause to be filed any and all forms (including U.S. Internal Revenue Service Form 8594), statements and schedules with respect to such allocation, including any required amendments to such forms.

      2.5    <u>Termination of Intercompany Obligations</u>.  Effective upon the Closing, (i) all rights and obligations and Claims of the German Subsidiary in relation to Seller or any Affiliates of Seller (other than the German Subsidiary) shall terminate and be without any further force or effect, and (ii) all rights and obligations and Claims of each of Seller and each Affiliate of Seller (other than the German Subsidiary) in relation to the German Subsidiary shall terminate and be without any further force or effect.  Buyer and Seller shall execute, and shall cause the German Subsidiary and Affiliates to execute, any waivers, releases or other agreements necessary or desirable to give effect to the following, promptly following any request therefore from the other Party.

3.    <u>Closing Transaction.</u>

      3.1    <u>Seller's Deliveries to Buyer at Closing</u>.  At the Closing, Seller shall make the following deliveries to Buyer:

      3.1.1    An Assignment and Assumption of Designated Contracts substantially in the form and content attached as **Exhibit "A"** hereto, duly executed by Seller pursuant to which Seller shall assign to Buyer Seller's interest, if any, in the Designated Contracts (the **"Assignment of Contracts"**).

3.1.2   A Bill of Sale and Assignment, duly executed by Seller in the form and on the terms of the bill of sale attached hereto as **Exhibit "B,"** pursuant to which Seller transfers and assigns to Buyer Seller's right, title and interest in and to the Assets (the **"Bill of Sale"**).

3.1.3   A counterpart Assignment of Intangible Property, duly executed by Seller, in the form and content of the assignment of intangible property attached as **Exhibit "C"** hereto, pursuant to which Seller assigns to Buyer Seller's interest, if any, in and to the Intangible Property (the **"Assignment of Intangible Property"**).

3.1.4   Any such other documents or instruments reasonably contemplated by this Agreement to be delivered by Seller to Buyer at the Closing.

3.2   Buyer's Deliveries to Seller at Closing.   At the Closing, Buyer shall make or cause the following deliveries to Seller:

3.2.1   Payment of the Cash Purchase Price (net of the Good Faith Deposit and the interest accrued thereon, which amounts shall be released to Seller by the Escrow Holder).

3.2.2   A counterpart of the Assignment of Contracts, duly executed by Buyer.

3.2.3   An Assumption of Liabilities with respect to the Assumed Liabilities, in the form and content attached as **Exhibit "D"** hereto and incorporated herein by this reference, duly-executed by Buyer (the **"Assumption of Liabilities"**).

3.2.4   Any such other documents or instruments reasonably contemplated by this Agreement to be delivered by Buyer to Seller at the Closing.

3.3   Assignment and Assumption.

3.3.1   At Closing, Seller shall, pursuant to the Sale Order and the Assignment and Assumption Agreement(s) and other transfer and assignment documents reasonably requested by the Buyer, assume and sell and assign to Buyer (the consideration for which is included in the Purchase Price), the Designated Contracts.  From and after the date hereof through ten (10) days following the Closing, Seller shall not reject any Designated Contract or any Held Contract (as defined below) unless otherwise agreed to in writing by the Buyer.  Seller shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to Designated Contracts and take all other actions necessary to cause such Designated Contracts to be assumed by Seller and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code, and Buyer shall, at or prior to Closing, comply with all requirements under Section 365 necessary to assign to Buyer the Designated Contracts.  The Buyer and Seller agree that there shall be excluded from the Assets any Designated Contracts that are not assignable or transferable pursuant to the Bankruptcy Code or otherwise without the consent of any Person other than Seller, to the extent that such consent shall not have been given prior to the Closing, and the Closing shall proceed with

respect to the remaining Designation without reduction to the Purchase Price, subject to Buyer's termination rights set forth in Section 10.

3.3.2 Buyer shall have the right, by written notice to the Seller within ten (10) days after the Closing Date, to specify any Contracts or leases that are not included as Designated Contracts (each such other Contract and lease, an **"Excluded Contract"**) that shall be held by the Seller and not rejected pursuant to Section 365 of the Bankruptcy Code (any such Contract, a **"Held Contract"**) for the duration of the Contract Retention Period, and the Seller shall have the right at any time following ten days after the Closing to cause any Excluded Contract other than the Held Contracts to be rejected pursuant to Section 365 of the Bankruptcy Code; it being understood and agreed that, without limiting any other obligation of the Seller hereunder, Seller shall not in any event reject or seek to reject any Contract during the period beginning on the date hereof and ending on the ten (10) day period following the Closing Date, except with Buyer's prior written consent; provided, however, that the Buyer shall compensate Seller for all Liabilities accruing from the Closing Date through the date that is twenty-five (25) days after the Closing Date on account of Excluded Contracts which are not timely designated by Buyer as a Held Contract. As to Held Contracts, Seller shall not seek to reject such contracts for a period of 180 days following the Closing Date or, if sooner, the date following the Closing on which a plan is confirmed in the Bankruptcy Case (the **"Contract Retention Period"**) and, as soon as practicable after receiving further written notice(s) (each, an **"Assumption Notice"**) from Buyer during the Contract Retention Period requesting assumption and assignment of any Held Contract, the Seller shall, subject to Buyer's demonstrating adequate assurance of future performance thereunder, take all actions reasonably necessary to seek to assume and assign to Buyer pursuant to section 365 of the Bankruptcy Code any Contract(s) set forth in an Assumption Notice, and any applicable Cure Cost shall be satisfied in accordance with the definition of Assumed Liabilities. The Seller agrees and acknowledges that the covenant set forth in this Section 3.3.2 shall survive the Closing; provided, that, with respect to any Held Contract, Buyer shall compensate the Seller for Liabilities for the continuation of such Held Contracts during the Contract Retention Period up to and including the date which is fifteen (15) days following Seller's receipt of written notice from Buyer authorizing rejection of the same, it being understood and agreed that Seller's obligation to assume and assign any Held Contract shall be conditioned upon Buyer's payment of such amounts and that Buyer's covenant to pay such amounts shall survive the Closing and the expiration of the Contract Retention Period. Notwithstanding anything in this Agreement to the contrary, on the date any Contract is assumed and assigned to Buyer pursuant to this Section 3.3.2, such Contract shall be deemed a Designated Contract for all purposes under this Agreement. Notwithstanding the foregoing, the Parties agree that the lease agreement in respect of Seller's Forth Worth, Texas facility may be rejected pursuant to Section 365 of the Bankruptcy Code, and shall not in any event be designated as either a Designated Contract or as a Held Contract.

3.4 Share Transfer Agreement. On or before the Closing Date, representatives of Buyer and Seller shall execute a Share Transfer Agreement, providing for transfer of all equity interests in the German Subsidiary to Buyer and containing such other customary terms which in no way expand or enlarge the Parties' obligations under the other provisions of this Agreement as the Parties may mutually and reasonably determine (the **"Share Transfer Agreement"**). The

Share Transfer Agreement shall include a specific allocation of a portion of the Purchase Price to the German Subsidiary equity interests being transferred. The execution of the Share Transfer Agreement shall be duly notarized by a notary public in accordance with applicable German laws and regulations. All notary fees and expenses associated with such notarization shall be paid in equal amounts by Buyer and Seller.

      3.5     <u>Sales, Use and Other Taxes</u>. To the extent not exempt under the Bankruptcy Code, all Transfer Taxes arising out of, in connection with, or attributable to, the transactions effected pursuant to this Agreement shall be borne and paid exclusively by Seller to the extent imposed by Governmental Entities; provided however that Buyer shall reimburse Seller for 50% of any such Transfer Taxes actually paid by Seller up to a maximum of $20,000. Seller shall prepare and timely file all relevant Tax Returns required to be filed in respect of such Transfer Taxes and shall pay such Transfer Taxes.

      3.6     <u>Possession</u>. Right to possession of the Assets shall transfer to Buyer on the Closing Date. Seller shall transfer and deliver to Buyer on the Closing Date such keys, locks and safe combinations and other similar items as Buyer may reasonably require to obtain occupation and control of the Assets, and shall also make available to Buyer at their then existing locations the originals of all documents in Seller's actual possession that are required to be transferred to Buyer by this Agreement.

    4.   <u>Conditions Precedent to Closing</u>.

      4.1     <u>Conditions to Seller's Obligations</u>. Seller's obligation to make the deliveries required of Seller at the Closing Date and otherwise consummate the transaction contemplated herein shall be subject to the satisfaction or waiver by Seller of each of the following conditions:

      4.1.1     All of the representations and warranties of Buyer contained herein shall continue to be true and correct in all material respects (except as to those representations and warranties that are qualified by materiality, which shall be true in all respects) on the Closing Date with the same effect as though such representations were made as of such date or, in the case of representations and warranties made as of a specified date earlier than the Closing Date, on and as of such earlier date.

      4.1.2     Buyer shall have executed and delivered to Seller the Assignment of Contracts and the Assumption of Liabilities.

      4.1.3     Buyer shall have delivered, or shall be prepared to deliver to Seller at the Closing, the Cash Purchase Price and other documents required of Buyer to be delivered at the Closing.

      4.1.4     Buyer shall have delivered to Seller a certificate as to the incumbency of those officers of Buyer executing this Agreement and any instrument or other document delivered in connection with the transaction contemplated by this Agreement.

4.1.5    Buyer shall have substantially performed or tendered performance of each and every material covenant on Buyer's part to be performed which, by its terms, is required to be performed at or before the Closing.

4.1.6    The Bankruptcy Court shall have entered the Bidding Procedures Order and the Sale Order substantially in the forms affixed hereto as **Exhibits "E" and "F,"** respectively (subject to non-material changes only and other changes which have been or may be approved by the Seller in writing) and provided such other relief as may be necessary or appropriate to allow the consummation of the transactions contemplated by this Agreement. The Sale Order shall not have been stayed as of the Closing.

4.1.7    No action, suit or other proceedings shall be pending before any court, tribunal or governmental authority seeking or threatening to restrain or prohibit the consummation of the transaction contemplated by this Agreement, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any governmental authority having appropriate jurisdiction.

4.2      Conditions to Buyer's Obligations.  Buyer's obligation to make the deliveries required of Buyer at the Closing and otherwise consummate the transaction contemplated herein shall be subject to the satisfaction or waiver by Buyer of each of the following conditions:

4.2.1    Seller shall have substantially performed or tendered performance of each and every covenant on Seller's part to be performed which, by its terms, is required to be performed or capable of performance at or before the Closing.

4.2.2    All of the representations and warranties of Seller contained herein shall continue to be true and correct in all material respects (except as to those representations and warranties that are qualified by materiality, which shall be true in all respects) on the Closing Date with the same effect as though such representations were made as of such date or, in the case of representations and warranties made as of a specified date earlier than the Closing Date, on and as of such earlier date.

4.2.3    Seller shall have executed and delivered to Buyer the Assignment of Contracts, the Bill of Sale, the Assignment of Intangible Property, and the Share Transfer Agreement in respect of the equity in the German Subsidiary (which Share Transfer Agreement shall have been notarized as required under applicable German law).

4.2.4    Seller shall have delivered a certified copy of the Sale Order.

4.2.5    Seller shall have delivered all other documents required of Seller to be delivered at the Closing.

4.2.6    No action, suit or other proceedings shall be pending before any court, tribunal or governmental authority seeking or threatening to restrain or prohibit the

consummation of the transaction contemplated by this Agreement, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any governmental authority having appropriate jurisdiction.

4.2.7   Since the date of this Agreement, there shall not have been any theft, damage or destruction of a material portion of the Assets.

4.2.8   Buyer shall have been furnished with evidence satisfactory to Buyer of the consent or approval of those persons whose consent or approval shall be required in order to permit the assignment and assumption of those Designated Contracts listed on Schedule 4.2.8 attached hereto (the **"Required Consent Contracts"**); provided, however, in no event shall Seller be required to obtain the consent of any counterparty to a Required Consent Contract with respect to which the Sale Order obviates the need for such consent or where the Sale Order does not so obviate the need for such consent solely due to Buyer's failure to provide reasonable assurance of performance under such Contract pursuant to Section 365 of the Bankruptcy Code.

4.2.9   The Bankruptcy Court shall have entered the Bidding Procedures Order and the Sale Order substantially in the forms affixed hereto as **Exhibits "E" and "F,"** respectively (subject to non-material changes only and other changes which have been or may be approved by the Buyer in writing) and provided such other relief as may be necessary or appropriate to allow the consummation of the transactions contemplated by this Agreement. The Sale Order shall not have been stayed as of the Closing.

4.2.10   There shall not be in effect, at the Closing Date, any injunction or other binding order of any court or other tribunal having jurisdiction over the Buyer that prohibits the purchase of the Assets by Buyer. The Sale Order shall not have been reversed or vacated, and shall not be subject to a stay pending appeal. The stay provided for in Fed.R.Bankr.P. 6004(h) shall have expired or been waived by the Bankruptcy Court.

4.2.11   [Reserved.]

4.2.12   The Argent Agreement shall be duly and validly assigned to Buyer effective as of the Closing and shall remain in full force and effect following the Closing without a material change in the terms and conditions thereof.

4.2.13   GMAC CF shall have executed and delivered to Buyer such waivers and consents as are reasonably required to cause the Facilities Agreement between GMAC CF and the German Subsidiary to remain in full force and effect following the Closing without a material change in the terms and conditions thereof.

4.2.14   Any guaranties, pledges and any other obligations of the German Subsidiary to any third party in respect of any obligations of Seller or its Subsidiaries (other than Assumed Liabilities) (including without limitation any obligations to Ableco Finance in connection with Ableco Finance's secured loan to Seller) shall be terminated and released as to the German Subsidiary at the Closing pursuant documentation reasonably satisfactory to Buyer. For

the avoidance of doubt, nothing in this Section 4.2.14 shall be deemed to condition Buyer's obligations under this Agreement upon Seller obtaining the termination or release of any obligation to any such third party with respect to which the German Subsidiary is a direct or primary obligor.

4.2.15  GMG and CCE shall each have delivered to Buyer a certificate as to the incumbency of the respective officers of GMG and CCE executing this Agreement and any instrument or other document delivered in connection with the transaction contemplated by this Agreement.

Any waiver of a condition to Buyer's or Seller's obligations hereunder shall be effective only if such waiver is stated in writing and signed by the waiving Party; provided, however, that the consent of a Party to the Closing shall constitute a waiver by such Party of any conditions to Closing not satisfied as of the Closing Date.

5.  Seller's Representations and Warranties.  Except as otherwise indicated on **Schedule 5** attached hereto, Seller hereby represents and warrants to Buyer as follows:

5.1  Organization, Standing and Power. GMG and CCE are corporations duly organized, validly existing, and in good standing under the laws of the State of Delaware. To Seller's Knowledge, the German Subsidiary is a limited company duly organized and validly existing under the laws of the Federal Republic of Germany.  Seller has all requisite corporate power and authority to own its properties and to carry on its business as now being conducted.

5.2  Validity and Execution. Subject to entry of the Approval Order, GMG and CCE have all requisite corporate power and authority, and have taken all corporate action necessary, to execute and deliver this Agreement and the Ancillary Agreements to which each of them is a party, to consummate the transactions contemplated hereby and thereby and to perform their respective obligations hereunder and thereunder.  Subject to entry of the Approval Order, each of this Agreement and the Ancillary Agreements to which GMG and CCE is a party has been (or, when executed and delivered, will have been) duly authorized, executed and delivered by GMG and CCE and constitutes (or, when executed and delivered, will constitute) the legal, valid and binding obligation of each such Party enforceable against such Party in accordance with its terms.  This Agreement and the Ancillary Agreements to which Seller is a party have been duly approved by the Boards of Directors of GMG and CCE.

5.3  No Conflict. Subject to entry of the Approval Order, neither the execution and delivery by GMG and CCE of this Agreement or any of the Ancillary Agreements, nor the consummation of the transactions contemplated hereby or thereby, will (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any governmental authority, to which GMG or CCE is subject or any provision of the respective certificates of incorporation or bylaws of GMG or CCE or (ii) conflict with or result in a breach of GMG's or CCE's respective certificates of incorporation or bylaws.

5.4  Title to the Assets. To Seller's Knowledge, GMG and the German Subsidiary have good, valid, and marketable title to all assets used in the operation of their

respective portions of the Business (including, as to GMG, the Assets) and, subject to the entry of the Sale Order, Buyer will be vested with good title to the Assets, free and clear of all Encumbrances other than Permitted Encumbrances and Assumed Liabilities.

5.5     Subsidiaries. Other than the Subsidiaries listed on **Schedule 5.5**, there are no corporations, partnerships, joint ventures, associations or other entities in which GMG or CCE owns, of record or beneficially, any direct or indirect equity or other interest.

5.6     Material Contracts. To Seller's Knowledge and, as to the German Subsidiary except for leases and the like for vehicles, forklifts, telephone system, and office machines entered into by the German Subsidiary in the ordinary course of business, Schedules 1.1.1-(i) through 1.1.1(iii) and the materials heretofore provided or made available to Buyer by GMG collectively include and set forth a list of all of the material Contracts (other than purchase orders and supplier orders, but including all real property leases) to which Seller or the German Subsidiary is a party or by which it or any of the Assets owned by Seller and/or the German Subsidiary are bound and that are used in or related to Seller's or the German Subsidiary's ordinary course of business or by which any of the Assets or the Business or the assets of the German Subsidiary may be bound or affected (collectively, the "**Material Contracts**"). To Seller's Knowledge, (i) Seller has provided, or made available, to Buyer true and complete copies of all Material Contracts, and (ii) the copies of such Material Contracts provided or made available to Buyer are true and complete.

5.7     Financial Statements. To Seller's Knowledge, with respect to the financial statements prepared for the fiscal year ending January 31, 2008 and interim periods thereof (including GMG's period ending November 24, 2007), the balance sheets and statements of income, and cash flow (including the notes thereto) of Seller and of the German Subsidiary previously provided by Seller to Buyer have been prepared in accordance with generally accepted accounting principles applied on a consistent basis throughout the periods covered thereby, present fairly the financial condition of Seller or the German Subsidiary, as the case may be, as of such dates, and are correct and complete in all material respects.

5.8     Intangible Property. To Seller's Knowledge, Schedule 5.8 hereto lists all pending or threatened Claims against Seller and/or the German Subsidiary with respect to the Intangible Property or any other Intellectual Property.

5.9     Real Property. Seller and the German Subsidiary do not own any real property used in the Business or included in the Assets.

5.10    Inventory.

5.10.1  There are no material U.S. Inventory items that are subject to written or oral commitments from customers of Seller to purchase outside of the ordinary course of business. Except to the extent of any past practice of Seller with respect to such customers as previously disclosed to Buyer, Seller has no knowledge of any fact or circumstance which may cause such customers to demand any price markdowns or adjustments on such U.S. Inventory.

5.10.2 **Schedule 5.10.2** contains a complete list of the addresses of all warehouses and other facilities in which material Inventory of GMG and/or the German Subsidiary is located, and an identification of Inventory items by part number, quantity and value at each location.

5.11 <u>Litigation</u>. Except as to Intangible Property (which is addressed in Section 5.8 above) and for collection matters pending against the German Subsidiary by vendors seeking to collect approximately Euro 40,000 in the aggregate, to Seller's Knowledge, Schedule 5.11 sets forth a complete list of all pending litigation with respect to the Business.

5.12 <u>Labor Matters</u>. To Seller's Knowledge, neither GMG nor the German Subsidiary is a party to or bound by any collective bargaining agreement, nor has Seller or the German Subsidiary experienced any strikes, claims of unfair labor practices, or other collective bargaining disputes. Neither GMG, nor to Seller's Knowledge, the German Subsidiary has received written notice of any organizational effort presently being made or threatened by or on behalf of any labor union with respect to employees of Seller or the German Subsidiary.

5.13 <u>Environmental, Health, and Safety Matters</u>. To Seller's Knowledge, GMG and the German Subsidiary have complied and are in compliance with all Environmental Laws in all material respects, except where noncompliance has not had, or could not reasonably be expected to have, a Material Adverse Effect.

5.14 <u>Complete Copies of Materials</u>. To Seller's Knowledge, Seller has delivered or made available true and complete copies in all material respects of each document listed on the Schedules attached hereto.

5.15 <u>Employees</u>. GMG has previously provided Buyer with a schedule (the "**Employee Schedule**") which lists the name, the place of employment, the annual salary rates, bonuses, deferred or contingent compensation, accrued vacation, and other like benefits paid or payable (in cash or otherwise) in 2008 to each employee of Seller and, to Seller's Knowledge, the German Subsidiary. To Seller's Knowledge, no pension benefits, and no severance, "golden parachute" or similar benefits or commitments have been granted to any current employee.

5.16 <u>Other Subsidiaries</u>. Custom Chrome Manufacturing, Inc. and Custom Chrome Far East, Ltd. (Taiwan) have not conducted material business operations (which, for purposes of this representation means any manufacturing operations and/or the ordinary course sale and distribution of Goods to customers) since July 31, 2007 and March 31, 2007, respectively.

6. <u>Buyer's Warranties and Representations</u>. In addition to the representations and warranties contained elsewhere in this Agreement, Buyer hereby makes the following representations and warranties to Seller:

6.1 <u>Organization, Standing and Power</u>. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Buyer has all requisite entity power and authority to own, lease and operate its properties, to carry on its business

as now being conducted and to execute, deliver and perform this Agreement and all writings relating hereto.

6.2     No Conflict. The execution, delivery and performance of this Agreement and all writings relating hereto by Buyer have been duly and validly authorized. The execution and delivery of this Agreement, the consummation of the transaction herein contemplated, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Buyer do not and will not: (i) conflict with or result in a breach of the articles of incorporation or by-laws of Buyer or, if applicable, other organizational documents or agreements of Buyer; (ii) violate any statute, law, rule or regulation, or any order, writ, injunction or decree of any court or governmental authority; or (iii) violate or conflict with or constitute a default under any agreement, instrument or writing of any nature to which Buyer is a party or by which Buyer or its assets or properties may be bound.

7.  Bankruptcy Matters

7.1     Motion(s). The Seller shall file with the Bankruptcy Court on or promptly after the Petition Date, a motion(s) (the "**Motion**") seeking the Bankruptcy Court's approval of the Bidding Procedures Order and the Sale Order in the forms affixed hereto as **Exhibits "E"** and **"F,"** respectively. Seller shall affix a true and complete copy of this Agreement to the Motion filed with the Bankruptcy Court.

7.2     Bidding Procedures Order. The Motion shall request, among other things, (i) the scheduling of the date of the Auction to be commenced not later than February 29, 2008, and the Sale Hearing (as defined below) not more than two (2) Business Days following the completion of the Auction, and (ii) the entry of the Bidding Procedures Order, containing, among other provisions acceptable to Buyer and Seller (but, in all events, only to the extent consistent with the Bidding Procedures Order attached as **Exhibit "E"** hereto), the following provisions:

(a)     a schedule of the date(s) for the Auction and the hearing (the "**Sale Hearing**") to consider the entry of the Sale Order;

(b)     the establishment of notice requirements, bidding procedures, including requirements regarding competing bids, and the pre-qualification (in the Seller's discretion) of competing bids and bidders ("**Qualified Bids**") for the Auction;

(c)     a requirement that a competing bidder shall be required to demonstrate (to Seller's satisfaction) that it has the financial wherewithal to consummate the transactions contemplated by this Agreement;

(d)     a requirement that any party desiring to submit a Qualified Bid must submit a deposit equal to $1,000,000 simultaneously with the submission of a Qualified Bid;

(e)     a requirement that Qualified Bids must be in substantially the form of this Agreement and marked to show any modifications to this Agreement;

(f)     a requirement that a Qualified Bid must be in an amount that is at least $800,000 greater than the Purchase Price.

(g)     a requirement that subsequent bids must be in an amount that is at least $100,000 more than the prior bid;

(h)     a requirement that the Seller file with the Bankruptcy Court not later than two (2) Business Days after Buyer has delivered to Seller the list identifying the Designated Contracts and the amounts necessary to cure defaults under each of the Designated Contracts (the "**Cure Schedule**"); and

(i)     establishment of cure claim notice and dispute procedures relating to the assumption and sale and assignment of the Designated Contracts.

The Seller shall serve on all counterparties to the Designated Contracts a notice specifically stating that the Seller is or may be seeking the assumption and assignment of the Designated Contracts and shall notify such parties of the deadline for objecting to the amounts listed in the Cure Schedule, which deadline shall not be less than [two] business days prior to the Sale Hearing. In cases in which the Seller is unable to establish that a default exists, the relevant cure amount shall be set at $0.00. The Motion shall reflect that Buyer is responsible for providing from and after the Closing adequate assurance of future performance necessary to satisfy the requirements of section 365 of the Bankruptcy Code in respect of the assignment to Buyer of the Designated Contracts. Notwithstanding anything to the contrary in this Agreement, Buyer acknowledges and agrees that if Seller is unable to transfer or assign any Designated Contract by reason of Buyer's failure to provide adequate assurance of future performance, such Contract shall thereupon become an Excluded Asset.

7.3     Entry of the Bidding Procedures Order. The Bidding Procedures Order shall be entered not later than February 14, 2008 (but, in all events, only to the extent consistent with the Bidding Procedure Order attached as **Exhibit "E"** hereto).

7.4     Sale Order. The Motion shall seek the entry of the Sale Order containing, *inter alia*, the following provisions:

(a)     finding that the notice of the Sale Hearing and the Auction was proper and sufficient under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Bankruptcy Court's Local Bankruptcy Rules, that the Seller and the Buyer entered into the Agreement in good faith, the Purchase Price and Assumed Liabilities constitute fair value in consideration for the Assets and Designated Contracts and determining that the Buyer is a "good faith" purchaser entitled to the protections afforded by Section 363(m) of the Bankruptcy Code with respect to the transactions, the Assets and the Designated Contracts;

(b)     authorizing the Seller to transfer to the Buyer all right, title, privilege and interest of the Seller in and to the Assets, free and clear of any Encumbrances, with all such Encumbrances attaching to the net proceeds of sale, if any;

(c)      authorizing the Seller to assume and sell and assign the Designated Contracts to the Buyer pursuant to Sections 363 and 365 of the Bankruptcy Code;

(d)      finding that the Buyer is a not a successor to the Seller or its estate by reason of any theory of law or equity with respect to any Liens, Claims, and Encumbrances against the Debtor or the Assets other than Permitted Encumbrances and Assumed Liabilities; and

(e)      establishing the amounts, if any, which the Seller must pay or escrow to cure any defaults or actual pecuniary losses under or with respect to the Designated Contracts.

7.5      <u>Assumption of Designated Contracts</u>. Pursuant to Section 365 of the Bankruptcy Code and as requested by parties to the Designated Contracts and required by the Bankruptcy Court, the Buyer shall provide adequate assurance of future performance under and with respect to the Designated Contracts. After the Closing Date, the Seller shall be released from any further liability under the Designated Contracts as provided for under Section 365(k) of the Bankruptcy Code.

7.6      <u>Procedure</u>. Prior to filing or submission with the Bankruptcy Court, the Seller shall use all diligent and commercially reasonable efforts to provide the Buyer with drafts of any and all pleadings and proposed orders to be filed or submitted in connection with the obtaining approval of this Agreement for the Buyer's prior review and comment. The Bidding Procedures Order and Sale Order shall be in the forms affixed hereto as **Exhibits "E"** and **"F,"** respectively, and any changes thereto shall be subject to Seller's and Buyer's approval. Seller shall use diligent and commercially reasonable efforts to obtain approval of the Bidding Procedures Order and the Sale Order.

7.7      <u>Buyer Protections</u>. Subject to entry of the Bidding Procedures Order, the Seller shall pay to Buyer the Break-Up Fee and the Expense Reimbursement to the extent and as and when required by the terms and conditions set forth in Section 10.2 hereof.

8.      <u>Employment Matters</u>.

8.1      Buyer may in its sole discretion offer to employ any or all of the Seller's employees; provided however that Buyer shall extend offers of employment effective as of the Closing to at least 90% of all Seller employees at each of Seller's U.S. locations on terms comparable to their current terms of employment with Seller as reflected on the Employee Schedule which provides separate itemization of employees at each such U.S. location. Subject to Section 8.2 below, Buyer shall not have any liability or obligation for any persons who are employees of the Seller from and after the Closing or in respect of any severance or other costs relating to the termination of employment of any of the Seller's employees or in respect of any liability or obligation of the Seller under any employee plan or on account of any employment-related agreement. Any employment arrangement between the Buyer and any of the Seller's employees to be hired by the Buyers as of the Closing Date (each a **"Transferred Employee"**) shall be employment at the will of the Buyers and each Transferred Employee. Either the Buyer or Transferred Employee shall be entitled to terminate the employment arrangement at

any time for any reason or for no reason, with or without cause, and with or without notice to the other. Nothing herein or elsewhere will be construed as a commitment to employ any Transferred Employee (or any employee) for any period of time or to pay any Transferred Employee (or any employee) any severance pay; provided, however, as between Seller and Buyer, Buyer shall be solely responsible for any liability to any such Transferred Employee arising out of Buyer's post-Closing dealings with such individuals, which liability shall be deemed part of the Assumed Liabilities.

8.2     Seller shall retain and shall be responsible for paying and discharging all liabilities for vacation time, sick leave, personal leave and other compensated time off accrued by Seller's employees as of the Closing Date to the extent the same is required by applicable law to be paid at the Closing. Except to such extent, (i) the balance of Seller's Accrued Vacation Obligations to each Transferred Employee shall be credited to such Transferred Employee upon commencement of their employment with Buyer and such Accrued Vacation Obligations shall be Assumed Liabilities, and (ii) Buyer shall credit each such Transferred Employee for the term of their employment with Seller for purposes of eligibility for any employee benefits offered by Buyer based on length of service. For avoidance of doubt, Seller shall retain any Liabilities arising out of the transfer of Accrued Vacation Obligations to Buyer, to the extent such transfer is determined to be contrary to applicable laws or regulations or otherwise results in any Claim, and Buyer shall not be entitled to a credit against the Purchase Price pursuant to Section 2.2 hereof with respect to any such Liabilities arising out of Accrued Vacation Obligations so retained by Seller.

9.    Covenants of the Parties

9.1     General. Each of the Parties will use commercially reasonable efforts to take or cause to be taken all actions and to do or cause to be done, as soon as possible, all things necessary, proper or advisable (subject to any applicable laws and regulations) to consummate the Closing and the other transactions contemplated by this Agreement, including the negotiation, execution and delivery of any additional instruments necessary to consummate the transactions contemplated by this Agreement. Neither of the Parties will, without prior written consent of the other Party, take or fail to take, or permit their respective Affiliates to take or fail to take, any action, which would reasonably be expected to prevent or materially impede, interfere with or delay the consummation of the transactions contemplated by this Agreement. Further, each Party shall use its commercially reasonable efforts to cause all of the conditions to the obligations of such under Section 4.1 or Section 4.2 (as the case may be) to be satisfied on or prior to the Closing Date and to obtain, prior to the Closing, in writing (copies of which shall be delivered to the other Party) all consents, waivers or approvals of all third parties and Governmental Entities which, notwithstanding the Sale Order, are necessary for the consummation by such party of the transactions contemplated by this Agreement

9.2     Notices and Consents. Prior to the Closing Date, the Seller will use commercially reasonable efforts to give all notices required to be given by the Seller in connection with the Transactions contemplated hereby. In connection with the foregoing, each Party will (a) promptly notify the other Party of any written communication to that Party or its Affiliates from any Governmental Entity and, subject to Law, provide the other Party with a copy of any written communication to any of the foregoing and (b) not participate in any substantive meeting or

discussion with any Governmental Entity in respect of any filings, investigation or inquiry concerning the transactions contemplated by this Agreement unless it consults with the other Party in advance and, to the extent permitted by such Governmental Entity, gives the other Party the opportunity to attend and participate thereat, with respect to this Agreement and the transactions contemplated hereby or thereby.

9.3    Conduct of the Business. Prior to the Closing Date, except with the written consent of Buyer or as may be required by order of the Bankruptcy Court, the Seller will:

(a)    not take or intentionally omit to take any action which could reasonably be expected to result in a material breach of any of Seller's representations and warranties hereunder;

(b)    promptly disclose to Buyer any information relating to Seller's representations and warranties hereunder that Seller becomes aware of after the date hereof, which makes any information previously provided to Buyer incomplete or incorrect in ,any material respect and all information regarding any material damage to or material loss of any of the Assets;

(c)    conduct the Business in all material respects in accordance with the operating budget attached hereto as Schedule 9.3 and incorporated by reference herein (the "**Budget**"); provided, however, notwithstanding anything to the contrary in this Agreement, Seller shall in no event be deemed to be in breach or violation of its obligations under this Agreement solely by virtue of Seller's failure to pay any obligations owing to or place any further orders with or incur any further obligations to any party obligations to whom are not included among the Designated Trade Obligations.

(d)    to the extent consistent with the Budget, use its commercially reasonable efforts to (i) preserve the existing business organization and management of the Business intact, (ii) keep available the services of the current officers and employees of the Business, to the extent reasonably feasible, (iii) maintain the existing relations with customers, carriers, call centers, distributors, suppliers, creditors, business partners, employees and others having business dealings with the Business, to the extent reasonably feasible, and (iv) refrain from changing in any material respect any of its product prices or pricing policies (e.g., discount policies) for any of its products except as shall be necessary to meet competition or customer requirements;

(f)    not make any loans to or otherwise enter into any transaction with any officer, employee, partner or Affiliate (other than any debtor in possession financing arrangement Seller may obtain or enter into with Ableco Finance in order to fund all or any portion of the amounts required to comply with the Budget, so long as any Liens or Encumbrances associated therewith terminate and are removed at or prior to the Closing), or make or grant any increase in any employee's or officer's wages, salary, bonus or other compensation or make or grant any increase in any employee benefit plan, incentive arrangement, or other benefit covering any of its officers or employees, or establish, amend, or contribute to any pension, retirement, severance, profit sharing, plan or multiemployer plan covering any of the employees of the Business, except as required by law or as specifically contemplated by the Budget;

(g)     not enter into, assume, amend, modify or terminate any material Contract or lease (including any Designated Contract) or amend or other modify any of its organizational documents, in each case except as specifically contemplated by the Budget, and, so long as any Liens or Encumbrances associated therewith terminate and are removed at or prior to the Closing, any Contract(s) Seller may enter into in connection with any debtor in possession financing Seller may obtain in order to fund all or any portion of the amounts required to comply with the Budget;

(h)     not adopt or propose any change to, or fail to maintain, the current levels of insurance coverage afforded the Seller under existing insurance policies except as may be specifically contemplated by the Budget;

(i)     not sell, assign, transfer, lease or license any of the Assets, other than sales of inventory in the ordinary course of business, or subject any of the Assets or the Business to any Lien or Encumbrance (except for Permitted Encumbrances) which will not be removed by virtue of the entry of the Sale Order;

(j)     not waive or release any material right of the Seller that constitutes Assets;

(j)     not enter into any commitment for capital expenditures, except as may be specifically contemplated by the Budget;

(k)     not effect any distribution, dividend or other transfer of cash, inventory or other assets from the German Subsidiary to Seller or to any Affiliate of Seller, other than payment of cash for the sale of Inventory to the German Subsidiary in the ordinary course and at prices consistent with the Company's customary transfer pricing policies and practices;

(l)     not transfer or assign any Liability of Seller or its Affiliates to the German Subsidiary; and

(m)     not cause the German Subsidiary to guarantee or otherwise incur any Liability with respect to any Liability of Seller or its Affiliates.

9.4     Access to Business, Records and Documents.

9.4.1     Prior to the Closing, Seller will (a) upon reasonable notice, permit representatives of the Buyers to have reasonable access during normal business hours and under reasonable circumstances to all personnel, premises, properties, assets, books, and records of the Business, and (b) furnish the Buyers with financial and other information in the Seller's possession relating to the Business and the Assets as the Buyers may from time to time reasonably request.

9.4.2     During the period from the Closing until the closing of the Bankruptcy Case (the **"Post-Closing Cooperation Period"**), (i) the Buyer shall permit Seller's counsel and other advisers and any successor to Seller and its professional advisers (collectively, **"Permitted Access Parties"**) access to the financial and other books and records relating to the

Business for all periods preceding the Closing Date, to the extent that such books and records are transferred to the Buyer at closing. Such access shall be provided upon at least five (5) Business Days' prior written notice and during Buyer's normal business hours, and only to the extent such access does not interfere with or disrupt Buyer's normal business operations. Such access shall include (a) the right of such Permitted Access Parties to copy, at such Permitted Access Parties' expense, such documents and records as they may request in furtherance of the purposes described above, and (b) Buyer's copying and delivering to the relevant Permitted Access Parties such documents or records as they may request, but only to the extent such Permitted Access Parties furnish Buyer with reasonably detailed written descriptions of the materials to be so copied and the applicable Permitted Access Party reimburses the Buyer for the costs and expenses thereof. During the Post-Closing Cooperation Period, Buyer shall make designated personnel available to assist Seller with accessing information reasonably required for Seller's post-Closing activities (including, without limitation, preparation of tax returns), provided that such access does not interfere with the Buyer's business operations.

10.   Termination

    10.1   Termination Rights.

    This Agreement may be terminated at any time prior to the Closing:

        (a)   by mutual written agreement executed by Seller and Buyer.

        (b)   automatically and without any action or notice by any Party, immediately upon:

            (i)   the issuance of an order, decree, or ruling or any other action by a Governmental Entity to restrain, enjoin or otherwise prohibit the transfer of the Assets contemplated hereby which has not been reversed, released or removed as of the Outside Date (as defined in Section 10.1(c)(iv) below; or

            (ii)   consummation of an Alternate Transaction.

        (c)   by Buyer:

            (i)   if the Bidding Procedures Order shall not have been entered by February 14, 2008;

            (ii)   if the Bankruptcy Court has not entered the Sale Order by March 5, 2008 (or such later date as Buyer may agree upon in writing);

            (iii)   if there has been a material violation or breach by Seller of any material representation, warranty or covenant contained in this Agreement which (x) has rendered the satisfaction of any condition to the obligations of Buyer impossible or is not curable or, if curable, has not been cured within five (5) days following receipt by Seller of written notice of such breach from Buyer, and (y) has not been waived by Buyer;

(iv)     at any time after March 12, 2008 (the **"Outside Date"**), if the Closing shall not have occurred other than by reason of Buyer's material breach of its obligations under this Agreement;

(v)     if Seller's Bankruptcy Case shall be converted into a case under Chapter 7 of the Bankruptcy Code or dismissed, or if a trustee is appointed in the Bankruptcy Case;

(vi)     if there shall be excluded from the Assets any Required Consent Contract, to the extent that such consent shall not have been given prior to the Closing (except in the case of any Required Consent Contract that would have been assignable pursuant to the Bankruptcy Code, the Sale Order or otherwise, but for Buyer's failure to provide adequate assurance of future performance sufficient to satisfy the relevant requirements of Section 365 of the Bankruptcy Code);

(vii)     if Ableco Finance LLC shall fail to indicate in writing its consent to the terms of this Agreement and irrevocably waive any right to credit bid for the Assets pursuant to Section 363(k) of the Bankruptcy Code within five (5) Business Days of the Petition Date, which consent and waiver may be expressly conditioned upon there being no material modification or amendment of this Agreement prior to the Closing (other than changes to the Schedules attached hereto explicitly contemplated by this Agreement); or

(viii)     if Seller shall fail to file its Schedules of Assets and Liabilities and Statement of Financial Affairs required under the Bankruptcy Code and Federal Rules of Bankruptcy Procedures within seven (7) Business Days of the Petition Date.

(d)     by Seller:

(i)     if there has been a material violation or breach by Buyer of any agreement or any representation or warranty contained in this Agreement which (x) has rendered the satisfaction of any condition to the obligations of Seller impossible or is not curable or, if curable, has not been cured within five (5) days following receipt by Buyer of written notice of such breach from Seller, and (y) has not been waived by Seller, or

(ii)     upon occurrence of the Outside Date, but only to the extent the Closing has not occurred as of the Outside Date for reasons other than Seller's failure to meet its obligations hereunder, including without limitation using all diligent and commercially reasonable efforts to obtain approval of the Bidding Procedures Order and the Sale Order by the applicable dates specified in Section 10.1(c) above.

10.2     Break-Up Fee and Expense Reimbursement.

10.2.1     Subject to the entry of the Bidding Procedures Order, if this Agreement is terminated pursuant to Section 10.1(b)(ii) or 10.1(c)(iii) (the "Break-Up Right Provisions"), Seller shall upon consummation of an Alternate Transaction pay the Break-Up Fee to Buyer in immediately available funds, without need for further order of or from the Bankruptcy

Court. To the extent due and payable hereunder, the Break Up Fee shall be super-priority administrative expense priority obligations under Section 364(c)(1) of the Bankruptcy Code with priority over all expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code.

        10.2.2  Subject to the entry of the Bidding Procedures Order, if this Agreement is terminated pursuant to Sections 10.1(b)(ii), 10.1(c)(iii), 10.1(c)(vi), 10.1(c)(vii) or 10.1(c)(viii) (the "**Expense Reimbursement Right Provisions**") or on account of the Outside Date occurring prior to the Closing Date (provided that the Closing Date did not occur prior to the Outside Date due to a material breach of this Agreement by Buyer  or a termination of the transaction contemplated herein pursuant to Section 10.1(b)(i) hereof by reason of Buyer's actions or inactions), Seller shall pay the Expense Reimbursement to Buyer in immediately available funds upon consummation of the Alternate Transaction, without need for further order of the Bankruptcy Court, within three (3) days of receipt of reasonable evidence of the amounts constituting the Expense Reimbursement by both (i) Seller and (ii) the Creditors' Committee.  To the extent due and payable hereunder, the Expense Reimbursement shall be super-priority administrative expense priority obligations under Section 364(c)(1) of the Bankruptcy Code with priority over all expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code.

        10.2.3  The Parties agree that Buyer shall have no right to the Break-Up Fee or the Expense Reimbursement unless this Agreement is terminated pursuant to the Break-Up Right Provisions or the Expense Reimbursement Right Provisions, or if the Outside Date occurs prior to the Closing Date.

        10.2.4  Notwithstanding anything to the contrary herein, the total amount payable on account of the Break-Up Fee and the Expense Reimbursement shall not exceed $650,000.

        10.2.5  Subject to the entry of the Bidding Procedures Order, if Seller hereby acknowledges that the obligation to pay the Break-Up Fee and the Expense Reimbursement (to the extent due hereunder) shall survive the termination of this Agreement, and shall have administrative priority status against the Seller and its estate under Section 364(c)(1) of the Bankruptcy Code with priority over all expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code.

    11. Defined Terms

    The terms defined in this Article shall have the following respective meanings for all purposes of this Agreement, with the definitions being equally applicable to both the singular and plural forms of the terms defined:

    "**Accounts Receivable**" has the meaning given to such term in Section 1.1.5.

    "**Accounts Receivable Balance**" has the meaning given to such term in Section 2.1.2.

**"Accrued Vacation Obligations"** means all accrued but unpaid obligations to all employees of Seller for accrued vacation time as reflected on the Closing Statement (regardless of whether the applicable state law mandates payment of such obligations upon termination of employment by Seller).

**"Affiliate"** means, with respect to any Person, any other Person that controls, is controlled by, or is under common control with another Person. For purposes of this definition of "Affiliate", a Person shall be deemed to control another Person if it possesses, directly or indirectly, the power to direct or cause the direction of the management policies of such other Person, whether through ownership of voting securities, by contract or otherwise.

**"Alternate Transaction"** means a transaction or series of related transactions (or an agreement to do any of the following) involving a party other than the Buyer occurring within 180 days from the date hereof pursuant to which Seller (i) consummates the transaction contemplated by a Qualified Bid, other than that of Buyer, (ii) sells, transfers, leases or otherwise disposes of, directly or indirectly all or substantially all of the Assets, including through an asset sale, stock sale, merger, reorganization or other similar transaction (by Seller or otherwise), or (iii) the confirmation of a plan of reorganization or refinancing. Notwithstanding the foregoing, an Alternate Transaction shall not include a piecemeal liquidation under Chapter 7 or Chapter 11 of the Bankruptcy Code, or a piecemeal liquidation of the Asset after the Seller is no longer engaging in business operations in the ordinary course of business.

**"Ancillary Agreements"** shall mean all agreements and instruments executed or delivered by one or both of the Parties pursuant to this Agreement.

**"Assets"** has the meaning given to such term in Section 1.1.

**"Assigned Claim(s)"** has the meaning ascribed to such term in Section 1.1.8 hereof.

**"Assignment of Contracts"** means the Assignment of Contracts substantially in the form attached hereto as **Exhibit "A."**

**"Assumed Liabilities"** means, without duplication, only the (i) Seller's accounts payable to Vendors for Inventory delivered to GMG or at GMG's direction during the Section 503(b)(9) Period, which amount shall not exceed $1,600,000; (ii) all unpaid Post-Petition Product Payables; (iii) all Cure Costs associated with, and the liabilities and obligations of the Seller arising from and after the Closing under, the Designated Contracts assigned to Buyer, (iv) the Post-Petition G&A Payables; (v) all Designated Trade Obligations, (vi) the Accrued Vacation Obligations in accordance with Section 8.2 hereof, (vii) all product returns and warranty claims with respect to the Assets, but solely to the extent requiring return, replacement or repair of the product or service provided (and specifically excluding any other Liabilities relating to products or services sold or provided prior to the Closing, including, without limitation, any Liability for any claim under any Environmental Law and any claims for property damage, personal injury or death), and (viii) any post-Closing liabilities to Transferred Employees as set forth in Section 8.1 hereof. For avoidance of doubt, nothing in the definition of "Designated Trade Obligations" below shall in any way limit or modify the Assumed Liabilities set forth in clauses (i)-(iv) or (vi)-(viii) above. For avoidance of

doubt, any and all Liabilities falling within more than one of the categories enumerated in the preceding numbered clauses shall be counted only once without duplication.

"**Assignment of Intangible Property**" means the Assignment of Intangible Property substantially in the form attached hereto as **Exhibit "C."**

"**Auction**" means the auction for the sale of the Assets conducted by Seller if any other Qualified Bid is received pursuant to the Bidding Procedures Order.

"**Avoidance Actions**" means any causes of action arising under Chapter 5 of the Bankruptcy Code (11 U.S.C. Section 501 et seq.).

"**Bankruptcy Case**" has the meaning given to such term in the Recitals.

"**Bankruptcy Code**" means title 11 of the United States Code, as amended and in effect from time to time.

"**Bankruptcy Court**" has the meaning given to such term in the Recitals.

"**Bidding Procedures Order**" means the order of the Bankruptcy Court authorizing and approving procedures for soliciting Qualified Bids and conducting the Auction, and approving payment of the Break-Up Fee and the Expense Reimbursement on the terms and conditions set forth herein, substantially in the form affixed hereto as **Exhibit "E"** (subject to non-material changes only and other changes which have been or may be approved by the Seller in writing).

"**Bill of Sale**" means the Bill of Sale, substantially in the form attached hereto as **Exhibit "B."**

"**Break-Up Fee**" means a fee in the amount of $500,000 which shall be payable in accordance with Section 10.2 of this Agreement and subject to the limitations set forth in Section 10.2.4 hereof.

"**Business Day**" means a day that is a day of the year in which banks are not required or authorized by law to close in Wilmington, Delaware.

"**Claim(s)**" means (a) claims as that term is defined in section 101(5)(A) of the Bankruptcy Code, and (b) claims as that term is defined in section 101(5)(B) of the Bankruptcy Code.

"**Closing**" means the consummation and effectuation of the transactions contemplated herein pursuant to the terms and conditions of this Agreement, which shall be held on or before three (3) Business Days after the date that all conditions (except for closing conditions that by their terms can only be satisfied on the Closing Date) to the Parties' obligations to consummate the transactions contemplated herein have been satisfied or, if applicable, waived by the appropriate Party or Parties, at 10:00 A.M. (Pacific time) in the offices of Reed Smith LLP, San Francisco, California, or on such other date or at such other time or place as is mutually agreed by the Parties hereto.

**"Closing Date"** means the date on which the Closing actually occurs.

**"Code"** means the Internal Revenue Code of 1986, as amended.

**"Contract"** means any agreement, contract, lease commitment or other binding arrangement or understanding, whether written or oral, to which Seller is a party and which Seller is permitted under the Bankruptcy Code to assume and assign.

**"Contract Retention Period"** has the meaning given to such term in Section 3.3.2.

**"Copyrights"** means all copyrights, including without limitation moral rights and rights of attribution and integrity, copyrights in software and in the content contained on any web site, and registrations and applications for any of the foregoing, and rights to sue for past infringement thereof.

**"Creditors' Committee"** means the Official Committee of Unsecured Creditors appointed in the Bankruptcy Case;

**"Cure Costs"** means amounts that must be paid and obligations that otherwise must be satisfied, including pursuant to Sections 365(b)(l)(A) and (B) of the Bankruptcy Code, in connection with the assumption and sale and assignment of the Designated Contracts.

**"Designated Contracts"** has the meaning given to such term in Section 1.1.1.

**"Designated Trade Obligations"** means all obligations of Seller identified on **Schedule 1.1.1-(iv)** hereto (which Schedule shall identify the vendors to whom such obligations are owed and the amount of such obligations as of the date hereof), provided that the third-party identified on that schedule agrees in a writing with the Buyer, prior to the Sale Hearing, to accept payment of the applicable Designated Trade Obligation on the ninetieth (90th) day following the Closing, or on such other terms as are agreed by Buyer and the Holder of the applicable Designated Trade Obligation, and agrees to immediately commence shipment or deliveries to Buyer following the Closing on credit terms at least as favorable as those previously provided to the Seller and which are acceptable to Buyer, in its sole discretion. The Buyer shall be permitted to add or delete Designated Trade Obligations to **Schedule 1.1.1-(iv)** at any time prior to the Sale Hearing.

**"Encumbrance"** means any mortgage, conditional sales agreement, title retention contract, easement, encumbrance, security interest, Lien, debt, levy, charge, indenture, lease, option, pledge or restriction (whether on voting, sale, transfer, disposition or otherwise), whether imposed by agreement, understanding, law, equity or otherwise, except for any restrictions generally arising under any applicable federal or state securities laws.

**"Environmental Laws"** means all federal, state, local and foreign environmental, health and safety laws, codes and ordinances and all rules and regulations promulgated thereunder, including, without limitation, laws relating to emissions, discharges, releases or threatened releases of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or wastes into the environment (including, without limitation, air, surface water, ground water, land

surface or subsurface strata) or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or- handling of hazardous substance or waste or other pollutants, contaminants, chemicals, or industrial, solid, toxic or hazardous substances or wastes.

"**Excluded Assets**" has the meaning given to such term in Section 1.2.

"**Excluded Avoidance Actions**" means all Avoidance Actions except those against any counterparty to any Designated Contract assumed and assigned to Buyer in accordance with this Agreement, any Transferred Employees, and/or any of the holders of the Assumed Liabilities to whom Buyer assumes all of Seller's Liabilities at the Closing.

"**Excluded Contract**" has the meaning given to such term in Section 1.2.

"**Excluded Obligations**" shall include all Liabilities of the Seller not specifically assumed by the Buyer pursuant to this Agreement as Assumed Liabilities.

"**Expense Reimbursement**" means the documented actual out-of-pocket costs and expenses (including, without limitation, actual fees and expenses of counsel) incurred by Buyer and/or its Affiliates in connection with the negotiation, documentation and implementation of this Agreement and the transactions contemplated hereby and participation in the Bankruptcy Case up to a maximum of $300,000. Buyer acknowledges that the amount of any Expense reimbursement payable to Buyer in accordance with and under the circumstance provided in Section 10.2 hereof shall expressly be subject to the limitation set forth in Section 10.2.4 hereof.

"**German Subsidiary**" has the meaning given such term in Section 1.1.9.

"**Governmental Entity**" means any government or any agency, bureau, board, commission, court (including, without limitation, the Bankruptcy Court), department, official, political subdivision, tribunal or other instrumentality of government, whether federal, state, local, domestic or foreign.

"**Held Contract**" has the meaning given to such term in Section 3.3.2.

"**Holder**" means a Person holding a Claim or other right.

"**Intellectual Property**" means Copyrights, Patents, Trademarks, Software and Trade Secrets owned or used by Seller or held for use in the Business.

"**Knowledge**" means the actual, current knowledge of Dan Cook, Maureen Schilling, Scott Avila, Frank Esposito and Peter Clapp (the "**Knowledge Group**"); provided that, with respect to matters relating to the German Subsidiary, such knowledge is based solely upon information provided by representatives of the German Subsidiary to one or more members of the Knowledge Group after inquiry by GMG.

"**Liability**" means any debt, liability, claim, Lien, expense, commitment or obligation, whether accrued or not, known or unknown, disclosed or undisclosed, fixed or contingent, asserted or unasserted, liquidated or unliquidated, and including all costs and expenses relating thereto.

"**Lien**" means any debt, mortgage, security interest, lien, encumbrance, pledge, charge, defect, Claim, option, right of first refusal, restriction or adverse claim of any kind or nature whatsoever.

"**Material Adverse Effect**" means any event, occurrence or effect that has had or would be reasonably likely to have, individually or when taken as a whole with any other events, occurrences or effects, a material adverse effect on the Property, Business of the Seller and/or the ability, of the Seller to consummate the transactions contemplated by this Agreement, but excluding any material adverse effect arising out of (i) any changes in United States general economic or securities markets conditions, or (ii) any changes that affect the aftermarket motorcycle components industry in general.

"**Net Merchandise Inventory**" means the sum, at any time, of the value (at standard cost,) as determined by application of the J.D. Edwards Enterprise System employed by GMG as of the execution date of this Agreement, of: (i) all Inventory physically located at any of GMG's facilities at: (a) 16100 Jacqueline Court, Morgan Hill, California, 95037, (b) 3500 Industrial Road, Harrisburg, Pennsylvania 17110 (the "**Harrisburg Facility**"), (c) 4298 Nash Road, Cape Girardeau, Missouri 63701, and (d) 7227 West Sunnyview, Visalia, CA 93291-9639 (collectively, the "**Facilities**"); plus (ii) all supplies, goods, materials, work in process, inventory and stock in trade intended for use in connection with the operation of the Business (collectively, "**US Goods**") in-transit to any of the Facilities that has been shipped on an FOB origin basis; plus (iii) all US Goods that have been shipped and are in-transit between or among any of the Facilities; plus (iv) all Inventory, determined on an aggregate basis, shipped and in transit from the Harrisburg Facility to or at the direction of the German Subsidiary from and after January 14, 2008; plus, (v) all consigned US Goods (i.e., US Goods which are property of GMG, but physically located at a vendor's premises or facility for the purpose of incorporation into a finished assembly, such as Dae-Il produced Rev Tech engines)."

"**Patents**" means all patents and industrial designs, including, without limitation, any continuations, divisionals, continuations-in-part, renewals, reissues and applications for any of the foregoing, and rights to sue for past infringement thereof

"**Petition Date**" has the meaning given to such term in the Recitals.

"**Permits**" means permits, certificates, licenses, filings, approvals and other authorizations of any Governmental Entity.

"**Permitted Encumbrances**" means any (i) any easements and any rights of lessors under any leases or other counterparties included in the Designated Contracts; (ii) statutory liens arising in the ordinary course which are not past due and that do not materially affect the value or use of the affected asset, and, (iii) as to the German Subsidiary, the Lien of GMAC Commercial Finance plc ("**GMAC CF**") on the accounts receivable, inventory, and other assets of the German Subsidiary under the Facilities Agreement dated December 5, 2006, between the German Subsidiary and GMAC CF (the "**Facilities Agreement**").

**"Person"** means any individual, partnership, corporation, limited liability company, trust, unincorporated organization, association, joint venture or other entity or a Governmental Entity.

**"Post-Petition G&A Payables"** means all accounts payable of Seller (excluding accounts payable of the German Subsidiary) with respect to general trade creditors (not including Vendors) (but for avoidance of doubt specifically not including amounts payable by Seller pursuant to Section 12.12 hereof) with respect to periods subsequent to the Petition Date and prior to the Closing Date, including payables with respect to "Received Not Vouched" goods & services that may not otherwise have been recorded as payables on Seller's books and records.

**"Post-Petition Product Payables"** means all accounts payable of Seller (excluding accounts payable of the German Subsidiary) with respect to shipments of Inventory received by Seller subsequent to the Petition Date and prior to the Closing Date, including payables with respect to "Received Not Vouched" Inventory that may not otherwise have been recorded as payables on Seller's books and records.

**"Purchase Price"** has the meaning given to such term in Section 2.1.

**"Qualified Bid"** has the meaning given to such term in Section 7.1(c).

**"Release"** means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, or leaching into the indoor or outdoor environment, or into or out of any property.

**"Required Consent Contract"** has the meaning given to such term in Section 4.2.8.

**"Sale Hearing"** has the meaning given to such term in Section 7.1(b).

**"Sale Order"** means an order of the Bankruptcy Court authorizing and approving the sale of the Assets by Seller to Buyer and the sale and assignment by Seller and assumption by Buyer of the Designated Contracts, substantially in the form affixed hereto as **Exhibit "F"** (subject to non-material changes only and other changes which have been or may be approved by the Seller in writing).

**"Section 503(b)(9) Period"** means the twenty (20) calendar days preceding the Petition Date.

**"Seller Products"** means all products currently or previously sold or offered for sale by Seller.

**"Share Transfer Agreement"** has the meaning given to such term in Section 3.4.

**"Software"** means any and all (i) computer programs, (ii) databases and compilations, (iii) descriptions, flow-charts and other work product used to design, plan and/or develop any of the foregoing, (iv) screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (v) all documentation including user manuals and other training documentation related to any of the foregoing.

"**Subsidiary**" means, with respect to a Person, any corporation, limited liability company, partnership, association or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity, a majority of the partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof. For purposes hereof, a Person shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity if such Person shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control any managing director or general partner of such limited liability company, partnership, association or other business entity.

"**Tax**" or "**Taxes**" shall mean all federal, state, local and foreign income, excise, gross receipts, ad valorem, profits, gains, property, capital, sales, transfer, use, license, payroll, employment, social security, severance, unemployment, withholding, duties, excise, windfall profits, intangibles, franchise, backup withholding, value added, alternative or add-on minimum, estimated and any other taxes, charges, levies, customs, duties, governmental fees or like assessments or charge of any kind whatsoever, together with all penalties and additions to tax and interest thereon, whether disputed or not, imposed by any Taxing Authority or court, administrative agency or commission or other Governmental Entity.

"**Tax Return**" shall mean any return, declaration, report, claim for refund, or information return or similar statement relating to Taxes, including any schedule or attachment thereto, and including any claim for refund or amendment thereof, or declaration of estimated tax, supplied or required to be supplied to a Taxing Authority.

"**Taxing Authority**" shall mean any Governmental Entity, domestic or foreign, having jurisdiction over the assessment, determination, collection, or other imposition of any Taxes.

"**Trademarks**" means all trademarks, service marks, trade names, domain names, brand names, corporate names, designs, logos, emblems, signs or insignia, slogans, other similar designations of source or origin and general intangibles of like nature, together with the goodwill of the business symbolized by any of the foregoing, registrations and applications relating to any of the foregoing, and rights to sue for past infringement thereof.

"**Trade Secrets**" means all trade secrets including, without limitation, trade secrets of the following nature: financing and marketing information, technology, know-how, inventions, proprietary processes, formulae, algorithms, models and methodologies, and rights to sue for past infringement thereof.

"**Transfer Taxes**" means transfer, recording, stamp or similar Taxes.

"**Transferred Employee**" has the meaning given to such term in Section 8.1.

"**Vendor**" means any suppliers of products for resale by Seller or suppliers of product components or materials.

12. Miscellaneous.

    12.1    Attorneys' Fees.  In the event that either Party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing Party in that action or proceeding shall be entitled to have and recover from the non-prevailing Party all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing Party may suffer or incur in the pursuit or defense of such action or proceeding.

    12.2    Time is of the Essence.  Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

    12.3    Notices.  Unless otherwise provided herein, any notice, tender, or delivery to be given hereunder by any Party to the other may be effected by personal delivery in writing, or by recognized overnight messenger service, or by registered or certified mail, postage prepaid, return receipt requested or by facsimile, and shall be deemed communicated as of the date of personal delivery or facsimile transmission (with answer back confirmation of such transmission), the next business day following deposit with a messenger service, or five business following mailing by registered or certified mail.  Mailed notices shall be addressed as set forth below, but each Party may change his address by written notice in accordance with this Section 12.3.

| | |
|---|---|
| To Seller: | Global Motorsport Group, Inc.<br>16100 Jacqueline Court<br>Morgan Hill  95037<br>Attn: Mr. Scott Avila, Chief  Restructuring Officer<br>Facsimile:  (310) 919-3751 |
| With a copy to: | Pachulski Stang Ziehl & Jones LLP<br>919 North Market Street, 17th Floor<br>Wilmington, Delaware  19899<br>Attn: Laura Davis Jones, Esq.<br>Facsimile:  (302) 652-4400 |
| To Buyer: | Dae-il USA, Inc.<br>2805 Day Road<br>Gilroy, CA 95020<br>Attn: Mr. Ignatius (Nace) Panzica<br>Facsimile:  (408) 847-0324 |
| With a copy to: | Reed Smith LLP<br>Two Embarcadero Center<br>San Francisco, CA 94111 |

12.4    Entire Agreement.  This instrument, any confidentiality agreements executed prior to the date hereof between Seller and Buyer or their respective Affiliates, and the documents to be executed pursuant hereto contain the entire agreement between the Parties relating to the sale of the Assets.

12.5    Modification.  This Agreement may be modified, amended or supplemented only by a written instrument duly executed by all the Parties hereto.

12.6    Closing Date.  All actions to be taken on the Closing Date pursuant to this Agreement shall be deemed to have occurred simultaneously, and no act, document or transaction shall be deemed to have been taken, delivered or effected until all such actions, documents and transaction  have been taken, delivered or effected.

12.7    Severability.  Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement shall survive.

12.8    Captions.  All captions and headings contained in this Agreement are for convenience of reference only and shall not be construed to limit or extend the terms or conditions of this Agreement.

12.9    Further Assurances.  Each Party hereto will execute, acknowledge and deliver any further assurance, documents and instruments reasonably requested by  the other Party for the purpose of giving effect to the transaction  contemplated herein or the intentions of the Parties with respect thereto; provided that nothing herein shall be deemed to require any Party to execute or deliver any such further assurance, document or instrument to the extent that the same could in any material way increase the burdens, obligations or liabilities otherwise imposed upon such Party by this Agreement or require any monetary expenditure such Party is not otherwise expressly required to make or incur pursuant to any other provision of this Agreement.

12.10    Waiver.  No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the Party making the waiver.

12.11   Brokerage Obligations.  Seller and the Buyer each represent and warrant to the other that, other than Lincoln International Advisors, LLC (the **"Broker"**), Seller's investment banker, such Party has incurred no liability to any broker or agent with respect to the payment of any commission or other compensation regarding the consummation of the transaction contemplated hereby.  It is agreed that if any claims for commissions, fees or other compensation, including, without limitation, brokerage fees, finder's fees, or commissions are ever asserted against Buyer or Seller in connection with this transaction by any party other than the Broker (for whose commission or other compensation Seller shall be solely responsible), all such claims shall

be handled and paid by the Party whose actions form the basis of such claim and such Party shall indemnify, defend (with counsel reasonably satisfactory to the Party entitled to indemnification), protect, save and hold the other harmless from and against any and all such claims.

12.12   Payment of Fees and Expenses.  Except as provided in Sections 10.2 and 12.1 above, each Party to this Agreement shall be responsible for, and shall pay, all of its own fees and expenses, including those of its counsel, incurred in the negotiation, preparation and consummation of the Agreement and the transactions described herein.

12.13   Survival.  The respective representations and warranties of Buyer and Seller under this Agreement or in any certificate delivered at the Closing and all covenants hereunder which, by their terms, are to be performed at or prior to the Closing, shall lapse and cease to be of any further force or effect effective upon the Closing.  Except as provided in the immediately preceding sentence, the covenants and agreements of Seller and Buyer herein, or in any certificates or other documents delivered prior to or at the Closing, shall not be deemed waived or otherwise affected by the Closing.

12.14   Assignments.  Neither this Agreement nor any rights or obligations under it are assignable, except that Buyer may assign or delegate its rights and obligations (in whole or in part) hereunder to one or more newly formed entities, to one or more of its Subsidiaries and/or to one or more Persons that Buyer determines to partner with in connection with the transactions contemplated by this Agreement; provided, however, that Buyer shall remain liable for all of its obligations under this Agreement.

12.15   Binding Effect.  Subject to the provisions of Section 12.14 above, this Agreement shall bind and inure to the benefit of the respective heirs, personal representatives, successors, and assigns of the Parties hereto.

12.16   Applicable Law and Jurisdiction.  THIS AGREEMENT AND ALL DOCUMENTS, INSTRUMENTS AND AGREEMENTS EXECUTED AND DELIVERED PURSUANT TO THE TERMS AND PROVISIONS HEREOF WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE BANKRUPTCY CODE AND, TO THE EXTENT NOT INCONSISTENT WITH THE BANKRUPTCY CODE, THE INTERNAL LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICTING PROVISION OR RULE (WHETHER OF THE STATE OF DELAWARE OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE LAWS OF ANY JURISDICTION OTHER THAN DELAWARE TO BE APPLIED.  IN FURTHERANCE OF THE FOREGOING, THE LAW OF DELAWARE WILL CONTROL THE INTERPRETATION AND CONSTRUCTION OF THIS AGREEMENT AND SELLER ANCILLARY DOCUMENTS AND BUYER ANCILLARY DOCUMENTS, EVEN IF UNDER SUCH JURISDICTION'S CHOICE OF LAW OR CONFLICT OF LAW ANALYSIS, THE SUBSTANTIVE LAW OF SOME OTHER JURISDICTION WOULD ORDINARILY APPLY. **THE PARTIES AGREE THAT IF ANY DISPUTE ARISES OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE DOCUMENTS EXECUTED HEREUNDER OR IN CONNECTION HEREWITH, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE PERSONAL AND SUBJECT MATTER JURISDICTION AND SHALL BE**

THE EXCLUSIVE VENUE TO RESOLVE ANY AND ALL DISPUTES RELATING TO THE TRANSACTION CONTEMPLATED BY THIS AGREEMENT. SUCH COURT SHALL HAVE SOLE JURISDICTION OVER SUCH MATTERS AND THE PARTIES AFFECTED THEREBY AND BUYER AND DEBTORS EACH HEREBY CONSENT AND SUBMIT TO SUCH JURISDICTION.

12.17 <u>Good Faith</u>. All Parties hereto agree to do all acts and execute all documents required to carry out the terms of this Agreement and to act in good faith with respect to the terms and conditions contained herein before and after Closing.

12.18 <u>No Third-Party Beneficiaries</u>. This Agreement will not confer any rights or remedies upon any Person or entity other than the Parties hereto, their respective successors and permitted assigns.

12.19 <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, ANTITRUST CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON-LAW OR STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH LEGAL COUNSEL OF ITS OWN CHOOSING, OR HAS HAD AN OPPORTUNITY TO DO SO, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS, HAVING HAD THE OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS, OR MODIFICATIONS TO THIS AGREEMENT. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT WITHOUT A JURY.

12.20 <u>Construction</u>. In the interpretation and construction of this Agreement, the Parties acknowledge that the terms hereof reflect extensive negotiations between the Parties and that this Agreement shall not be deemed, for the purpose of construction and interpretation, drafted by either Party hereto.

12.21 <u>Counterparts</u>. This Agreement may be signed in counterparts. The Parties further agree that this Agreement may be executed by the exchange of facsimile signature pages provided that by doing so the Parties agree to undertake to provide original signatures as soon thereafter as reasonable in the circumstances.

12.22    Interpretation and Rules of Construction.  In this Agreement, except to the extent that the context otherwise requires:

12.22.1    any reference in this Agreement to an Article, Section, Exhibit or Schedule is to an Article or Section of, or an Exhibit or Schedule to, this Agreement, unless otherwise indicated;

12.22.2    the headings and captions used in this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

12.22.3    the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

12.22.4    all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

12.22.5    the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

12.22.6    any law defined or referred to herein or in any agreement or instrument that is referred to herein means such law or statute as from time to time amended, modified or supplemented, including by succession of comparable successor laws;

12.22.7    references to a person are also to its permitted successors and assigns; and

12.22.8    the use of "or" is not intended to be exclusive unless expressly indicated otherwise.

In Witness Whereof, Buyer and Seller have executed this Asset Purchase Agreement as of the day and year first above written.

**BUYER:**

**Dae-il USA, Inc.**

By: _____

Name: IGNATIUS T. PANZICA

Its: PRESIDENT

**GMG:**

**Global Motorsport Group, Inc.**

By: _____

Name: T. Scott Ayala

Its: Chief Restructuring Officer

**CCE:**

**Custom Chrome Europe Ltd.**

By: _____

Name: DANIEL M. COOK

Its: DIRECTOR

DOCSLA-15623591.19

**SCHEDULE 1.1.1-(i)**

**Real Property Leases**

1.      Harrisburg

Lease Agreement, dated January 19, 2007, between Keystone Central Storage LP and Global Motorsport Group, Inc.

First Amendment to the Lease Agreement, dated as of December 27, 2007, between Keystone Central Storage LP and Global Motorsport Group, Inc.

# SCHEDULE 1.1.1-(ii)

## Other Leases

Vendor / Equipment
- Crown #32966
- Crown #34340
- Crown #34343
- Crown Master Lease
- GE Capital Lease – Forklift
- Insight Global Finance
- Pitney Bowes – Mailroom equipment

# SCHEDULE 1.1.1-(iii)

## Other Contracts

General Business Agreements
- Advanstar Communications – Booth costs- Cinci
- Argent – inventory barter/trade agreement
- Daeil Industrial and Hanjoo Metal Co. – Exclusive Dealing Agreement
- Effordables, LLC
- Impressions on Hold- phone hold line at Cape G
- Insight – McAfee Gold Virus Contract
- Jammer – license agreement
- Kewill Solutions North America
- Oracle Corporation Software Maintenance Contract
- Phoenix Formations – Cincinnati show booth provider
- S&S Cycle, Incorporated
- Settlement Agreement, dated 7/11/90, between Harley-Davidson, Inc. and Custom Chrome, Inc. relating to settlement of trademark and other IP disputes
- South Valley Systems Resources Maintenance Contracts


Royalty Agreements

- Bandit Machine Works
- Big Bear Choppers
- Brian Drugge
- Casey Hoekstra
- Chica Motorcycle Service
- Cole Foster
- Daytona Twin Tec
- Don Rich
- Donnie Smith
- Doug Keim
- Duncan Keller
- Eddie Trotta
- Ergo Designs
- Eric Tommy Jansson
- Essex Motorsports
- Fred Kodlin
- James Crosby
- Jesse G James / Vanilla Gorilla
- John Reed
- Kosman Designs
- Nasi Design
- Paul Cox Leather
- Paul Yaffe
- Rick Doss
- Roger Bergi

- Steve Vergano
- Wilhelm Desser
- Wyatt Fuller

Employee Agreements

- Ed Martin
- Holger Mohr

**Product Vendors**

| Name | Total assumed amounts (including Section 503(b)(9) Period amounts) as of January 31, 2008. |
|---|---|
| A & E PRODUCTS | 380.06 |
| AC RACING | 13,342.73 |
| ACCESS MARKETING | 2,911.22 |
| ACCUTRONIX BILLET PRODUCTS | 5,137.75 |
| ADJURE INC. | 12,867.60 |
| AKME ENTERPRISES, INC. | 529.62 |
| ALINABAL, INC. | 4,918.70 |
| ALL RITE PRODUCTS | 3,084.60 |
| ALTO PRODUCTS CORP. | 11,543.99 |
| AMERICAN BIG BIKE | 1,748.06 |
| AMERICAN MANUFACTURING | 64,739.21 |
| AMP RESEARCH | 3,883.00 |
| AMREP | 23,029.43 |
| ANCRA INTERNATIONAL LLC | 7,017.96 |
| ANDOVER INCORPORATED | 8,069.41 |
| ANDREWS PRODUCTS, INC. | 58,628.72 |
| ARLEN NESS INC. | 116,290.11 |
| ASIA SURGE ENT.. | 8,331.31 |
| ATHENA MOTOR GASKETS | 61,440.92 |
| ATHENA USA | 26,979.78 |
| AUTO GEM | 350.00 |
| AUTO METER PRODUCTS, INC. | 5,341.75 |
| AVON GRIPS | 4,268.35 |
| AWI INC | 936.00 |
| B & M SCALE, INC. | 206.06 |
| BADLANDS MOTORCYCLE PRODUCT775 | 10,407.89 |

| | |
|---|---|
| BANDIT MACHINE WORKS | 323.70 |
| BARNETT TOOL & ENGINEERING | 37,824.84 |
| BATTERIES PLUS | 292.50 |
| BAY SEAL COMPANY, INC. | 472.56 |
| BEL-RAY COMPANY, INC. | 85,206.69 |
| BELT DRIVES LTD. | 272,103.94 |
| BENDER CYCLE & MACHINE CORP | 3,847.86 |
| BIG BOAR PRODUCTS | 9,037.25 |
| BIKE ALERT | 18,289.50 |
| BIKE BRITE, INC. | 8,291.72 |
| BIKE BUDDY PRO | 6,546.19 |
| BILLET INDUSTRIES | 459.77 |
| BILTWELL, INC. | 4,042.80 |
| BLENDZALL | 1,545.92 |
| BP LUBRICANTS USA, INC. | 101,619.84 |
| BRAKE TECH USA, INC | 1,636.88 |
| BRUCE LINSDAY COMPANY | 3,659.97 |
| BURG'S BIKE TOOLS LLC | 722.50 |
| CALIFORNIA SIDECAR | 239.51 |
| CANDLEPOWER INC. | 10,140.80 |
| CANYON DANCER | 6,420.00 |
| CARL SPOTTS | 2,701.00 |
| CARLISLE TIRE AND WHEEL | 30,911.47 |
| CARL'S SPEED SHOP | 2,269.11 |
| CARTWHEELS | 2,901.54 |
| CHADPAK COMPANY INC | 1,440.00 |
| CHAO LUNG ELECTRIC CO. LTD. | 46,878.65 |
| CHIAPERO Y ASOCIADOS S.R.L. | 40,958.21 |
| CHICA MOTORCYCLE SERVICE, INC. | 6,425.94 |
| CHICAGO RAWHIDE | 12,269.74 |
| CHOPPER GUYS BIKER PRODUCTS, INC. | 100.00 |
| CHOPPERS, INC. | 3,250.00 |
| CHRIS PRODUCTS | 12,784.05 |
| CLASSIC DESIGNS | 3,074.95 |

DOCSSFO-12507756.3

| | |
|---|---|
| CLEAN CYCLE PRODUCTS | 154.00 |
| CLYMER | 12,770.20 |
| COLONY MACHINE & TOOL INC. | 30,872.68 |
| COMETIC GASKET | 18,422.30 |
| COMPANY OF THE AMERICAS, INTL. | 1,033.00 |
| COMPETITION CAMS, INC. | 3,230.21 |
| COMPETITION CHEMICALS | 2,893.05 |
| CONQUEST PRODUCTS | 4,967.33 |
| CONTAINER CONSULTING SERVICE, INC. | 1,954.62 |
| CONTINENTAL CHAIN CO | 5,866.38 |
| CONTINENTAL GENERAL TIRE, I | 291.49 |
| COOPER-AVON TYRES LTD. | 3,434.16 |
| CRANE CAMS INC. | 87,765.99 |
| CRUZTOOLS, INC. | 8,026.12 |
| CUSTOM CYCLE ACCESSORIES | 18,967.28 |
| CUSTOM CYCLE ENGINEERING | 906.00 |
| CYCLE COUNTRY ACCESSORIES C | 15,473.21 |
| CYCLE PRO, LLC. | 10,513.00 |
| CYCLELINE | 9.88 |
| CYCLESMITHS INC. | 10,634.90 |
| CYCRA RACING SYSTEMS | 1,361.74 |
| CYPRESS MEDIA INC | 2,700.00 |
| D & D PERFORMANCE ENTERPRISES | 20.22 |
| DADDYMACK | 2,275.00 |
| DAEIL INDUSTRIAL CO. LTD. | 26,761.58 |
| DAEIL INDUSTRIAL CO., LTD. | 148,921.68 |
| DAIDO CORPORATION OF AMERIC | 54,239.20 |
| DAKOTA DIGITAL, INC. | 4,781.18 |
| DALLAS GASKETS AND PACKING CO. | 896.00 |
| DAYTEC CENTER | 61,587.72 |
| DAYTONA INTERNATIONAL TRADI | 22,898.97 |
| DAYTONA TWIN TEC LLC | 291.00 |
| DEKALB TRADE VOICE | (368.05) |
| DEL CITY WIRE CO INC | 252.90 |

DOCSSFO-12507756.3

| | |
|---|---|
| DELTRAN | 39,884.70 |
| DENNIS CORSO | 275.07 |
| DENNIS STUBBLEFIELD SALES INC. | 236.10 |
| DESIGNS BY NOVELLO | 2,778.10 |
| DETROIT BROS. CUSTOM CYCLES | 3,315.00 |
| DIAMOND CHAIN | 20,253.39 |
| DIAMOND ENGINEERING | 572.30 |
| DIAMOND POWERSPORTS | 7,947.12 |
| DIRT DIGITS | 972.15 |
| DL MACHINE LLC | 2,224.62 |
| DNA SPECIALTY INC. | 27,122.35 |
| DOHERTY MACHINE | 1,406.46 |
| DOWCO INC. | 57,756.77 |
| DR. NEON'S LABORATORY | 1,403.90 |
| DRIVE LINE | 74.25 |
| DS MFG. | 133,489.65 |
| DUNLOP | 77,049.56 |
| DYNATEK | 61,938.32 |
| DYNOJET RESEARCH INC. | 1,721.45 |
| EASTERN MOTORCYCLE PARTS | 3,855.55 |
| EASTSIDE HARLEY-DAVIDSON IN | 30,423.58 |
| EASYRIDER ROADWARE | 388.96 |
| EDELBROCK CORPORATION | 8,014.44 |
| EMGO | 35,994.43 |
| ENERSYS INC | 17,953.42 |
| ENGELHORN DESIGNS | 2,887.50 |
| ENGINE ELECTRONICS, INC. | 1,091.74 |
| ESSEX MOTORSPORTS INTL. | 101.68 |
| EVS SPORTS | 9.00 |
| EXCEL COMPONENTS, INC. | 6,534.70 |
| EYERIDE MOTORWEAR | 7,585.40 |
| FABRICATOR KEVIN'S STEEL CH | 3,630.00 |
| FASTENING SYSTEMS | 628.37 |
| FEDERAL-MOGUL CORP. | (341.86) |

- 4 -

| | |
|---|---|
| FEDERAL-MOGUL CORP. | (1,760.83) |
| FEDERAL-MOGUL OPERATIONS IT | 242,354.22 |
| FENDERS N' MORE, LLC | 1,149.00 |
| FERODO RACE SUPPORT | 5,063.16 |
| FEULING OIL PUMP CORPORATIO | 6,428.50 |
| FLAMBEAU PRODUCTS CORP. | 458.88 |
| FLAMING RIVER INDUSTRIES | 174.60 |
| FMF RACING | 2,851.59 |
| FORCE MOTOR PRODUCTS INC. | 9,668.12 |
| FRIEND METALS CO., INC. | 7,925.00 |
| GARDNER-WESTCOTT CO. | 3,393.06 |
| GENE'S PLATING WORKS | 4,836.25 |
| GENGRAS HARLEY-DAVIDSON/BUELL | 621.76 |
| GLASS RESTORATION SPECIALISTS, INC. | 414.00 |
| GMA ENGINEERING (BDL) | 4,798.25 |
| GOLAN PRODUCTS | 23,518.00 |
| GOODRIDGE, (USA) INC. | 145,535.79 |
| GOODYEAR DUNLOP TIRES NA, L | 18,388.65 |
| GORILLA AUTOMOTIVE PRODUCTS | 1,871.52 |
| GRANDEUR CYCLE | 2,136.78 |
| GREENBALL CORPORATION | 191,534.40 |
| H.G. MAKELIM CO.        ## | 2,268.60 |
| H.H.I. | 5,220.00 |
| HARDLINE PRODUCTS | 803.99 |
| HARDSTREET SADDLEBAGS | 715.86 |
| HARNESS INC. | 770,487.76 |
| HASTINGS MFG. CO. | 18,080.97 |
| HAYDEN ENTERPRISES | 568.72 |
| HEADWINDS CUSTOM HEADLIGHTS | 1,476.44 |
| HEARTLAND USA, L.L.C. | 1,922.00 |
| HIGHLAND PLATING COMPANY | 15,754.87 |
| HIGHWAY CHOPPERS INC. | 4,060.00 |
| HOBSON BEARING | 1,262.60 |
| HONEYWELL, INC. | 15,844.12 |

DOCSSFO-12507756.3

| | |
|---|---|
| HOT CAMS, INC. | 6,387.97 |
| HOT RODS PRODUCTS | 2,879.73 |
| HOWARD'S HOG HORNS | 1,638.00 |
| HYDRODYNAMICS USA, INC. | 81.40 |
| I.L PRODUCTIONS | 3,459.50 |
| Idemitsu Lubricants America Corporation | 45,423.09 |
| IMAGE MEDIA | 1,160.00 |
| IMAGE WERXS | 2,584.00 |
| INA USA / SCHAEFFLER GROUP | 703.06 |
| INDIAN LARRY LEGACY | 1,450.00 |
| INNOVATIONS INC | 1,288.22 |
| INNOVATIVE BRANDS | 12,708.46 |
| INNOVATIVE CHEMICAL CORP. | 55,312.52 |
| INTERCO PRODUCTS CORPORATIO | 14,702.72 |
| IZUMI CHAIN MFG.CO.LTD.    ## | 16,438.14 |
| J.STRONG INDUSTRIES | 71,385.00 |
| JE PISTONS | 9,552.96 |
| JETT DEVELOPMENT GROUP | 15,583.40 |
| JIM'S MACHINING | 1,558.50 |
| JOHNNY'S CUSTOM SHOP | 129.51 |
| K & L SUPPLY COMPANY | 8,717.83 |
| K & N ENGINEERING | 24,441.02 |
| KAYO CORPORATION | 8,002.40 |
| KBC AMERICA INC | 31,334.00 |
| KENDON INDUSTRIES INCORPORA | 47,419.33 |
| KEVIN DARLING'S BOYCE PRO S | 4,743.74 |
| KIBBLEWHITE PRECISION MACH. | 14,279.69 |
| KIWI INDIAN MOTOCYCLES | 2,765.00 |
| K-LINE INDUSTRIES, INC. | 568.68 |
| KOLPIN POWERSPORTS | 14,292.31 |
| KREEM PRODUCTS | 15,116.30 |
| KRYPTONITE CORPORATION | 13,961.80 |
| KT COMPONENTS INC. | 7,115.50 |
| KWIK TEK | 22,456.50 |

- 6 -

DOCSSFO-12507756.3

| | |
|---|---|
| LA BOITE, INC. | 11,281.10 |
| LANDMARK MFG., INC. | 12,974.66 |
| LBV ENGINEERING | 2,610.25 |
| LE PERA ENTERPRISES INC | 4,396.65 |
| LEAK PROOF SEALS | 2,167.50 |
| LIQUID PERFORMANCE DISTRIBU | 10,311.08 |
| LISLE CORPORATION | 615.00 |
| LOGISTICS SUPPLY CORP | 2,887.50 |
| LUSTER LACE METAL POLISH | 2,197.19 |
| MACHINE EXPERIENCE & DESIGN ## | 1,718.00 |
| MACHINE TOOL BEARINGS | 298.08 |
| MAIER MANUFACTURING INC. | 3,690.89 |
| MANLEY PERFORMANCE PRODUCTS | 5,779.72 |
| MARSHALL ELECTRIC CORPORATI | 7,837.85 |
| MARSHALL INSTRUMENTS, INC. | 3,851.91 |
| MASTER LOCK | 437.74 |
| MASTER LOCK COMPANY | 2,349.15 |
| MAXIMA PRODUCTS | 25,130.79 |
| MCLEOD ACCESSORIES | 121,250.36 |
| MELLON BANK (Gas Cap) | 1,802.88 |
| MES | 29,952.05 |
| MEYER RETAINING RING COMPANY, INC. | 57.95 |
| MIC | 4,772.50 |
| MIDWEST ACORN NUT COMPANY | 65,289.93 |
| MIKUNI AMERICAN CORPORATION | 62,961.06 |
| MILWAUKEE IRON | 7,786.07 |
| MINOR RUBBER COMPANY INC. | 1,284.48 |
| MIRAMAR DESIGNS | 623.70 |
| MJM VEHICLE DESIGN & FABRICATION | 1,493.00 |
| MLP SEATING | 2,094.00 |
| MOTHERWELL PRODUCTS | 5,454.63 |
| MOTION INDUSTRIES | 3,366.45 |
| MOTION PRO | 27,170.69 |
| MOTO 911 INC. | 3,672.57 |

DOCSSFO-12507756.3

| | |
|---|---|
| MOTOBLOC | 1,574.08 |
| MOTOR CITY HARLEY-DAVIDSON | 314.72 |
| MOTORBOOKS INTERNATIONAL | 210.18 |
| MOTOREX USA | 12,113.18 |
| MOTORWAY CUSTOM CYCLES | 18,104.00 |
| MOTUL USA INC | 93,319.73 |
| MTIA INTERNATIONAL, INC. | 37,838.37 |
| MUSCARELLA'S | 1,526.00 |
| MUSTANG SEATS/AL SIMMONS CO. | 603.40 |
| MXL INDUSTRIES, INC. | 2,145.60 |
| NAMZ CUSTOM CYCLE PRODUCTS | 15.22 |
| NASH MOTORCYCLE CO. | 3,498.26 |
| NASHUA LABELS | 1,071.20 |
| NATIONAL CYCLE, INC. | 35,411.83 |
| NEELEY RACING INC | 173.21 |
| NELSON-RIGG | 51,956.69 |
| NEW AGE INDUSTRIAL | 8,473.07 |
| NGK SPARK PLUGS USA INC | 80,586.87 |
| NOLOGY ENGINEERING, INC. | 940.80 |
| NYC CUSTOM MOTORCYCLES INC. | 2,561.00 |
| O NEAL AZONIC | 91,441.81 |
| O'NEILL MFG., INC. | 15,246.72 |
| OXLITE MANUFACTURING | 37,152.22 |
| PACIFIC COAST SUNGLASSES | 1,668.00 |
| PACIFIC POWERSPORTS INC. | 2,207.42 |
| PAUGHCO INC | 16,261.30 |
| PAUL COX LEATHER | 5,553.23 |
| PAUL YAFFE ORIGINALS | 7,005.42 |
| PERFORMANCE TIRE INC | 2,544.86 |
| PINSLEY MANUFACTURING INC | 21,851.66 |
| PIVOT WORKS INC | 5,945.59 |
| PJH BRANDS | 17,559.48 |
| PLASTICHE CASSANO SRL | 18,139.78 |
| PLEXUS | 13,855.80 |

DOCSSFO-12507756.3

| | |
|---|---|
| POLLAK CORP./STONERIDGE CONTROL DEVICES | 4,007.82 |
| POLLY HEATERS, INC. | 4,620.00 |
| POLYPAN GEL, LLC | 887.25 |
| POWERSPORT INDUSTRIES, INC. | 27,768.84 |
| POWERTYE | 1,162.50 |
| PRAIRIETECH INNOVATIONS | 2,536.80 |
| PRECISION ENGINE PRODUCTS CORPORATION | 8,808.80 |
| PRESTOLITE WIRE | 24,654.03 |
| PRESTOLITE WIRE (ACCEL) | 3,191.90 |
| PROGRESSIVE SUSPENSION INC. | 58,672.45 |
| PRO-ONE PERFORMANCE | 15,872.11 |
| PROTECT ALL, INC | 1,335.24 |
| PYRAMID PRODUCTS | 701.42 |
| R.B. INTERNATIONAL | 173.00 |
| R.G. RAY CORPORATION | 2,952.03 |
| RADIANTZ | 1,633.58 |
| REGINA USA INC | 3,961.21 |
| RENO CYCLE WORX, LTD | 34,110.00 |
| RICK DOSS' REVENGE CYCLE, INC. | 79.20 |
| RIDETEK | 3,565.52 |
| RIVERA PRIMO, INC. | 10,994.38 |
| RK EXCEL AMERICA, INC. | 9,971.22 |
| ROCKEM & SOCKEM MOTORCYCLE, CO. | 8,105.24 |
| RODGER MCEWAN CO. | 154.50 |
| ROWE U.S.A. | 477.90 |
| ROYAL INDUSTRIES LTD. | 2,680.00 |
| RW COMPANY'S BIKESTUFF | 60.00 |
| S & S CYCLE, INC. | 189,081.36 |
| SAFETY VEHICLE EMBLEM | 2,782.77 |
| SAMSON MOTORCYCLE PRODUCTS, INC. | 37,038.00 |
| SCORPION EXHAUSTS | 106,936.82 |
| SCOTT USA | 10,950.65 |
| SCRIBNER PLASTICS | 5,302.29 |
| SEAL METHODS INC. | 131,755.01 |

DOCSSFO-12507756.3

| | |
|---|---|
| SIR SPEEDY | 17.50 |
| SJS PRODUCTS | 100.00 |
| SKULL ENTERPRISES | 7,478.45 |
| SLIPSTREAMER INC | 20,918.55 |
| SOLUTIONS MANUFACTURING, IN | 38,065.30 |
| SONNAX INDUSTRIES, INC. | 2,804.36 |
| SPECTRE PERFORMANCE | 2,518.73 |
| SPEEDWAY DIVISION OF KNBI,INC | 118.00 |
| SPORTECH, INC | 18,950.86 |
| SPS | 1,190.21 |
| SPYKE, INC. | 8,621.41 |
| SRITONG INDUSTRIAL SUPPLY LTD. | 1,162.86 |
| STANADYNE | 228.80 |
| STANDARD MOTOR PRODUCTS INC718 | 18,410.51 |
| STAR WEST INC     . | 6,827.50 |
| STD DEVELOPMENT INC. | 20,771.45 |
| STEADY CLOTHING INC. | 720.10 |
| STEVENSON'S CYCLE | 743.00 |
| STOUT MARKETING, INC. | 3,690.00 |
| STRIDE TOOL, INC | 766.53 |
| SUMMIT IND., INC. | 439.30 |
| SUMMIT INDUSTRIES INC. | 15,808.74 |
| SUN MYTH INTERNATIONAL | 20,194.53 |
| SUNG BO INDUSTRIAL CO LTD | 2,295.00 |
| SUPERTRAPP INDUSTRIES INC | 27,802.90 |
| SYNCRO CORP (MES) | 37,902.17 |
| SYSTEM PLASTIC CO., LTD. | 4,490.00 |
| T.P ENGINEERING | 558.50 |
| TAG METALS AMERICA LLC (Valencia) | 3,698.40 |
| TALLERES DIVA S.A. DE C.V. | 4,162.29 |
| TAW VEHICLE CONCEPTS | 12,208.00 |
| TAYLOR CABLE PRODUCTS INC.  ## | 2,191.91 |
| TECHLUSION, INC. | 34,918.54 |
| TERRY COMPONENTS | 937.83 |

DOCSSFO-12507756.3

| | |
|---|---|
| THE STANDARD RIVET CO. | 41.25 |
| THERMO-TECH AUTOMOTIVE INC. | 15,689.00 |
| THUNDER CYCLE DESIGNS | 4,539.90 |
| THUNDERHEART PERFORMANCE | 9,686.12 |
| TIMKEN CORPORATION, THE | 13,662.88 |
| TIMKEN CORPORATION, THE | 8,667.32 |
| TOLEMAR MFG. | 43,668.97 |
| TRANSPO ELECTRONICS, INC. | 15,317.95 |
| TRAVELCADE SADDLEMEN | 3,538.60 |
| TRIM-LOK, INC. | 199.73 |
| TWISTED CHOPPERS | 3,246.51 |
| UFO | 9,209.70 |
| UM PERFORMANCE PRODUCTS | 5,353.28 |
| UNI FILTER, INC. | 13,632.45 |
| UNITED ENGINE & MACHINE COM | 11,528.00 |
| VALENCIA SPORT GROUP | 74,975.33 |
| VALLEY MACHINE | 290.00 |
| VON HOFFMAN CORPORATION | 84,216.29 |
| VOSS EXTREME SPORTS INC | 7,008.00 |
| VP RACING FUELS, INC. | 7,468.11 |
| WANG'S INTERNATIONAL | 2,623.20 |
| WARN INDUSTRIES | 431,414.58 |
| WEST COAST CHOPPERS INC. | 9,711.45 |
| WHITE BROTHERS (MAG) | 18,342.74 |
| WILD 1 | 17,134.73 |
| WINDFIELD CONSUMER PRODUCTS, INC. | 983.51 |
| WINDVEST COMPANY | 8,128.00 |
| WIRE PLUS, INC. | 1,510.00 |
| WISECO PISTON INC. | 37,228.91 |
| XENA SECURITY | 5,462.80 |
| YANKEE ENGINEUITY | 5,669.71 |
| YAZAWA INCORPORATED | 122.50 |
| YOST PERFORMANCE PRODUCTS | 1,688.70 |
| YUASA BATTERY, INC. | 14,610.65 |

DOCSSFO-12507756.3

| | |
|---|---|
| YUHUAN LINGYU MACHINERY MGF0086 | 9,143.50 |
| ZAN HEADGEAR | 4,457.29 |
| ZENITH FUEL SYSTEMS, LLC | 8,804.61 |
| ZERUST CONSUMER PRODUCTS | 510.50 |
| ZIPPER'S CYCLE, INC. | 50,703.50 |
| ZODIAC ENTERPRISES LIMITED | 128,285.31 |

DOCSSFO-12507756.3

## G&A Vendors

| Name | Total assumed amounts (including Section 503(b)(9) Period amounts) as of January 31, 2008. |
|---|---|
| | - |
| ALLAGASH PROPERTY TRUST | |
| AFFLINK | 48,562.26 |
| BARNETT'S MAGAZINE | 1,620.00 |
| BIG BEAR CHOPPERS - ROYALTIES | (7.00) |
| BRIAN DRUGGE | 95.20 |
| CASEY HOEKSTRA | 47.21 |
| CIT TECHNOLOGY FIN SERV, INC | 317.57 |
| COLE FOSTER | 924.26 |
| CROWN CREDIT CORP | 4,182.26 |
| DEALER-WORLD.COM | 6,995.00 |
| DON RICH | 1,040.40 |
| DONNIE SMITH | - |
| DONNIE SMITH | - |
| DOUG KEIM - ROYALTIES | (5.19) |
| DUNCAN KELLER | 78.40 |
| EDDIE TROTTA - ROYALTIES | (9.10) |
| EHLERT PUBLISHING GROUP, I | 2,977.00 |
| ERGO DESIGNS INCORPORATED | 327.54 |
| ERIC TOMMY JANSSON | - |
| EXPERIAN | 830.58 |
| FRED KODLIN | 499.34 |
| GE CAPITAL | 560.23 |
| HATTON-BROWN PUBLISHERS, IN | 4,250.00 |
| INSIGHT GLOBAL FINANCE | 1,750.15 |
| INTRAVEX | 138,347.18 |
| JAMES CROSBY | - |
| JESSE G. JAMES/VANILLA GORI | 3,792.00 |
| JOHN REED | 1,119.41 |
| JP Morgan Chase Bank, N.A. | 1,250.00 |
| KOSMAN DESIGN-ROYALTIES | 27.98 |

- 13 -

DOCSSFO-12507756.3

| | |
|---|---|
| KRIS KNUTSON | 974.25 |
| MOTORCYCLE PRODUCT NEWS | 11,526.00 |
| MOTORCYCLE PRODUCT NEWS | 2,860.25 |
| MURPHY & HARRISON, INC. | 962.50 |
| NASI DESIGN | 293.08 |
| PAISANO PUBLICATIONS | 7,000.00 |
| PAUL YAFFEE -ROYALTIES | 260.50 |
| PITNEY BOWES CREDIT CORPORATION | 2,425.85 |
| PRIMEDIA SPECIALTY GROUP | 3,064.48 |
| RECEIVABLE MANAGEMENT SERVICES | 2,891.37 |
| RICK DOSS-ROYALTIES | 1,641.53 |
| RICOH BUSINESS SYSTEMS | 2,842.39 |
| ROGER MINKOW | 116.61 |
| SAGE PAYMENT SOLUTIONS INC | - |
| STEVE VERGANO | 95.20 |
| WILHELM DESSER | 301.00 |
| WYATT FULLER | 318.00 |

DOCSSFO-12507756.3

## SCHEDULE 1.1.2

### Personal Property

| | |
|---|---|
| Gross Book Value | $37,248, 247.82 |
| Accumulated Depreciation | ($36,298,280.51) |
| Net Book Value | $ 849,967.31 |

**SCHEDULE 1.1.3**

**Specified Intangible Property**

**NONE**

## SCHEDULE 1.1.4

### Deposits (as of 1/14/08)

**Grand Total Deposits** (Leases, Ins., Utilities, Contracts)    $271,670.33

## SCHEDULE 1.1.5

### Accounts Receivable

| | | |
|---|---|---|
| 1/9/2008 | All/Gross Receivables | 6,660,409.63 |

# SCHEDULE 1.1.6

## Inventory

| Date | Type | Amount |
|------|------|--------|
| 1/14/2008 | All | 18,817,186.56 |

## SCHEDULE 1.2

### Additional Excluded Assets

Equity interests in any Subsidiaries of Sellers other than the German Subsidiary

**SCHEDULE 4.2.8**

**Required Consent Contracts**

**Perot Systems**

# SCHEDULE 5.5

## Subsidiaries

The following constitute all the direct and indirect subsidiaries of Global Motorsport Group, Inc. ("GMG"). GMG owns, directly or indirectly, 100% of the equity interest in each.

### Direct Subsidiaries

- Custom Chrome Manufacturing, Inc. [a California corporation]
- Custom Chrome Europe, Ltd. [a Delaware corporation]
- Custom Chrome Far East, Ltd. [a Delaware corporation]

### Indirect Subsidiaries

- Global Motorsport Group, GmbH [a German corporation and a direct subsidiary of Custom Chrome Europe, Ltd.
- Custom Chrome Far East, Ltd. [a corporation organized under the laws of the Republic of China (Taiwan) and a direct subsidiary of Custom Chrome Far East, Ltd. (Delaware)]

# SCHEDULE 5.8

## Intangible Property Disputes

The following describes certain pending or potential disputes relating to intellectual property in which GMG has an interest:

1. <u>John Reed Rocker Boxes</u>. GMG and Custom Chrome Europe believe that certain European distributors may be selling rocker boxes designed by John Reed, as to which GMG has the exclusive right to distribute. These distributors may have received the rocker boxes from GMG's Taiwan manufacturer, in violation of the manufacturer's contractual obligations to GMG. GMG's counsel has contacted the European distributor but has not received a satisfactory response to date.

2. <u>Custom World Int'l</u>. CWI is a Canadian firm in the same line of business as GMG. GMG has opposed CWI's application to register the name "Custom World Int'l in Canada because it was too close to Custom Chrome. GMG's and CWI's counsel are discussing a settlement, under which CWI would be allowed to register the trademark but would agree to include in its advertising a notice that it is not affiliated with Custom Chrome.

3. <u>Elizabeth Truck Center ("ETC")</u>. This is a New Jersey-based company that provides after-market parts, including chrome parts, for large trucks. GMG has opposed its application to register its logo, which includes the words "ETC Custom Chrome." GMG and ETC's counsel have just begun discussions.

4. <u>www.customchrome.com.au</u>. Bendigo Custom Cycles, an Australian dealer in motorcycle parts, including GMG parts, uses this URL – if you type it into your browser, you are redirected to Bendigo's web page. To date, Bendigo has ignored correspondence from GMG's counsel.

5. <u>Registration of "Custom Chrome" in Australia</u>. GMG's application to register the mark "Custom Chrome" has been provisionally denied by the Australian trademark office, on the ground that the name is purely descriptive. GMG is considering whether to pursue the application.

6. <u>"Santé" in Europe</u>. ZEG, a German company, attempted to register the trademark "Santé." The application covered a broad range of products, including toys, bicycle parts, as well as motorcycle parts and accessories. GMG opposed the application as similar to its "Santee" trademark. GMG's and ZEG's counsel have negotiated an agreement, to be documented, under which ZEG would delete all references in its application to motorized vehicles or vehicle parts and add language that specifically excludes "motorized two-wheeled vehicles."

7. www.gmgracing.com. "Global Motorsports Group" is a southern California shop that builds, races, and modifies high-end sports cars. It apparently has no motorcycle operations. GMG successfully opposed its application to register the name "Global Motorsports Group" but has not taken any other action.

8. Chalice, Ltd. (Guatemala). Chalice, a GMG distributor in Guatemala, filed and registered the "Custom Chrome" mark in that country. GMG intends to contact the distributor and have the registration transferred to GMG.

# SCHEDULE 5.10.2

## Warehouse Addresses

### Visalia

7227 West Sunnyview
Visalia, CA 93291-9639

### Harrisburg

3500 Industrial Road
Harrisburg, PA 17110

### Cape Girardeau

4298 Nash Road
Cape Girardeau, MO 63701

### Germany

Global Motorsport Group GmbH
Planiger Strasse 154
55543 Bad Kreuznach
Germany

# SCHEDULE 5.11

## Pending Litigation

### 1.   Ft. Worth

Caption and Case No.:    PFF Industiral 4300 Diplomacy Drive, L.P. v. Global
                         Motorsport Group, Inc., Case No. 067-226699-07.

Nature of Proceeding:    Suit for back rent.

Court, etc.:             State of Texas, District Court, Tarrant County

Status:                  Pending

### 2.   Parkinson

Caption and Case No.:    Parkinson & Scartelli v. Custom Chrome, Inc. & Global
                         Motorsport Group, Inc., Case No. 1221

Nature of Proceeding:    Product liability

Court, etc.:             Court of Common Pleas, Philadelphia County, PA

Status:                  Pending

### 3.   Independence

Caption and Case No.:    Global Motorsport Group, etc. v. Focus, Inc., et al., Case
                         No. C20055329

Nature of Proceeding:    Collection action

Court, etc.:             Arizona Superior Court, Pima County

Status:                  Pending

### 4.   Kurena

Caption and Case No.:    Kurena v. Custom Chrome, Inc., Case No. CJ-2006-247

| | |
|---|---|
| <u>Nature of Proceeding</u>: | Product Liability |
| <u>Court, etc.</u>: | Oklahoma District Court, Payne County |
| <u>Status</u>: | Pending |

5.   **Feist**

| | |
|---|---|
| <u>Caption and Case No.</u>: | <u>William Feist III v. Global Motorsport Group, Inc.</u>, PHRC Case No. 200602233, EEOC No. 17F20076430 |
| <u>Nature of Proceeding</u>: | Employment discrimination |
| <u>Court, etc.</u>: | Pennsylvania Human Relations Commission |
| <u>Status</u>: | Pending |

6.   **Hog Farm I**

| | |
|---|---|
| <u>Caption and Case No.</u>: | <u>Lee et al. v. The Hog Farm, Inc., et al.</u>, Case No 20060527 |
| <u>Nature of Proceeding</u>: | Conversion, breach of contract, etc. |
| <u>Court, etc.</u>: | Court of Common Pleas, Brown County, Ohio |
| <u>Status</u>: | Pending |

7.   **Hog Farm II**

| | |
|---|---|
| <u>Caption and Case No.</u>: | <u>Spencer v. The Hog Farm, Inc., et al.</u>, Case No. 1:2006 cv 00592 |
| <u>Nature of Proceeding</u>: | Breach of contract, etc. |
| <u>Court, etc.</u>: | United States District Court, Southern District of Ohio |
| <u>Status</u>: | Pending |

8.   **Hog Farm III**

Caption and Case No.:    Jenkins v. The Hog Farm, Inc., et al., Case No 2006 CV
                         0634

Nature of Proceeding:    Violation of Ohio Revised Code § 1345.02; cross-claim by
                         Hog Farm v. Custom Chrome for accounting.

Court, etc.:             Court of Common Pleas, Brown County, Ohio

Status:                  Pending

9.   **Monday**

Caption and Case No.:    In re Gary Monday, Case No. 05-19618-JKC-7

Nature of Proceeding:    Chapter 7 bankruptcy case; GMG has asserted a claim
                         against the debtor.

Court, etc.:             United States Bankruptcy Court, Southern District of
                         Indiana, Indianapolis Division

Status:                  Pending.

10.  **Gattis**

Julie Gattis, a former GMG employee at GMG's Southern California facility, has filed a
gender discrimination claims against GMG with the U.S. Equal Employment Opportunity
Commission and California's Department of Fair Employment and Housing in
connection with her termination by GMG during the Fall of 2007. Both complaints are
pending.

## Budget

**Global Motorsport Group**
Cash Flow Projections - February 1, 2008 - March 12, 2008
(000's)

| Week Ending: | Week 1 2/1 | Week 2 2/8 | Week 3 2/15 | Week 4 2/22 | Week 5 2/29 | Week 6 3/7 | Week 7 3/12 | Total |
|---|---|---|---|---|---|---|---|---|
| **Receipts** | | | | | | | | |
| CCI/ASI receipts | $283 | $607 | $623 | $702 | $818 | $938 | $1,053 | $5,024 |
| Foreign Net Funding/CCE | 0 | 75 | 75 | 75 | 75 | 75 | 75 | 450 |
| Total Receipts | 283 | 682 | 698 | 777 | 893 | 1,013 | 1,128 | 5,474 |
| **Disbursements - Operations** | | | | | | | | |
| Trade Payments | | | | | | | | |
| Salaries | 0 | 500 | 601 | 600 | 500 | 600 | 600 | 3,401 |
| Freight-wire | 0 | 432 | 0 | 440 | 0 | 417 | 0 | 1,289 |
| Credit Card Fees & Royalties | 0 | 88 | 105 | 110 | 159 | 196 | 196 | 854 |
| Rents & RE Taxes | 0 | 6 | 22 | 8 | 11 | 14 | 29 | 90 |
| Tax & Insurance | 0 | 262 | 0 | 0 | 0 | 262 | 0 | 524 |
| Print Media | 0 | 96 | 0 | 0 | 0 | 96 | 0 | 192 |
| Data & Telecom / Perct | 0 | 448 | 85 | 0 | 0 | 0 | 0 | 533 |
| Trade Shows | 0 | 251 | 0 | 0 | 251 | 0 | 0 | 502 |
| Empl Reimburs/Travel | 0 | 148 | 65 | 0 | 0 | 0 | 0 | 213 |
| Normal Course Professionals | 0 | 15 | 15 | 15 | 15 | 15 | 9 | 84 |
| Utilities | 0 | 9 | 9 | 8 | 8 | 9 | 8 | 50 |
| Other | 0 | 48 | 33 | 34 | 37 | 37 | 16 | 205 |
| Total Disbursements - Operations | 0 | 2,303 | 935 | 1,215 | 981 | 1,646 | 858 | 7,938 |
| **Disbursements - Other** | | | | | | | | |
| Estimated Proceeds from Sale[1] | | | | | | | (16,000) | (16,000) |
| Transaction Fees[2] | | | | | | | 185 | 185 |
| Professional Fees[3] | | 60 | 60 | 50 | 35 | 40 | 765 | 1,010 |
| BK Deposits | | 150 | 51 | | | | | 201 |
| Claims Admin | | | | | 40 | | | 40 |
| Misc / Other Costs | | | | | | 5 | 5 | 10 |
| Interest Expense | | | | | 14 | 5 | 10 | 23 |
| Total Disbursements - Other | 0 | 210 | 111 | 50 | 89 | 45 | (15,065) | (14,551) |
| Total Disbursements | 0 | 2,513 | 1,046 | 1,265 | 1,070 | 1,691 | (14,197) | (6,613) |
| Net Change In Cash - Weekly | 283 | (1,831) | (348) | (487) | (177) | (678) | 15,325 | 12,087 |
| <DIP Balance> / Available to Estate | $283 | ($1,548) | ($1,896) | ($2,383) | ($2,560) | ($3,238) | $15,325 / $12,087 | |

# EXHIBIT A

# ASSIGNMENT AND ASSUMPTION OF DESIGNATED CONTRACTS

**THIS ASSIGNMENT AND ASSUMPTION OF DESIGNATED CONTRACTS** (this **"Assignment of Contracts"**) is made and entered into as of this ___ day of _____, 2008, by and between Dae-il USA, Inc., a Delaware corporation (the **"Assignee"**), and Global Motorsport Group, Inc., a Delaware corporation (**"GMG"**) and Custom Chrome Europe, Ltd., a Delaware corporation (**"CCE"**). GMG and CCE are herein referred to collectively as the **"Assignor."**

## RECITALS

A.    This Assignment of Contracts is being delivered to Assignee under and pursuant to the provisions of that certain Asset Purchase Agreement dated as of January 28, 2008 (the **"Purchase Agreement"**) by and between Assignor and Assignee.

B.    Pursuant to the Purchase Agreement, Assignor has agreed to assign, sell, transfer, convey and deliver to Assignee all Assignor's right, title and interest in and to the contracts, leases, orders, purchase orders, licenses, contracts, agreements and similar arrangements described on Schedule A attached hereto (the **"Designated Contracts"**).

C.    Unless otherwise defined herein, capitalized terms used in this Assignment of Contracts shall have the meanings ascribed to them in the Purchase Agreement.

**NOW, THEREFORE,** in consideration of the premises, the consideration described herein and in the Purchase Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

1.    <u>Assignment</u>.  Assignor hereby assigns to Assignee, and Assignee hereby accepts such assignment of, Assignor's entire right, title and interest in and to all the Designated Contracts.

2.    <u>Assumed Obligations</u>.  Assignee hereby assumes the Cure Costs associated with, and the liabilities and obligations of the Seller arising from and after the Closing under, the Designated Contracts.

3.    <u>Excluded Contracts</u>.  The parties acknowledge and agree that Assignee shall not assume or be responsible for any obligations or liabilities of Assignor under the Excluded Contracts, and Assignor shall retain and be solely responsible for the Excluded Contracts.

4.    <u>Miscellaneous</u>

a.    <u>Relationship to the Purchase Agreement</u>.  Notwithstanding any other provisions to the contrary, nothing contained in this Assignment of Contracts shall modify, replace, amend, change, rescind, waive, exceed, expand, enlarge or in any way affect the provisions, including warrants, covenants, agreements, conditions, representations, or in general any of the rights and remedies, and any of the obligations and indemnifications of Assignor or Assignee set forth in the Purchase Agreement nor shall this Assignment of Contracts expand or enlarge any remedies under the Purchase Agreement including, without limitation, any limits on

indemnification specified therein. This Assignment of Contracts is intended only to effect the transfer of certain assets transferred pursuant to the Purchase Agreement and shall be governed entirely in accordance with the terms and conditions of the Purchase Agreement.

b.     <u>Governing Law</u>. This Assignment of Contracts shall be governed by and construed and enforced in accordance with Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (as amended, the **"Bankruptcy Code"**) and, to the extent not inconsistent with the Bankruptcy Code, the internal laws of the State of Delaware, without regard to the choice of laws rules of such State.

c.     <u>Headings; Captions</u>. All paragraph titles or captions in this Assignment of Contracts are for convenience only and in no way define, limit, extend or describe the scope or intent of any provision hereof.

d.     <u>Counterparts</u>. This Assignment of Contracts may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument.

[Signature Page to Follow.]

LANLIB1\L2K\618262.05

**In Witness Whereof,** the parties executed this Assignment of Contracts as of the day and year first written above.

ASSIGNEE:

Dae-Il USA, Inc.

By: _____
Name: _____
Its: _____


ASSIGNOR:

Global Motorsport Group, Inc.


By: _____
Name: _____
Its: _____


Custom Chrome Europe, Ltd.


By: _____
Name: _____
Its: _____

# SCHEDULE A

## Designated Contracts

LANLIB1\L2K\618262.05

# EXHIBIT B

# BILL OF SALE AND ASSIGNMENT

**THIS BILL OF SALE AND ASSIGNMENT** (the **"Bill of Sale"**) is made and entered into as of this ___ day of _____, 2008, by Global Motorsport Group, Inc., a Delaware corporation (**"GMG"**) and Custom Chrome Europe, Ltd., a Delaware corporation (**"CCE"**), in favor of Dae-il USA, Inc., a Delaware corporation (**"Buyer"**). GMG and CCE are herein referred to collectively as the **"Seller."**

## RECITALS

A.     This Bill of Sale is being delivered to Buyer under and pursuant to the provisions of that certain Asset Purchase Agreement dated as of January 28, 2008 (the **"Purchase Agreement"**) by and between Seller and Buyer.

B.     Pursuant to the Purchase Agreement, Seller has agreed to assign, sell, transfer, convey and deliver to Buyer certain assets of Seller as set forth on <u>Schedule A</u> attached hereto (the **"Assets"**).

C.     Unless otherwise defined herein, capitalized terms used in this Bill of Sale shall have the meanings ascribed to them in the Purchase Agreement.

**NOW, THEREFORE,** in consideration of the premises, the consideration described herein and in the Purchase Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

1.     <u>Transfer</u>.  Seller does hereby sell, convey, transfer, assign, and deliver the Assets unto Buyer, its successors and assigns, forever.

2.     <u>Assignment of Claims</u>.  Seller hereby assigns and transfers to Buyer, its successors and assigns, to the extent held by Seller, all Claims relating to the Assets sold, conveyed, transferred, delivered, and assigned under this Bill of Sale.

3.     <u>Acceptance of Assets</u>.  Buyer hereby accepts the Assets and Claims sold, conveyed, transferred, delivered, and assigned under this Bill of Sale.

4.     <u>Power of Attorney to Transfer</u>.  Seller constitutes and appoints Buyer, its successors and assigns, the true and lawful attorney-in-fact of Seller, with full power of substitution, having full right and authority, in the name of Seller, but at the expense of Buyer, to collect or enforce for the account of Buyer, all liabilities and obligations of third parties with respect to the Assets; to institute and prosecute all proceedings that Buyer may deem proper in order to collect, assert, or enforce any claim, right, or title of any kind in or to the Assets, to defend and compromise any and all actions, suits, or proceedings with respect to any of the Assets, and to do all such acts and things in relation to such assets that Buyer may reasonably deem advisable.  Seller agrees that the above-stated powers are coupled with an interest and shall be irrevocable by Seller in any manner or for any reason.

5. **Miscellaneous.**

    a.    <u>Relationship to the Purchase Agreement</u>.  Notwithstanding any other provisions to the contrary, nothing contained in this Bill of Sale shall modify, replace, amend, change, rescind, waive, exceed, expand, enlarge or in any way affect the provisions, including warrants, covenants, agreements, conditions, representations, or in general any of the rights and remedies, and any of the obligations and indemnifications of Seller or Buyer set forth in the Purchase Agreement nor shall this Bill of Sale expand or enlarge any remedies under the Purchase Agreement including, without limitation, any limits on indemnification specified therein.  This Bill of Sale is intended only to effect the transfer of certain assets transferred pursuant to the Purchase Agreement and shall be governed entirely in accordance with the terms and conditions of the Purchase Agreement.

    b.    <u>Governing Law</u>.  This Bill of Sale shall be governed by and construed and enforced in accordance with Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (as amended, the "Bankruptcy Code") and, to the extent not inconsistent with the Bankruptcy Code, the internal laws of the State of Delaware, without regard to the choice of laws rules of such State.

    c.    <u>Headings; Captions</u>.  All paragraph titles or captions in this Bill of Sale are for convenience only and in no way define, limit, extend or describe the scope or intent of any provision hereof.

    d.    <u>Counterparts</u>.  This Bill of Sale may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

IN WITNESS WHEREOF, Seller has executed this Bill of Sale as of the date first above written.

SELLER:

**Global Motorsport Group, Inc.**

By: _____
Name: _____
Its: _____


**Custom Chrome Europe, Ltd.**

By: _____
Name: _____
Its: _____


Acknowledged and Agreed by:

**BUYER:**

**Dae-il USA, Inc.**

By: _____
Name: _____
Its: _____

# SCHEDULE A

## Schedule of Assets

Exhibit D

## ASSUMPTION OF LIABILITIES

**THIS ASSUMPTION OF LIABILITIES** is made and entered into as of this ___ day of
_____, 2008, by Dae-il USA, Inc., a Delaware corporation (the **"Assignee"**), in favor
of Global Motorsport Group, Inc., a Delaware corporation (**"GMG"**) and Custom Chrome
Europe, Ltd., a Delaware corporation (**"CCE"**).  GMG and CCE are herein referred to
collectively as the **"Assignor."**

### RECITALS

A.     This Assumption of Liabilities is being delivered to Assignor under and pursuant
to the provisions of that certain Asset Purchase Agreement dated as of January 28, 2008 (the
**"Purchase Agreement"**) by and between Assignor and Assignee.

B.     Pursuant to the Purchase Agreement, Assignee has agreed to assume certain
liabilities of Assignor.

C.     Unless otherwise defined herein, capitalized terms used in this Assumption of
Liabilities shall have the meanings ascribed to them in the Purchase Agreement.

**NOW, THEREFORE,** in consideration of the premises, the consideration described
herein and in the Purchase Agreement, and other good and valuable consideration, the receipt
and sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

1.     <u>Assumption</u>.  Assignee hereby assumes all of the Assumed Liabilities.

2.     <u>Excluded Obligations</u>.  The parties acknowledge and agree that Assignee shall not
assume or be responsible for any Excluded Obligations, and Assignor shall retain and be solely
responsible for the Excluded Obligations.

3.     <u>Miscellaneous</u>

a.     <u>Relationship to the Purchase Agreement</u>.  Notwithstanding any other
provisions to the contrary, nothing contained in this Assumption of Liabilities shall modify,
replace, amend, change, rescind, waive, exceed, expand, enlarge or in any way affect the
provisions, including warrants, covenants, agreements, conditions, representations, or in general
any of the rights and remedies, and any of the obligations and indemnifications of Assignor or
Assignee set forth in the Purchase Agreement nor shall this Assumption of Liabilities expand or
enlarge any remedies under the Purchase Agreement including, without limitation, any limits on
indemnification specified therein.  This Assumption of Liabilities is intended only to effect the
transfer of certain liabilities transferred pursuant to the Purchase Agreement and shall be
governed entirely in accordance with the terms and conditions of the Purchase Agreement.

b.     <u>Governing Law</u>.  This Assumption of Liabilities shall be governed by and
construed and enforced in accordance with Chapter 11 of Title 11 of the United States Code, 11
U.S.C. §§ 101-1330 (as amended, the **"Bankruptcy Code"**) and, to the extent not inconsistent
with the Bankruptcy Code, the internal laws of the State of Delaware, without regard to the
choice of laws rules of such State.

c.     Headings; Captions.  All paragraph titles or captions in this Assumption of Liabilities are for convenience only and in no way define, limit, extend or describe the scope or intent of any provision hereof.

d.     Counterparts.  This Assumption of Liabilities may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument.

[Signature Page to Follow.]

**In Witness Whereof,** the parties executed this Assumption of Liabilities as of the day and year first written above.

ASSIGNEE:

Dae-il USA, Inc.

By: _____
Name: _____
Its: _____


ASSIGNOR:

Global Motorsport Group, Inc.


By: _____
Name: _____
Its: _____


Custom Chrome Europe, Ltd.


By: _____
Name: _____
Its: _____

# EXHIBIT C

# ASSIGNMENT OF INTANGIBLE PROPERTY

**THIS ASSIGNMENT OF INTANGIBLE PROPERTY** is made and entered into as of this ___ day of _____, 2008, by and between Dae-il USA, Inc., a Delaware corporation (the **"Assignee"**), and Global Motorsport Group, Inc., a Delaware corporation (**"GMG"**) and Custom Chrome Europe, Ltd., a Delaware corporation (**"CCE"**). GMG and CCE are herein referred to collectively as the **"Assignor."**

## RECITALS

A.      This Assignment of Intangible Property is being delivered to Assignee under and pursuant to the provisions of that certain Asset Purchase Agreement dated as of January 28, 2008 (the **"Purchase Agreement"**) by and between Assignor and Assignee.

B.      Pursuant to the Purchase Agreement, Assignor has agreed to assign, sell, transfer, convey and deliver to Assignee certain intangible property of Assignor described on <u>Schedule A</u> attached hereto (the **"Intangible Property"**).

C.      Unless otherwise defined herein, capitalized terms used in this Assignment of Intangible Property shall have the meanings ascribed to them in the Purchase Agreement.

**NOW, THEREFORE,** in consideration of the premises, the consideration described herein and in the Purchase Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

1.      <u>Assignment</u>. Assignor hereby assigns to Assignee, and Assignee hereby accepts such assignment of, Assignor's entire right, title and interest in and to all the Intangible Property.

2.      <u>Miscellaneous</u>

a.      <u>Relationship to the Purchase Agreement</u>. Notwithstanding any other provisions to the contrary, nothing contained in this Assignment of Intangible Property shall modify, replace, amend, change, rescind, waive, exceed, expand, enlarge or in any way affect the provisions, including warrants, covenants, agreements, conditions, representations, or in general any of the rights and remedies, and any of the obligations and indemnifications of Assignor or Assignee set forth in the Purchase Agreement nor shall this Assignment of Intangible Property expand or enlarge any remedies under the Purchase Agreement including, without limitation, any limits on indemnification specified therein. This Assignment of Intangible Property is intended only to effect the transfer of certain assets transferred pursuant to the Purchase Agreement and shall be governed entirely in accordance with the terms and conditions of the Purchase Agreement.

b.      <u>Governing Law</u>. This Assignment of Intangible Property shall be governed by and construed and enforced in accordance with Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (as amended, the **"Bankruptcy Code"**) and, to the extent not inconsistent with the Bankruptcy Code, the internal laws of the State of Delaware, without regard to the choice of laws rules of such State.

c.      <u>Headings; Captions</u>. All paragraph titles or captions in this Assignment of Intangible Property are for convenience only and in no way define, limit, extend or describe the scope or intent of any provision hereof.

d.      <u>Counterparts</u>. This Assignment of Intangible Property may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument.

[Signature Page to Follow.]

ERROR! UNKNOWN DOCUMENT PROPERTY NAME.

**In Witness Whereof**, the parties executed this Assignment of Intangible Property as of the day and year first written above.

ASSIGNEE:

**Dae-il USA, Inc.**

**By:** _____
**Name:** _____
**Its:** _____


ASSIGNOR:

**Global Motorsport Group, Inc.**


**By:** _____
**Name:** _____
**Its:** _____


**Custom Chrome Europe, Ltd.**


**By:** _____
**Name:** _____
**Its:** _____

# SCHEDULE A

## Intangible Property Schedule