IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| GLOBAL MOTORSPORT GROUP, INC.,[1] et al., | ) Case No. 08-10192 (KJC) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) |

---

DISCLOSURE STATEMENT FOR CHAPTER 11 PLAN OF LIQUIDATION OF GLOBAL MOTORSPORT GROUP, INC., CUSTOM CHROME MANUFACTURING, INC., CUSTOM CHROME FAR EAST, LTD., AND CUSTOM CHROME EUROPE, LTD. UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

---

IMPORTANT DATES

- Date by which Ballots must be received: _____, 2009 at 4:00 p.m.
- Date by which objections to Confirmation of the Plan must be filed and served: _____, 2009 at 4:00 p.m.
- Hearing on Confirmation of the Plan: _____, 2009 at _____ __.m.

Laura Davis Jones (DE Bar No. 2436)
Brad R. Godshall (CA Bar No. 105438)
David M. Bertenthal (CA Bar No. 167624)
James E. O'Neill (DE Bar No. 4042)

Pachulski Stang Ziehl & Jones LLP

Dated: _____, 2009

---

[1] The Debtors consist of the following entities: Global Motorsport Group, Inc., Custom Chrome Manufacturing, Inc., Custom Chrome Far East, Ltd. And Custom Chrome Europe, Ltd.

# TABLE OF CONTENTS

**Page No.**

I. PREFATORY STATEMENT AND DEFINITIONS ................................................................... 1

II. INTRODUCTION AND OVERVIEW ...................................................................................... 1

   A. Introduction .......................................................................................................................... 1

   B. Disclaimers .......................................................................................................................... 2

   C. An Overview of the Chapter 11 Process .............................................................................. 3

   D. Plan Overview ...................................................................................................................... 3

      1. Description of Property to Be Distributed under the Plan ............................................ 4

      2. Summary of Classification and Treatment of Claims
         and Interests under the Plan ......................................................................................... 4

         a.      Unclassified Claims ............................................................................ 5

         b.      Classified Claims ................................................................................ 6

   E. Voting on the Plan ................................................................................................................ 7

      1. Who May Vote .............................................................................................................. 7

      2. How to Vote ................................................................................................................. 8

   F. Confirmation of the Plan ...................................................................................................... 8

      1. Generally ...................................................................................................................... 8

      2. Objections to Confirmation .......................................................................................... 9

      3. Hearing on Confirmation ........................................................................................... 10

III. HISTORY, ORGANIZATION AND ACTIVITIES OF THE DEBTORS .......................... 10

   A. Background ......................................................................................................................... 10

   B. Description of the Debtors and Summary of Operations ................................................... 10

   C. The Debtors' Corporate and Equity Structure ................................................................... 11

   D. The Debtors' Facilities ....................................................................................................... 12

   E. GMG's Workforce .............................................................................................................. 12

   F. The Debtors' Early History and Business Expansion ........................................................ 13

   G. Financing & Other Significant Indebtedness ..................................................................... 14

   H. Events Leading to the Commencement of the Debtors' Chapter 11 Cases ....................... 15

      1. The Debtors' Recent Business Performance and Financial Difficulties ..................... 15

      2. The Debtors' Exploration of Strategic Alternatives
         and Marketing Efforts and Their Bankruptcy Goals .................................................. 16

I.  The Commencement of the Chapter 11 Case ................................................................ 16
J.  First Day Motions and Other Relief.......................................................................... 17
    1. Joint Administration of Related Chapter 11 Cases ...................................................... 17
    2. Employees.......................................................................................................... 17
    3. Cash Management.............................................................................................. 17
    4. Taxes ................................................................................................................ 18
    5. Utilities............................................................................................................. 18
    6. Customer Obligations ........................................................................................ 18
    7. Interim Compensation for Professionals............................................................... 19
    8. Ordinary Course Professionals ........................................................................... 19
    9. Cash Collateral Use And DIP Financing ............................................................. 19
    10. Sale Procedures Motion .................................................................................... 19
    11. Sale Motion..................................................................................................... 20
K.  Appointment of Committee ..................................................................................... 20
L.  Bar Date for Filing Proofs of Claim ......................................................................... 20
M.  Bar Dates For Filing Administrative Expenses ......................................................... 21
N.  Filing of Statements and Schedules ......................................................................... 21
O.  Other Significant Postpetition Developments............................................................ 21
    1. Closing of the Sale Transaction .......................................................................... 21
    2. Creditor Settlement ........................................................................................... 21
        a.          Background. ........................................................................................ 21
        b.          Summary of Creditor Settlement. ........................................................ 22
        i.          Funding of Certain Accounts. ............................................................. 22
            (a)     GUC Fund................................................................................... 22
            (b)     Administrative Claims/Priority Claims Account. ............................. 22
            (c)     Professional Fees Account............................................................ 22
            (d)     The GUC Fund Expenses Reserve................................................. 23
        ii.         Release of Claims and Recognition of Security Interests................................ 23
            (a)     Confirmation of Financing Order. ................................................ 23
            (b)     Releases...................................................................................... 24
                (i)     The Debtors' Release ............................................................. 24
                (ii)    Other Releases. ..................................................................... 24
                (iii)   Additional Injunction. ........................................................... 25

3. The Creditor Settlement is Fair and Reasonable........................................................... 26

IV. DESCRIPTION OF THE PLAN ............................................................................................. 27

V. ADMINISTRATIVE CLAIMS, PROFESSIONAL FEES
AND PRIORITY TAX CLAIMS ........................................................................................... 27

  A. Introduction.......................................................................................................................... 27

  B. Administrative Claims (Other Than Professional Fees) .................................................... 27

  C. Professional Fee Claims....................................................................................................... 28

  D. Priority Tax Claims.............................................................................................................. 29

VI. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS
AND EQUITY INTERESTS................................................................................................... 29

  A. Summary............................................................................................................................... 29

  B. Classification and Treatment of Claims.............................................................................. 29

    1. Summary............................................................................................................................ 29

    2. Classification and Treatment of Claims Against All Debtors ........................................ 30

      a.     Class 1 – Priority Claims .................................................................................. 30

      b.     Class 2 – Lender Group Claims........................................................................ 30

      c.     Class 3 – Other Secured Claims........................................................................ 31

      d.     Class 4 – General Unsecured Claims................................................................ 31

      e.     Class 5 – Intercompany Claims ........................................................................ 31

      f.     Class 6 – Equity Interests.................................................................................. 32

VII. ACCEPTANCE OR REJECTION OF THE PLAN................................................................ 32

  A. Voting Classes ..................................................................................................................... 32

  B. Acceptance by Impaired Classes ........................................................................................ 32

  C. Presumed Rejection of Plan ................................................................................................ 32

  D. Nonconsensual Confirmation.............................................................................................. 32

  E. How to Vote......................................................................................................................... 33

VIII. MEANS FOR IMPLEMENTATION OF THE PLAN........................................................... 33

  A. Revesting/Handling of Plan Assets..................................................................................... 33

  B. Payment of Plan Expenses. ................................................................................................. 34

  C. Liquidation and Dissolution of the Liquidating Debtors. .................................................. 34

  D. Power and Authority of Responsible Officer...................................................................... 35

  E. The GUC Trust. ................................................................................................................... 35

F. GUC Fund. ........................................................................................................... 36

G. Causes of Action. .............................................................................................. 36

H. Payment of GUC Trust Expenses. .................................................................... 36

I. Distribution of GUC Trust Proceeds. ................................................................ 37

J. Power and Authority of GUC Trustee in Accordance
with the GUC Trust Agreement. ........................................................................ 37

K. GUC Distribution Procedures. .......................................................................... 37

L. Dissolution of the Committee. .......................................................................... 38

M. Full and Final Satisfaction. .............................................................................. 38

N. Resolution of Disputed Claims. ........................................................................ 38

O. Allocation of Distributions. .............................................................................. 39

P. Rounding. ........................................................................................................... 39

Q. No Interim Cash Payments of Less Than $50 on Account of Allowed Claims. .............. 39

R. Unclaimed Property. .......................................................................................... 39

S. Property Remaining ........................................................................................... 39

T. Setoffs. ............................................................................................................... 40

U. No Distributions on Late-Filed Claims. ........................................................... 40

V. Withholding Taxes. ............................................................................................ 40

W. De Minimis Distributions; Charitable Donation. .............................................. 40

X. United States Trustee Fees. ............................................................................... 40

Y. Books and Records. ........................................................................................... 41

IX. EFFECT OF CONSUMMATION. ............................................................................ 41

A. Binding Effect of Plan. ...................................................................................... 41

B. Re-Vesting of Property of Debtors in the Liquidating Debtors;
Vesting of GUC Trust Assets in the GUC Trust. .............................................. 41

C. Property Free and Clear. .................................................................................... 42

D. Limitation of Liability. ...................................................................................... 42

1. Injunction ...................................................................................................... 42

2. Terms of Existing Injunctions or Stays. ....................................................... 43

E. Post-Confirmation Liability of the Responsible Officer and the GUC Trustee. ............... 43

1. Good Faith .................................................................................................... 44

2. Substantive Consolidation ........................................................................... 44

a.      Consolidation of these Chapter 11 Cases of the Debtors. ................... 44

   b.   Substantive Consolidation Order. ................................................................ 44

   c.   Reservation of Rights................................................................................... 44

X. IMPLEMENTATION OF THE PLAN........................................................................... 45

 A. The Creditor Settlement.......................................................................................... 45

   1. Confirmation of Financing Order. ........................................................................ 45

   2. Releases.................................................................................................................. 45

   a.   The Debtors' Release................................................................................. 45

   b.   Other Releases. ........................................................................................... 46

 B. Funding of Plan....................................................................................................... 47

XI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............... 47

 A. Rejection of Executory Contracts and Unexpired Leases................................................. 47

 B. Claims Based on Rejection of Executory Contracts or Unexpired Leases........................ 47

 C. Corporate Action...................................................................................................... 47

XII. PROCEDURES FOR RESOLVING DISPUTED CLAIMS ................................................. 48

XIII. CONDITIONS PRECEDENT TO CONFIRMATION
   AND CONSUMMATION OF THe PLAN......................................................................... 48

 A. Conditions Precedent to Confirmation...................................................................... 48

 B. Conditions Precedent to Consummation.................................................................... 48

 C. Effect of Non-Occurrence of Conditions to Consummation ............................................ 49

 D. Notice of Effective Date .......................................................................................... 49

XIV. RETENTION OF JURISDICTION................................................................................... 49

XV. MISCELLANEOUS PROVISIONS .................................................................................. 51

 A. Payment of Statutory Fees ...................................................................................... 51

 B. Modification of Plan ................................................................................................ 51

 C. Revocation of Plan................................................................................................... 52

 D. Successors and Assigns............................................................................................ 52

 E. Reservation of Rights............................................................................................... 52

 F. Post-Confirmation Effectiveness of Proofs of Claims...................................................... 52

 G. Term of Injunctions or Stays.................................................................................... 52

 H. Further Assurances................................................................................................... 52

 I. Entire Agreement ..................................................................................................... 53

J.  Retiree Benefits................................................................................................... 53

K.  Failure of Bankruptcy Court to Exercise Jurisdiction....................................... 53

L.  Filing of Additional Documents ....................................................................... 53

M.  Enforceability.................................................................................................... 53

N.  Severability ....................................................................................................... 53

O.  Notice of Default under the Plan ...................................................................... 53

P.  Investments ....................................................................................................... 54

Q.  Reliance............................................................................................................. 54

XVI. RISK FACTORS ...................................................................................................... 54

XVII. BEST INTERESTS OF CREDITORS TEST .................................................... 54

A.  Chapter 7 ........................................................................................................... 54

B.  Liquidation Analysis ......................................................................................... 55

XVIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.................. 56

A.  Certain Federal Income Tax Consequences of the Plan .................................... 56

B.  In General.......................................................................................................... 57

C.  U.S. Holders of Claims. ..................................................................................... 58

D.  Non-U.S. Holder of Claims. .............................................................................. 58

E.  Importance of Obtaining Professional Tax Assistance...................................... 58

XIX. CONCLUSION............................................................................................................ 60

# I.
## PREFATORY STATEMENT AND DEFINITIONS

Pursuant to Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§101, et seq. (the "Bankruptcy Code"), Global Motorsport Group, Inc. ("GMG"), Custom Chrome Manufacturing, Inc. ("Manufacturing"), Custom Chrome Far East, Ltd. ("Far East") and Custom Chrome Europe, Ltd. ("Europe"), the debtors and debtors in possession in the above-captioned case hereby submit this disclosure statement (the "Disclosure Statement") in support of the Chapter 11 Plan Of Liquidation Of Global Motorsport Group, Inc., Custom Chrome Manufacturing, Inc., Custom Chrome Far East, Ltd., and Custom Chrome Europe, Ltd. Under Chapter 11 of the Bankruptcy Code (the "Plan"). The definitions contained in the Bankruptcy Code are incorporated herein by this reference. The definitions set forth in Article I to the Plan shall also apply to capitalized terms used herein that are not otherwise defined.

# II.
## INTRODUCTION AND OVERVIEW

### A.      Introduction

On January 31, 2008 (the "Petition Date"), the Debtors commenced the above-referenced bankruptcy cases (the "Chapter 11 Case") by filing voluntary petitions under Chapter 11 of the Bankruptcy Code. The Debtors are referred to herein as the "Debtors," the "Company" or the "Plan Proponent."

This Disclosure Statement, submitted in accordance with section 1125 of the Bankruptcy Code, contains information regarding the Plan proposed by the Debtors. A copy of the Plan accompanies this Disclosure Statement. The Disclosure Statement is being distributed to you for the purpose of enabling you to make an informed judgment about the Plan.

The Disclosure Statement describes the Plan and contains information concerning, among other matters: (1) the history, business, results of operations, management, properties and liabilities of and pending litigation of and against the Debtors; (2) the assets available for distribution under the Plan; and (3) a summary of the Plan. The Debtors strongly urge you to review carefully the contents of this Disclosure Statement and the Plan (including the exhibits to each) before making a decision to accept or reject the Plan. Particular attention should be paid to the provisions affecting or impairing your rights as a Creditor.

On _____, 2009, the Bankruptcy Court approved this Disclosure Statement as containing sufficient information to enable a hypothetical reasonable investor to make an informed judgment about the Plan. Under section 1125 of the Bankruptcy Code, this approval enabled the Debtors to send you this Disclosure Statement and solicit your acceptance of the Plan. The Bankruptcy Court has not passed on the Plan itself or conducted a detailed investigation into the contents of this Disclosure Statement.

Your vote on the Plan is important. Absent acceptance of the Plan, there may be protracted delays or a chapter 7 liquidation. These alternatives may not provide for distribution

1

of as much value to Holders of Allowed Claims as does the Plan. Accordingly, the Debtors urge you to accept the Plan by completing and returning the enclosed ballot(s) no later than _____, 2009, at 4:00 p.m. Eastern Time.

## B. Disclaimers

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTORS' PROPOSED PLAN. PLEASE READ THIS DOCUMENT WITH CARE. THE PURPOSE OF THE DISCLOSURE STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE DEBTORS AND THE CONDITION OF THE DEBTORS' BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN. See 11 U.S.C. § 1125(a).

FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY SUMMARY. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

NO REPRESENTATIONS CONCERNING THE DEBTORS' FINANCIAL CONDITION OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION THAT ARE OTHER THAN AS CONTAINED IN OR INCLUDED WITH THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

THE FINANCIAL INFORMATION CONTAINED HEREIN, UNLESS OTHERWISE INDICATED, IS UNAUDITED. MOREOVER, BECAUSE OF THE DEBTORS' FINANCIAL DIFFICULTIES, AS WELL AS THE COMPLEXITY OF THE DEBTORS' FINANCIAL MATTERS, THE BOOKS AND RECORDS OF THE DEBTORS, UPON WHICH THIS DISCLOSURE STATEMENT IN PART IS BASED, MAY BE INCOMPLETE OR INACCURATE. HOWEVER, REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT ALL SUCH INFORMATION IS FAIRLY PRESENTED.

PACHULSKI STANG ZIEHL & JONES LLP ("PSZ&J") IS GENERAL INSOLVENCY COUNSEL TO THE DEBTORS. PSZ&J HAS RELIED UPON INFORMATION PROVIDED BY THE DEBTORS IN CONNECTION WITH PREPARATION OF THIS DISCLOSURE STATEMENT. ALTHOUGH PSZ&J HAS PERFORMED CERTAIN LIMITED DUE DILIGENCE IN CONNECTION WITH THE PREPARATION OF THIS DISCLOSURE STATEMENT, COUNSEL HAS NOT INDEPENDENTLY VERIFIED ALL OF THE INFORMATION CONTAINED HEREIN.

THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS OR TAX ADVICE. EACH CREDITOR OR INTEREST HOLDER SHOULD CONSULT HIS OR HER OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX AND OTHER MATTERS CONCERNING HIS OR HER CLAIM.

## C.    An Overview of the Chapter 11 Process

Chapter 11 of the Bankruptcy Code contains numerous provisions, the general effect of which is to provide the debtor with "breathing space" within which to propose a restructuring of its obligations to third parties. The filing of a Chapter 11 bankruptcy petition creates a bankruptcy "estate" comprising all of the property interests of the debtor. Unless a trustee is appointed by the Bankruptcy Court for cause (no trustee has been appointed in the Chapter 11 Case), a debtor remains in possession and control of all its assets as a "debtor in possession." The debtor may continue to operate its business in the ordinary course on a day-to-day basis without Bankruptcy Court approval. Bankruptcy Court approval is only required for various enumerated kinds of transactions (such as certain financing transactions) and transactions out of the ordinary course of a debtor's business. The filing of the bankruptcy petition gives rise to what is known as the "automatic stay" which, generally, enjoins creditors from taking any action to collect or recover obligations owed by a debtor prior to the commencement of a Chapter 11 case. The Bankruptcy Court can grant relief from the automatic stay under certain specified conditions or for cause.

The Bankruptcy Code authorizes the creation of one or more official committees to protect the interests of some or all creditors or interest holders. The fees and expenses of counsel and other professionals employed by such official committees and approved by the Bankruptcy Court are generally borne by a bankruptcy estate. One official committee has been appointed in this Chapter 11 Case, which represents the collective interests of general unsecured creditors (the "Committee").

A Chapter 11 debtor emerges from bankruptcy by successfully confirming a plan of reorganization. Alternatively, the assets of a debtor may be sold and the proceeds distributed to creditors through a plan of liquidation, such as the Plan. A plan may be either consensual or non-consensual and provide, among other things, for the treatment of the claims of creditors and interests of shareholders and holders of options or warrants. The provisions of the Debtors' Plan are summarized below.

## D.    Plan Overview

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan. The Plan is a plan of liquidation and provides for the distribution of the proceeds from the Debtors' sale transaction (the "Sale Transaction") involving the sale of substantially all of their operating assets to Dae-Il USA, Inc. (the "Purchaser") and the disposition of the Debtors' assets remaining after the Sale Transaction.

The Plan provides for the classification and treatment of Claims against and Interests in the Debtors. For classification and treatment of claims against and equity interests in each

Debtor, the Plan designates five (5) Classes of Claims and one (1) Class of Interests. These classes and Plan treatments take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Interests.

### 1. Description of Property to Be Distributed under the Plan

The Plan implements a settlement (defined as the "Creditor Settlement") which resolves (a) all claims and challenges to the extent and validity of liens held by the Lender Group, (b) any Claims that the Debtors might have against various affiliates (i.e., the "Released Affiliate Parties") (the Debtors are aware of no meritorious claims); and (c) all claims that creditors voting for the Plan might have against the Released Affiliate Parties relating to the Debtors (the Debtors are again aware of no meritorious claims.) Pursuant to the Creditor Settlement in accordance with the term sheet attached hereto as Exhibit A, (a) the Lender Group shall consent to creation of (i) a GUC Fund to be administered by a GUC Trustee consisting of $425,000 in cash and (ii) a GUC Fund Expenses Reserve to be administered by the GUC Trustee consisting of $20,000 in cash; (b) the Agent shall also fund the Agent Contribution which shall be available for the payment of administrative and priority claims against the Estates, and (c) the Lender Group shall consent to the conveyance to the GUC Trustee for the benefit of Holders of Class 4 Claims under the Plan the Debtors' avoidance actions against parties other than the Lender Group and the Released Affiliate Parties (i.e., the Preserved Avoidance Actions and other Causes of Action)

The maximum funding commitment of the Lender Group to implement the Plan in accordance with the foregoing shall be $1,400,000, provided however that the Lender Group may waive the cap on its funding commitment in the Lender Group's sole discretion. The Plan provides that the GUC Trustee will administer and distribute the GUC Fund for the benefit of Holders of Allowed General Unsecured Claims. Upon the Effective Date, the Debtors shall be deemed to have transferred the GUC Fund to the GUC Trustee for the benefit of Holders of Class 4 Claims under the Plan. Holders of Allowed General Unsecured Claims will receive pro rata distributions of the proceeds of the GUC Fund from the GUC Trustee in accordance with the Plan.

Pursuant to the Plan, the Debtors will ultimately be dissolved and all existing interests in the Debtors (including all issued and outstanding preferred and common stock) will be extinguished and cancelled.

### 2. Summary of Classification and Treatment of Claims and Interests under the Plan

The following chart[2] briefly summarizes the treatment of Creditors and Interest Holders under the Plan. Amounts listed below are estimated. Actual Claims and Distributions will vary depending upon, among other things, the outcome of objections to Claims, recoveries on Preserved Avoidance Actions and whether the Bankruptcy Court approves the Creditor Settlement.

---

[2] This chart is only a summary of the classification and treatment of Claims and Interests under the Plan. References should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Interests.

a.  <u>Unclassified Claims</u>

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS AS OF EFFECTIVE DATE | TREATMENT |
|---|---|---|---|
| N/A | Administrative Claims (All the Debtors)<br><br>Estimated Recovery: 100% | $26,300.00 | The Lender Group has stipulated that the Lender Group Postpetition Claim in the aggregate principal amount of $3,500,000 shall be deemed satisfied on the Effective Date. With respect to all other Administrative Claims (excluding Professional Fee Claims), the Liquidating Debtors shall pay each Holder of an Allowed Administrative Claim in full in the amount of its Allowed Claim from the Administrative Claims/Priority Claims Account, without interest, in Cash promptly on the later of (a) the Effective Date and (b) the date on which the Claim becomes an Allowed Claim. The Holder of an Allowed Administrative Claim may be paid on such other date and upon such other terms as may be agreed upon in writing by that Holder of an Allowed Administrative Claim, the Liquidating Debtors and the Agent. |
| N/A | Priority Tax Claims (All the Debtors)<br><br>Estimated Recovery: 100% | $227,000 (estimated) | On the later to occur of (i) the Effective Date or (ii) the date on which such Claim shall become an Allowed Claim, the Liquidating Debtors shall pay to each Holder of an Allowed Priority Tax Claim such Allowed Priority Tax Claim without interest from the funds in the Administrative Claims/Priority Tax Account. |
| N/A | Professional Fee Claims (All the Debtors<br><br>Estimated Recovery: 100% | $695,000 (estimated) which represents agreed upon treatment for professional fees incurred and unpaid as of November 30, 2008 (see explanation in Treatment section) plus $125,000 cap from 12/1/2008 through Effective Date | The Liquidating Debtors shall pay Professionals from the Professional Fees Account in the maximum amount of i) 80% of Allowed fees and 100% of Allowed expenses of Professional Fee Claims incurred by Pachulski, Stang, Ziehl and Jones LLP; Fox Rothschild LLP; The Bayard Firm; CRG LLP; and Nachman Hayes LLP for the period of January 31, 2008 through November 30, 2008; (ii) 100% of Allowed fees and 100% of Allowed expenses incurred by Pachulski, Stang, Ziehl and Jones LLP; The Bayard Firm; CRG, LLP; and Nachman Hayes LLP for the period of December 1, 2008 through the Effective Date up to the maximum aggregate amount of $125,000.00; and (iii) 60% of allowed fees and 100% of allowed expenses of Andrews & Kurth LLP. The |

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS AS OF EFFECTIVE DATE | TREATMENT |
|---|---|---|---|
| | | | Professional Fees Account shall be augmented with any excess funds in the Administrative Claims/Priority Claims Account after payment in full of all Allowed Administrative Claims and Priority Claims with such excess funds being used solely to pay any unpaid Allowed Professional Fee Claims and expenses of Pachulski, Stang, Ziehl and Jones LLP, Fox Rothschild LLP; The Bayard Firm, CRG, LLP and Nachman Hayes LLP in full satisfaction of their respective fees and expenses incurred in connection the Chapter 11 cases. |

### b.  Classified Claims

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS AS OF EFFECTIVE DATE | TREATMENT |
|---|---|---|---|
| 1 | Priority Claims Against Any Debtor Estimated Recovery: 100% | $ 0 | The Liquidating Debtors shall pay the Allowed amount of each Class 1 Priority Claim from the Administrative Claims/Priority Claims Account to each Entity holding a Class 1 Priority Claim promptly following the later of (a) the Effective Date and (b) the date such Class 1 Priority Claim becomes an Allowed Claim (or as otherwise permitted by law).  The Liquidating Debtors shall pay each Holder of a Class 1 Priority Claim in Cash in full in respect of such Allowed Claim without interest accruing from the Petition Date; provided, however, that such Holder may be treated on such less favorable terms as may be agreed to in writing by such Holder. Class 1 is impaired and Holders of Class 1 Claims are entitled to vote on the Plan. |
| 2 | Lender Group Claims Against Any Debtor Estimated Recovery: 8.6% | $138,352,024.11 | The Agent on behalf of, and for distribution to, the Lender Group pursuant to the Pre-Petition Credit Documents and DIP Credit Documents, shall retain all distributions made prior to the Effective Date in full and final satisfaction of the Lender Group Claims.  Class 2 is an Impaired Class and Holders of Class 2 Claims are entitled to vote to accept or reject the Plan. |
| 3 | Other Secured Claims Against Any Debtor Estimated Recovery: N/A | $0 | With respect to Holders of Other Secured Claims (if any), the following alternative treatment shall apply, at the Debtors' option:  (i) each Holder shall receive on the Effective Date the net Liquidation Proceeds |

| | | | |
|---|---|---|---|
| | | | from the Assets of the Debtors upon which it holds a Lien senior to the Lien of the Agent (for itself and the Lender Group) or (ii) the Debtors or the Liquidating Debtors shall abandon the collateral securing such creditor' claim to such creditor as full and complete satisfaction of all Class 3 Claims. Class 3 is an Impaired Class and Holders of Class 3 Claims are entitled to vote on the Plan. |
| 4 | General Unsecured Claims Against Any Debtor<br>Estimated Recovery:<br>Between 2.0 % and 3.3% | $13,500,000 (estimated) | Each Holder of an Allowed General Unsecured Claim shall receive a Pro Rata share of the GUC Distributable Assets, as determined by the GUC Trustee. Class 4 is an Impaired Class and Holders of Class 4 Claims are entitled to vote to accept or reject the Plan. |
| 5 | Intercompany Claims Against Any Debtor<br>Estimated Recovery: 0% | $0 | On the Effective Date, all Intercompany Claims shall be cancelled and Holders of Intercompany Claims shall not receive or retain any Distribution or property on account of such Intercompany Claims under the Plan. Although the Class 5 Creditors are the proponents of the Plan, Holders of Class 5 Claims shall receive no Distribution under the Plan and therefore are deemed to have rejected the Plan. Accordingly, Class 5 Creditors are not entitled to vote. |
| 6 | Equity Interests in GMG<br>Estimated Recovery: 0% | $0 | There shall be no Distribution made on account of Class 6 Equity Interests. After the entry of the Effective Date, the Equity Interests will be canceled and will cease to exist. Class 6 Equity Interests will receive no Distribution under the Plan and are, therefore, deemed to have rejected the Plan. Accordingly, Class 6 Equity Interests are not entitled to vote. |

## E.    Voting on the Plan

### 1.    Who May Vote

The Plan divides Allowed Claims and Interests into multiple Classes. Under the Bankruptcy Code, only Classes that are "impaired" by the Plan are entitled to vote (unless the Class receives no compensation or payment, in which event the Class is conclusively deemed not to have accepted the Plan). A Class is impaired if legal, equitable or contractual rights attaching to the Claims or Interests of the Class are modified, other than by curing defaults and reinstating maturities. Under the Plan, Administrative Claims and Priority Tax Claims are unclassified and are not entitled to vote. Classes 5 and 6 receive nothing under the Plan and are therefore conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote under the Plan. Accordingly, only Classes 1, 2, 3 and 4 are

impaired and entitled to vote to accept or reject the Plan. Only those votes cast by Holders of Allowed Claims shall be counted in determining whether a sufficient number of acceptances have been received to obtain Plan Confirmation.

### 2. **How to Vote**

All votes to accept or to reject the Plan must be cast by using the appropriate form of Ballot. No votes other than ones using such Ballots will be counted except to the extent ordered otherwise by the Bankruptcy Court. A form of Ballot is being provided to Creditors in Classes 1, 2, 3 and 4 by which Creditors in such Classes may vote their acceptance or rejection of the Plan. The Ballot for voting on the Plan gives Holders of Classes 1, 2, 3 and 4 Claims one important choice to make with respect to the Plan – you can vote for or against the Plan. To vote on the Plan, after carefully reviewing the Plan and this Disclosure Statement, please complete the Ballot, as indicated thereon, (1) by indicating on the enclosed ballot that (a) you accept the Plan or (b) reject the Plan and (2) by signing your name and mailing the ballot in the envelope provided for this purpose. Epiq Bankruptcy Solutions, LLC ("Epiq"), as the Voting Tabulator and Balloting Agent, will count the Ballots.

IN ORDER TO BE COUNTED, BALLOTS MUST BE COMPLETED, SIGNED AND RECEIVED BY THE DEBTORS' BALLOTING AGENT, EPIQ, NO LATER THAN 4:00 P.M. EASTERN TIME ON _____, 2009 AT THE FOLLOWING ADDRESS:

Global Motorsport Group Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5115
New York, NY 10150-5115

- OR -

Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017
Attn: Ron Jacobs

IF YOUR BALLOT IS NOT PROPERLY COMPLETED, SIGNED AND RECEIVED AS DESCRIBED, IT WILL NOT BE COUNTED. IF YOUR BALLOT IS DAMAGED OR LOST, YOU MAY REQUEST A REPLACEMENT BY MAKING A WRITTEN REQUEST TO THE ADDRESS SHOWN ABOVE. FACSIMILE OR ELECTRONICALLY TRANSMITTED BALLOTS WILL NOT BE COUNTED.

### F. **Confirmation of the Plan**

### 1. **Generally**

"Confirmation" is the technical term for the Bankruptcy Court's approval of a plan of reorganization or liquidation. The timing, standards and factors considered by the Bankruptcy Court in deciding whether to confirm a plan of reorganization are discussed in Article [VII] below.

8

## 2. Objections to Confirmation

Any objections to Confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court and served on counsel for the Debtors, counsel for the Committee, counsel to the Agent and the United States Trustee on or before the date set forth in the notice of the Confirmation Hearing sent to you with this Disclosure Statement and the Plan. Bankruptcy Rule 3007 governs the form of any such objection.

Counsel on whom objections must be served are:

Counsel for the Debtors
Laura Davis Jones
James E. O'Neill
Pachulski Stang Ziehl & Jones LLP
919 North Market St., 16th Floor
Wilmington, DE 19801

Brad R. Godshall
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, CA 90067

Counsel for the Debtors' Post-Petition Lenders
Adam Harris
David M. Hillman
Adam L. Hirsch
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022

Adam G. Landis
919 North Market Street, Suite 600
P.O. Box 2087
Wilmington, DE 19899

Counsel for the Committee
Jeffrey M. Schlerf
Eric M. Sutty
Fox Rothschild LLP
919 North Market Street, Suite 1300
P.O. Box 2323
Wilmington, DE 19801

United States Trustee
844 King Street, Room 2207
Lockbox #35
Wilmington, DE 19899-0035

3. **Hearing on Confirmation**

The Court has set _____, 2009 at _____ __.m. for a hearing (the "Confirmation Hearing") to determine whether the Plan has been accepted by the requisite number of Creditors and whether the other requirements for confirmation of the Plan have been satisfied. The Confirmation Hearing will be held in Courtroom 5, Wilmington, DE 19801, before the Honorable Kevin J. Carey, United States Bankruptcy Judge. The Confirmation Hearing may be continued from time to time and day to day without further notice. If the Court confirms the Plan, it will enter the Confirmation Order.

## III.
## HISTORY, ORGANIZATION AND ACTIVITIES OF THE DEBTORS

A. **Background**

On January 31, 2008 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

The Debtors continue to manage their affairs as debtors in possession pursuant the Bankruptcy Code, but ceased operation of their businesses following the Sale Transaction, as discussed below.

B. **Description of the Debtors and Summary of Operations**

As of the Petition Date, GMG, a Delaware corporation, was the only operating Debtor and was an international wholesale distributor of after-market motorcycle parts and accessories. Collectively, the Debtors comprised the second largest global supplier of after-market parts and accessories for Harley-Davidson motorcycles. Further, through GMG's indirect subsidiary, Global Motorsport Group GmbH, a corporation organized under the laws of the Federal Republic of Germany ("GMG GmbH"), the Debtors held a larger market share for Harley-Davidson after-market parts and accessories in Europe than any of their competitors.

In the fiscal year ended January 31, 2007, on a consolidated basis (including foreign affiliates), the Debtors' net sales totaled approximately $133.72 million, resulting in an operating loss of approximately $26.35 million and a net loss of more than $51.76 million. In the fiscal year period through November 2007, on a consolidated basis (including foreign affiliates), the Debtors had net sales of approximately $99.99 million, an operating loss of approximately $4.4 million and a net loss of approximately $31.46 million.

As of November 24, 2007, on a consolidated basis (including foreign affiliates), the Debtors had total assets of approximately $40.98 million (book value), including approximately $8.48 million in accounts receivable (net), and approximately $28.76 million in merchandise inventory (net), and total liabilities of approximately $189.7 million, including approximately $8.6 million in accounts payable, approximately $136 million in notes payable (including the secured debt and subordinated Dodd Debt discussed below), approximately $15.2 million in other accrued liabilities, and approximately $28.8 million in other non-current liabilities.

10

GMG had two principal operating divisions – Custom Chrome and Motorcycle Stuff. Custom Chrome marketed after-market parts for the Harley-Davidson motorcycle market (i.e., people who buy and ride Harley-Davidson motorcycles). Motorcycle Stuff marketed after-market parts and accessories for the "metric" market – people who buy and ride Asian and European motorcycles, both on-road and off-road models such as those made by Honda, Suzuki, Yamaha, and BMW, among others. The metric market is 4-5 times larger than the Harley-Davidson market, with a more frequent product update cycle. In addition, GMG's Jammer division marketed parts and accessories for the "old school" Harley-Davidson market, which market is comprised of motorcycle enthusiasts devoted to rebuilding, customizing, or creating replicas of early Harley-Davidson models, particularly from the 1960s and 1970s. These divisions marketed their products internationally, except that GMG GmbH marketed the Debtors' products in Europe.

The Debtors distributed their own proprietary products under various brand names, including Custom Chrome, Jammer, RevTech, Motor Factory, and Santee, as well as products of other noted industry manufacturers, including Dunlop, Champion, Goodrich, and Accel. The Debtors sourced their products from approximately 400 vendors, and supplied as many as 42,000 products to approximately 12,000 dealers in North America, Europe, and Asia.

## C.    The Debtors' Corporate and Equity Structure

GMG has two classes of capital stock. Ableco Holding LLC ("Ableco Holding"), which is an affiliate of Cerberus Capital Management LLC ("Cerberus"), owns 80% of GMG's outstanding common stock (800 shares). Global Motorsport Holdings, Inc. ("Holdings"), which the Debtors are informed is a holding company owned by Stonington Partners LLC ("Stonington"), owns the remaining 20% of GMG's outstanding common stock (200 shares).[3] In addition, Stonington Capital Appreciation 1994 Fund, L.P., a Stonington affiliate, owns 150,000 shares of GMG's Series A Preferred Stock.

Each of the other Debtors – (i) Manufacturing, (ii) Far East, and (iii) Europe – is a wholly owned subsidiary of GMG. Manufacturing is a California corporation and the successor to Santee Industries, which formerly operated a manufacturing facility in Valencia, California. Manufacturing is inactive, having ceased operating in February 2007, as discussed more fully below. Far East is a Delaware holding company which owns 100% of the equity of Custom Chrome Far East Ltd. (Taiwan) ("CCFE-Taiwan"), a corporation organized under the laws of the Republic of China that formerly performed Asia sourcing services for the Debtors but is now inactive. Europe owns 100% of the equity of GMG GmbH, the Debtors' European marketing arm. As of the Petition Date, GMG GmbH, which is based in Bad Kreuznach, Germany, near Frankfurt, was GMG's only operating (indirect) subsidiary. GMG GmbH has not filed a bankruptcy petition and is not a debtor in these cases.

Certain employees of Cerberus and/or its affiliates have provided services to the Debtors. Daniel M. Cook is an employee of Cerberus Operating and Advisory Company LLC ("COAC"), an affiliate of GMG's principal lender and of GMG's majority shareholder (as discussed more fully herein). Mr. Cook's assignment, since September 2006, was to serve as GMG's full-time

---

[3] Stonington and Ableco Holding are unaffiliated.

Chief Executive Officer. In late January 2008, he was appointed as the CEO of each of the other Debtors as well. Mr. Cook also served as a director of each of the Debtors. Mr. Cook's salary, benefits and expense reimbursements related to his work for GMG were paid directly by COAC. Additionally, during the Chapter 11 Cases, five of the six directors of GMG – Daniel Cook, Jeffrey Fenton (Chairman since January 2006), Gerry Daniello, Kevin Genda, and Joseph Naccarato – were also employees of either Cerberus, COAC, Ableco and/or affiliates thereof. The other director, Alexis Michas, was a managing partner of Stonington. Mr. Fenton also served as the Chairman of the Board of the other three the Debtors. During the Chapter 11 Cases, the Debtors did not pay any fees or compensation to their directors. Before the Petition Date, Messrs. Cook, Fenton, and Daniello received payments for fees and/or reimbursement of expenses for work related to GMG from Cerberus, COAC and/or their affiliates.

In addition to the foregoing, Bryan Rishforth, a then-employee of COAC, acted as a "co-CEO" of GMG from March to September 2006, and Benjamin Humphreys, a Cerberus employee, served as GMG's Acting CFO from June 2006 until late January 2007, at which time he was then named Interim CFO, a position he served in until he resigned in May 2007. Further, from about January 2006 to about July 2007, a number of other employees of and consultants to Cerberus and COAC provided support services to the Debtors, including at times in respect to Asian and European operations, but did so solely as employees of or consultants to Cerberus or COAC, as applicable. These employees did not hold any positions with the Debtors and, as in the case of Messrs. Rishforth and Humphreys, received compensation or benefits from Cerberus or COAC, and not the Debtors.

## D.     The Debtors' Facilities

The Debtors leased all of their real property facilities. GMG's corporate headquarters were in a 100,000 square-foot facility in Morgan Hill, California, approximately 20 miles south of San Jose. GMG originally owned this building, but entered into a sale-leaseback transaction for it in 1999 with its current landlord. GMG also leased warehouse facilities in Visalia, California and Harrisburg, Pennsylvania, as well as a facility in Cape Girardeau, Missouri, which houses the Motorcycle Stuff division (both operations/sales and warehousing/fulfillment). Prior to the Petition Date, the Debtors had also leased a facility in Fort Worth, Texas. The Debtors rejected this lease effective as of the Petition Date.

## E.     GMG's Workforce

Prior to the closing of the Sale Transaction (the "Sale Closing"), GMG employed approximately 207 employees (the "Employees"), of whom approximately 37% were salaried Employees and approximately 63% were hourly Employees. Approximately 76 Employees were based at GMG's headquarters in Morgan Hill, California. The other Employees were based in GMG's Harrisburg, Pennsylvania, Visalia, California, and Cape Girardeau, Missouri facilities (with approximately 23, 36, and 68 Employees, respectively), while four Employees worked from their homes in Texas. None of the other the Debtors had any employees.

Commencing in November 2006, GMG outsourced most routine Human Relations functions, previously performed by its in-house HR department, by entering into an agreement (the "Administaff Agreement") with Administaff Companies II, L. P. ("Administaff").

Administaff is an affiliate of Administaff, Inc. which describes itself as a national "professional employer organization." Under the Administaff Agreement, GMG and Administaff were "co-employers" of the Employees. In short, Administaff administered GMG's payroll, and GMG Employees participated in benefit plans, including medical insurance, that were available to all of Administaff's clients. In addition, Administaff provided workers compensation and employment practices liability insurance to GMG. As discussed further below, GMG paid Administaff a fee for these services, which included reimbursement to Administaff for payments made by Administaff directly to Employees and for Employee benefits.

The Administaff Agreement permitted GMG to reduce the size of its in-house human resources department and generated savings in workers' compensation and benefit plan costs. GMG believes that its Employees' pay scale and benefits were comparable to those offered by other companies of its size.

In addition to the Employees, GMG utilized the service of several independent contractors (collectively, "Contractors" and together with the Employees, the "Workforce"), who were employed for both short and long term assignments. GMG paid the Contractors directly, not through Administaff.

**F.    The Debtors' Early History and Business Expansion**

GMG, then named Custom Chrome Inc., was incorporated as a California corporation in April 1970, as an affiliate of Coast Cycle Accessories, Inc., which at that time was a small independent shop selling used motorcycles and parts and accessories. In 1976, the ownership of Coast Cycle Accessories and GMG (still named Custom Chrome Inc. at that time) diverged, and GMG entered into the aftermarket wholesale business. From 1976 to 1981, GMG's annual revenues grew to approximately $10 million. During this period, it began sourcing many of its products from Asia.

In the 1980s, the Debtors' annual sales grew to $25-30 million. In 1990, GMG acquired Santee Industries, a fabricator of motorcycle frames, exhaust systems, and other parts, based in Valencia, California. Under the name Custom Chrome Manufacturing, Inc., Santee Industries became a direct, wholly owned subsidiary of GMG.

From 1988 to 1998, GMG added distribution centers in Louisville, Kentucky, Harrisburg, Pennsylvania, Fort Worth, Texas (though a 1997 acquisition of Chrome Specialties, Inc.), Jacksonville, Florida, and Visalia, California. During this period, annual sales grew to approximately $123 million. In 1995, GMG acquired its German subsidiary by purchasing an existing German firm (Tom's Motorcycle Parts GmbH). In 1997, in connection with the acquisition of Chrome Specialties, GMG changed its name from Custom Chrome Inc. to Global Motorsport Group, Inc.

In December 1998, following a public tender offer for GMG's common stock, Stonington, a New York investment firm, acquired a majority interest in GMG. As discussed below, Stonington subsequently transferred its majority stake to Ableco Holding in 2006.

In 2000, the Debtors entered the market for "metric" motorcycle after-market parts and accessories (which includes parts and accessories for brands such as Honda, Suzuki, Yamaha,

and BMW, among others) by acquiring Motorcycle Stuff, Inc., based in Cape Girardeau, Missouri.

## G.     **Financing & Other Significant Indebtedness**

GMG and Manufacturing were borrowers (collectively, the "Borrowers") under an Amended and Restated Credit Agreement, dated as of November 22, 2004 (as subsequently amended, the "Credit Agreement"), between themselves and GECC and Ableco Finance LLC ("Ableco Finance"). As discussed below, the other Debtors guaranteed the Borrowers' obligations. The Credit Agreement amended and restated an existing credit agreement dated as of February 5, 2001, as amended on January 1, 2002. As discussed further below, under the Credit Agreement, GECC and Ableco Finance agreed to advance term and revolving loans (the "Term Loan" and the "Revolver," respectively) totaling more than $100 million in principal. In July 2005, GECC left the lending syndicate, and Ableco Finance and certain of its affiliates acquired all of the Debtors' obligations under the Credit Agreement.

As discussed further below, the Borrowers' obligations under the Credit Agreement were secured by blanket liens in substantially all of the Borrowers' assets, as well as a stock pledge by GMG, pledging its common stock in its subsidiaries, Manufacturing, Far East and Europe. Further, Holdings guaranteed the Borrowers' obligations under the Credit Agreement, pledged all of the common stock of GMG held by Holdings to secure this guaranty, and granted a security interest in substantially all of its other assets. Additionally, GMG's subsidiaries, Far East and Europe, also guaranteed the Borrowers' obligations under the Credit Agreement, and in connection therewith, Far East and Europe pledged 65% of their equity interests in CCFE-Taiwan and GMG GmbH, respectively. Far East and Europe also granted a security interest in substantially all their other assets.

In January 2006, following defaults under the Credit Agreement, GMG, Ableco Finance, Stonington, and certain other parties entered into a series of related transactions, including amendments of the Credit Agreement, under which, among other things (a) Ableco Finance agreed to advance additional funds to GMG; and (b) Ableco Holding acquired 80% of GMG's common stock (as a result of which, Stonington, the former majority stakeholder in GMG, ended up with a minority 20% interest). At present, as discussed more fully below, approximately $139 million was due and outstanding under the Credit Agreement as of the Petition Date.

Other significant indebtedness included approximately $3.3 million in unsecured debt (comprised of approximately $2 million in principal and approximately $1.3 million in interest) owed by GMG to Susan Dodd ("Dodd Debt"). The Dodd Debt was incurred in connection with the Debtors' acquisition in 2000 of the assets of the Motorcycle Stuff division. The Debtors believe that the Dodd Debt was contractually subordinated to the prior payment in full of GMG's obligations under the Credit Agreement and any other current or future indebtedness to any current or future lender. However, in late January 2008, Susan Dodd sued GMG to collect on the Dodd Debt, and her counsel asserted that the Dodd Debt is not expressly subordinated to GMG's Credit Agreement obligations owed to Ableco Finance.

In addition to the foregoing, as of the Petition Date, the Debtors owed approximately $9.81 million in accounts payable and other business debt (excluding the Dodd Debt) and

14

approximately $155,000 in obligations under capital leases. As discussed more fully below, the Purchaser assumed certain liabilities in conjunction with the Sale Transaction, including a substantial portion of the Debtors' prepetition trade debt such as designated lease/contract cure costs and certain vendor claims with priority under Bankruptcy Code section 503(b)(9).

## H.    Events Leading to the Commencement of the Debtors' Chapter 11 Cases

### 1.    The Debtors' Recent Business Performance and Financial Difficulties

In the recent years prior to the Petition Date, the motorcycle after-market sector experienced increased competition and little or no growth which caused degradation in the Debtors' financial performance. In addition, a number of other factors contributed to the Debtors' increasing financial difficulties since 2004. Those factors included, among others: (i) expenses incurred with the acquisition and integration of Chrome Specialties and Motorcycle Stuff; (ii) several costly efforts to upgrade and integrate the Debtors' various computer systems; (iii) the cost of a failed $85 million bond offering in 2004 and the resulting distraction to management; (iv) unexpected difficulties in operating multiple distribution centers across the country; and (v) too much leverage and attendant high interest costs.

From 2002 through early 2006, GMG sold "bike kits" – consisting of a "rolling chassis" (frame and wheels), a drive train (engine and transmission), and all other components necessary to enable the retail customer to assemble a complete motorcycle. In early 2006, GMG terminated its bike kit program. Bike kit sales had generated almost $60 million in revenue over the preceding five years, but the lack of adequate internal resources, uncertainty regarding the program's profitability and long-term viability, and other concerns caused management to decide to exit the business.

During late 2005 to early 2006, GMG fell behind on payments of some payables and restricted some inventory purchases. As a result, certain vendors restricted credit terms and GMG's fill rates declined, adversely affecting customer loyalty and revenues.

All of these factors limited the Debtors' access to working capital and made it more difficult for the Debtors to meet their financial covenants under the Credit Agreement.

In 2006 and 2007, GMG undertook several steps in order to reduce expenses and increase revenues. In April 2006, GMG closed its distribution centers in South Bend, Indiana and Jacksonville, Florida and laid off approximately 75 employees. In October 2006, GMG entered into the Administaff Agreement, thereby outsourcing virtually all of its domestic human relations functions. In November 2006, GMG closed CCFE-Taiwan, its former captive Asian sourcing subsidiary, and turned to an unrelated Taiwanese company for the necessary supplies and products. In January 2007, GMG vacated its Fort Worth, Texas facility, and in February 2007, GMG closed Manufacturing and outsourced most of the fabrication work performed by that subsidiary to unrelated domestic and international vendors (the work that was not outsourced was stopped). As part of the Manufacturing shutdown, approximately 43 employees were laid off. In a further reduction-in-force in May 2007, GMG laid off an additional 48 employees. These efforts, together with additional financing from Ableco, enabled the Debtors to operate on a break-even basis for most of 2007 before restructuring costs, but continuing tight credit from

15

vendors restricted the Debtors' ability to attain the revenues they needed to be successful. Further, the Debtors' restructuring expenses were substantial.

## 2. The Debtors' Exploration of Strategic Alternatives and Marketing Efforts and Their Bankruptcy Goals

In Spring 2007, the Debtors decided to evaluate their various strategic alternatives, utilizing the services of restructuring advisors and other professionals.

As discussed further below, prior to the Petition Date, Corporate Revitalization Partners ("CRP") provided restructuring services to GMG pursuant to various engagement agreements during the period from February 2005 to March 2006. Scott Avila of CRP served as the CRO of GMG from July 2005 to the end of December 2005. In or about March 2007, TRG began providing restructuring services to GMG. Effective July 2007, TRG and CRP merged to form CRG Partners Group LLC ("CRG"), at which point CRG provided the restructuring services formerly provided by TRG. Mr. Avila was appointed the CRO of GMG effective as of October 1, 2007, and the CRO of the other the Debtors as of the Petition Date.

In connection with the Debtors' evaluation of their options, on or about October 16, 2007, GMG also engaged Lincoln International Advisors LLC ("Lincoln") as its investment banker.

Over a several month period prior to the Petition Date, CRG and Lincoln have assisted the Debtors in evaluating their options, including the potential sale of some or all of their assets. Lincoln distributed introductory letters regarding the potential disposition of the Debtors' businesses and assets and confidentiality agreements to approximately 110 potential buyers or strategic partners. Approximately fifty parties received an offering memorandum. The Debtors received seven initial indications of interest, and held five management presentations/visits for prospective buyers. Ultimately, two parties submitted letters of intent.

The Debtors entered into negotiations with the higher bidder (of the two bidders which had submitted letters of intent), but the parties were unable to reach a final sale agreement. Subsequently, the Debtors entered into discussions with another party which had expressed an interest in purchasing the Debtors' assets after the Debtors' receipt of the previously noted letters of intent (and after the Debtors were unable to reach agreement with the prior high bidder). After extensive, arms' length negotiations among the parties, the Debtors reached an agreement with the Purchaser.

## I. The Commencement of the Chapter 11 Case

In order to provide an attractive platform for a sale transaction, the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for District of Delaware on January 31, 2008. No trustee or examiner has been appointed in the Chapter 11 Case. The Committee was appointed on February 8, 2008 to represent the interests of the Debtors' general unsecured creditors. The Debtors continued to operate as debtors in possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code, but have ceased their business operations following consummation of the Sale Transaction.

## J. **First Day Motions and Other Relief**

On the Petition Date, the Debtors sought approval from the Bankruptcy Court of certain motions and applications (collectively, the "First Day Motions"), which the Debtors filed simultaneously with, or around the same time as, their voluntary petitions. The Debtors sought this relief to minimize disruption of the Debtors' business operations as a result of the chapter 11 filing, to establish procedures in the Chapter 11 Case regarding the administration of the Chapter 11 Case and interim compensation for Estate professionals, and to facilitate reorganization efforts. Specifically, the First Day Motions and other critical motions during the Chapter 11 Case addressed the following issues, among others:

### 1. **Joint Administration of Related Chapter 11 Cases**

The four Debtors that filed for bankruptcy protection are related entities. In order to permit the Clerk of the Court to utilize a single general docket for these cases and combine notices to creditors of the Debtors' respective estates and other parties in interest, which resulted in savings to the estates, the Debtors requested joint administration of the Debtors' Chapter 11 Cases. The Court entered its order granting the relief requested by the Debtors in respect of their joint administration of the Debtors' Chapter 11 Cases and related relief on February 1, 2008.

### 2. **Employees**

The Debtors required immediate relief to provide assurances to their employees of their stability during the pendency of the Chapter 11 Case with respect to the payment of employee compensation, expenses and benefits. The Debtors' employees performed a variety of critical functions for the Debtors, including, without limitation, nationwide sales and marketing of music and imaging services, custom music programming, design, engineering and installation of audio/video systems, design of proprietary audio/visual distribution platforms, and company-wide back office support (customer service, billing, financial reporting, and human resources). The employees' skills and their specialized knowledge and understanding of the Debtors' infrastructure and operations were essential to the Debtors' continuing operations and to the Debtors' ability to effectuate the sale and reorganization. The Debtors' reliance on their numerous employees necessitated that such employees be confident that their insurance, disability program, expense reimbursements and other benefits would be honored by the Debtors notwithstanding the commencement of the Chapter 11 Case. First day relief was also needed to avoid any possibility that financial institutions would not honor uncashed or in-transit employee payroll checks.

On February 1, 2008, the Court entered its order authorizing the payment of certain pre-petition employee-related claims and the continuation of certain employee benefits post-petition.

### 3. **Cash Management**

Prior to the commencement of their Chapter 11 Case, the Debtors, in the ordinary course of their business, maintained various bank accounts from which they managed their cash receipts and disbursements. The Debtors' cash management system included the use of an operating/concentration account, certain lockbox accounts, merchant services account and other specialized accounts to handle receipts and disbursements. Absent an immediate order from the

17

Court at the commencement of the Chapter 11 Case, the Debtors faced the risk of the suspension of their cash management system. The Debtors also needed authority to maintain existing bank accounts and business forms in order to minimize disruptions and make the transition to chapter 11 smoother and more orderly. The Debtors further requested that it be excused from compliance with certain aspects of section 345(b) of the Bankruptcy Code, requiring certain deposit or investment procedures. The Court entered its interim order granting the relief requested by the Debtors in respect of their cash management system and related relief on February 1, 2008 and a final order on February 19, 2008.

### 4. Taxes

In the normal course of their business, the Debtors sold services and equipment to their customers. In connection with such sales, the Debtors and/or the service providers collected and remitted an assortment of sales, local gross receipts and utility user taxes (collectively, the "Sales Taxes") to various state and municipal taxing authorities. In some cases, Sales Taxes were paid in arrears, once collected by the Debtors. Many jurisdictions, however, required the Debtors to remit estimated Sales Taxes on a periodic basis during the month or quarter in which sales are made. The Debtors then generally timely filed a Sales Tax return with the relevant taxing authority reporting the actual Sales Tax due, paying any further amounts owed for the month or quarter. On a periodic basis, typically monthly, the Debtors would remit the Sales Taxes collected during the preceding month to the taxing authorities. Some taxing authorities required the Debtors to prepay the Sales Taxes.

In addition many municipal and county governments required the Debtors to obtain a business license and to pay corresponding business license fees and business operating taxes (the "Regulatory Fees"). The requirements for a company to obtain a business license and the manner that the Regulatory Fees were computed varied greatly according to the local tax laws.

Accordingly, the Debtors sought authority to pay prepetition sales and use taxes, and other taxes in the ordinary course of their business. The Court granted the Debtors such authority by order entered on February 1, 2008.

### 5. Utilities

In the normal conduct of their business, the Debtors used gas, water, electric, telephone, and other services provided by various utility companies that serviced the Debtors' corporate headquarters, as well as their regional facilities. Inasmuch as the Debtors did business with many utilities, it was imperative that "additional assurance" procedures be established for efficient administration of the Debtors' responsibilities under section 366 of the Bankruptcy Code. On February 7, 2008, the Court entered its amended interim order implementing the procedures proposed by the Debtors to ensure adequate assurance of future payment to utility service providers. A final order was entered on February 19, 2008.

### 6. Customer Obligations

The Debtors sought and obtained Court approval of the right to honor pre-petition gift certificates, volume discount programs and warranty programs, in order to maintain the good will of their business. The Court granted such authority on February 1, 2008.

18

7. **Interim Compensation for Professionals**

The Debtors sought authority to implement procedures for the application, interim allowance and payment of Estate Professionals on a monthly basis. On February 19, 2008, the Court entered its order approving the monthly compensation procedures proposed by the Debtors.

8. **Ordinary Course Professionals**

On the Petition Date, the Debtors filed a motion seeking authority to retain and pay certain professionals in the ordinary course of their business, without having to file applications to employ and compensate such professionals. The "Ordinary Course Professionals" consisted primarily of different professional firms that provided, among other things, various ongoing legal, actuarial and employee benefit consulting services. On February 19, 2008, the Court entered its order authorizing the employment of ordinary course professionals using the procedures outlined by the Debtors.

9. **Cash Collateral Use And DIP Financing**

The Debtors required the use of the Lender Group's cash collateral and an incremental debtor in possession financing facility in the amount not to exceed $3,500,000 in order to operate efficiently pending the closing of the Sale and to give comfort to their vendors that the chapter 11 filings would not disrupt the Debtors' business operations. The Debtors and the DIP Lenders negotiated and agreed on terms pursuant to which the Debtors would receive debtor in possession financing ("DIP Financing").

On the Petition Date, the Debtors filed their *Motion to Approve Interim Stipulation and Order (I) Authorizing the Debtors to incur Post-Petition Secured Indebtedness, (II) Authorizing the Use of Cash Collateral Pursuant to Bankruptcy Code Sections 105, 361, 362, 363 and 364, (III) Granting Adequate Protection, (IV) Granting Security Interests and Super-Priority Claims Pursuant to Bankruptcy Code Sections 361 and 363, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing.* On February 1, 2008, the Court entered its Interim Order approving the DIP Financing pursuant to the terms of the cash collateral budget, and authorizing the Debtors to incur postpetition secured indebtedness, to enter into the proposed DIP Credit Agreements and granting certain adequate protection to the Lender Group. The final hearing concerning the use of cash collateral and financing was held on February 19, 2008 and the final order was entered by the Court on February 19, 2008 (the "Final DIP Financing Order ").

10. **Sale Procedures Motion**

On the Petition Date, the Debtors filed a *Motion to Approve and Order (A) Approving Bid Procedures Relating to Sale of Substantially All of the Assets of Global Motorsport Group, Inc. and Custom Chrome Europe, Ltd.; (B) Scheduling a Hearing to Consider the Sale and Approving the Form and Matter of Notices; (C) Establishing Procedures Relating to Assumption and Assignment of Certain Contracts, Including Notice of Proposed Cure Amounts; (D) Approving Expense Reimbursement and Break-Up Fee Provisions; and (E) Granting Related Relief* (the "Sale Procedures Motion") concerning the proposed Sale Transaction. Generally, the Sale Procedures Motion sought entry of an order scheduling dates, times and places for a hearing

19

regarding a sale motion, and approving the bidding and auction procedures (the "Bid Procedures"). On February 14, 2008, the Court entered its Order granting the relief requested in the Sale Procedures Motion.

## 11. Sale Motion

On the Petition Date, the Debtors also filed a *Motion to (I) Sell Property Free and Clear of Liens, (II) Approve Asset Purchase Agreement and Authorize the Sale by Global Motorsport Group, Inc. and Custom Chrome Europe, Ltd. Of Substantially All of Their Assets Outside the Ordinary Course of Business; (III) Authorize the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Grant Related Relief* (the "Sale Motion") seeking to sell substantially all of their assets to the Purchaser pursuant to the APA, or the Successful Bidder at the sale auction presenting the highest and best bid.

On February 26, 2008, the Debtors filed a *Notice of Non-Receipt of Additional Qualified Bids With Respect To Motion for an Order: (i) Approving Asset Purchase Agreement and Authorizing the Sale by Global Motorsport Group, Inc. and Custom Chrome Europe, Ltd. of Substantially All of Their Assets Outside the Ordinary Course of Business; (ii) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests Pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code, (iii) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (iv) Granting Related Relief* advising the Court that no Auction took place because there were no competing bids.

On February 28, 2008, the Court entered its order granting the relief requested by the Debtors in the Sale Motion, and approving the sale of the Purchased Assets (including, the assumption and assignment of the Assumed Contracts) to the Purchaser pursuant to the APA.

## K. Appointment of Committee

On February 8, 2008, at a meeting of the twenty (20) largest unsecured creditors of the Debtors held at the Office of the United States Trustee in Wilmington, Delaware, the U.S. Trustee appointed the Committee as the representative of the Debtors' general unsecured creditor constituency in the Chapter 11 Case. The Committee was composed of five (5) members: (1) The Hog Farm, Inc.; (2) Perot Systems Corporation; (3) Valwood Centreport, L.P. c/o RREEF Management Company; (4) Merrill Communication LLC; and (5) David G. Sadler. The Committee retained Bayard, P.A. and Andrews Kurth LLP as co-counsel and NachmanHaysBrownstein, Inc. as its financial advisors to assist in the Committee's involvement in the Chapter 11 Case. Andrews Kurth LLP has ceased representing the Committee. The professionals at Bayard P.A. who were representing the Committee have moved to Fox Rothschild LLP where they continue to represent the Committee.

## L. Bar Date for Filing Proofs of Claim

On March 20, 2008, the Debtors filed a motion requesting that the Court set a deadline by which parties, including governmental units, must file proofs of claim (the "Bar Date Motion"). The Bar Date Motion was granted by the Court on April 2, 2008 (the "Bar Date Order") and established June 2, 2008 as the deadline for filing Proofs of Claim with the Court for any claims

20

against the Debtors arising prior to the Petition Date (the "General Bar Date"). A schedule of the filed Proofs of Claims is being maintained by Epiq, the Debtors' noticing and claims agent.

**M.     Bar Dates For Filing Administrative Expenses**

On March 20, 2008, the Debtors filed their Motion of Debtors for an Order (A) Fixing the Procedures and Deadlines to File Proofs of Claim and Make Requests for Payment of Administrative Expense Claims, (B) Approving the Form and Manner of Notice of Bar Date, and (C) Granting Related Relief. On April 2, 2008, the Court entered its Order establishing June 2, 2008 as the date that requests for payment of administrative expenses incurred between the Petition Date and March 15, 2008 must be filed by creditors wishing to assert such claims against the Debtors.

**N.     Filing of Statements and Schedules**

On February 10, 2008, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs with the Bankruptcy Court, which set forth, *inter alia*, scheduled prepetition claims against the Debtors based on their books and records.

**O.     Other Significant Postpetition Developments**

**1.     Closing of the Sale Transaction**

The Sale Closing occurred on March 7, 2008. The consideration paid by the Purchaser was as follows: $16,000,000 in cash, subject to adjustment pursuant to the terms of the APA plus the assumption and payment by the Purchaser of certain "Designated Trade Obligations" (as that term is defined under the APA) plus the assumption of all amounts payable and obligations that otherwise must be satisfied pursuant to section 365 (b)(1)(A) and (B) of the Bankruptcy Code in connection with the "Designated Contracts" (as that term is defined under the APA) as set forth in the agreements and contracts identified under schedules 1.1.1 (i), (ii), and (iii) of the APA, plus assumption of all "Assumed Liabilities", as that term is defined under the APA.

As a result of the assumption of liabilities and retention of employees by the Purchaser, the outstanding claims against the Debtors were materially reduced. The Claim estimates set forth in Article II(D)(2) above take into account the reduction in Claims resulting from the Sale Closing.

**2.     Creditor Settlement**

a.     Background.

As a condition to providing the DIP Loan, the Lender Group sought the inclusion of a provision in the Financing Order recognizing the extent, validity, perfection and enforceability of its Pre-Petition Indebtedness and the Agent's liens on substantially all of the Debtors' Pre-Petition Collateral for all purposes subject to the rights of any party in interest, other than the Debtors, to file a complaint within 90 days after the appointment of the Committee (the "Claims Challenge Deadline") pursuant to Bankruptcy Rule 7001 seeking to invalidate, subordinate or otherwise challenge the Pre-Petition Indebtedness and/or Agent's pre-petition liens upon and

31606-001\DOCS_DE:146418.8

security interests in the Pre-Petition Collateral. If no complaint was timely filed by the Claims Challenge Deadline or any timely filed complaint was dismissed or denied, then, among other things, (i) the Pre-Petition Indebtedness and Agent's security interests in and liens upon the Pre-Petition Collateral would be recognized and allowable as valid, perfected, binding, and in full force and effect, and (ii) the Pre-Petition Indebtedness would be an allowed claim against the Debtors, in each case without any claims, counterclaims, setoff or defenses thereto. The Challenge Deadline has been extended by a series of Stipulations which have been approved by the Court.

      b.    Summary of Creditor Settlement.

As described more fully in the Plan, the Creditor Settlement contemplates the release of claims against the Lender Group and the other Released Affiliate Parties in exchange for the Lender Group's consent to the treatment and allocation of certain assets on which the Agent asserts a lien. The maximum amount of the Lender Group's obligations to fund the Plan is $1,400,000 unless the foregoing cap on its obligations is waived by the Lender Group in its sole discretion. In summary, the Creditor Settlement contemplates the following economic terms:

      i.    Funding of Certain Accounts. On the Effective Date, the following accounts will be funded:

      (a)    GUC Fund. On the Effective Date, the GUC Trustee shall create the GUC Fund (from which payment of all Allowed General Unsecured Claims shall be paid). The GUC Fund shall consist of cash in the amount of $425,000 and the Preserved Avoidance Actions and other Causes of Action.

      (b)    Administrative Claims/Priority Claims Account.
Additionally, an account will be established and administered by the Liquidating Debtors and will contain funds deposited from the Debtors' Cash on hand on the Confirmation Date plus the Agent Contribution, which the Debtors believe will be sufficient to fully satisfy the aggregate amount of asserted and unpaid Administrative Claims, Tax Priority Claims and Priority Claims incurred on or before the Effective Date (whether or not subject to dispute, but other than Administrative Claims, Secured Claims, Tax Priority Claims and Priority Claims that are disallowed on or before the Effective Date pursuant to a Final Order of the Bankruptcy Court), other than Professional Fee Claims.

      (c)    Professional Fees Account. An account will also be established and administered by the Liquidating Debtors containing funds deposited from the Debtors' Cash on hand on the Effective Date in an amount equal to the sum of (i) 80% of Allowed fees and 100% of Allowed expenses of Professional Fee Claims incurred by Pachulski, Stang,

Ziehl and Jones LLP; Fox Rothschild LLP; The Bayard Firm; CRG LLP; and Nachman Hayes LLP for the period of January 31, 2008 through November 30, 2008; (ii) 100% of Allowed fees and 100% of Allowed expenses incurred by Pachulski, Stang, Ziehl and Jones LLP; Fox Rothschild LLP; The Bayard Firm; CRG, LLP; and Nachman Hayes LLP for the period of December 1, 2008 through the Effective Date up to the maximum aggregate amount of $125,000.00; and (iii) 60% of allowed fees and 100% of allowed expenses of Andrews & Kurth LLP.

(d)     The GUC Fund Expenses Reserve.  A separate account to be used solely for the payment or reimbursement of the fees and expenses incurred by the Professionals of the GUC Trustee in objecting to Claims against any of the Debtors, prosecuting Preserved Avoidance Actions, preparing final tax returns, or otherwise in carrying out the provisions of the Plan in an amount not to exceed $20,000.

ii.     Release of Claims and Recognition of Security Interests.  In return for and subject to the foregoing financial accommodations, the Estates and Creditors release the Lender Group and the Released Affiliate Parties as follows:

(a)     Confirmation of Financing Order.

The provisions of the Financing Order are deemed fully binding on the Debtors, their respective estates, the GUC Trustee, Liquidating Debtors, the Responsible Officer, the Committee, any trustee appointed in any of the Chapter 11 Cases and any trustee appointed in any subsequent or superseding bankruptcy case (including, without limitation, any conversion of any or all of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code), and all other parties in interest.  Without limiting the generality of the foregoing, on the Effective Date, (a) the Pre-Petition Obligations and Agent's security interests in and liens upon the Pre-Petition Collateral  shall be finally and conclusively recognized and allowed as valid, binding, in full force and effect, not subject to any claims, counterclaims, setoff or defenses, perfected and senior to all other liens upon and claims against the Pre-Petition Collateral to the extent provided in the Financing Order, (b) the Pre-Petition Obligations shall be finally and conclusively allowed in the full amount specified in the Financing Order and in the Proofs of Claim filed by the Agent on behalf of the Lender Group pursuant to sections 502 and 506 of the Bankruptcy Code, (c) the releases in favor of the Lender Group as set forth in the Financing Order are fully and conclusively effective and binding on the Debtors, their respective estates, the Committee, the GUC Trustee and any trustee appointed in any of the Chapter 11 Cases and any trustee appointed

in any subsequent or superseding bankruptcy case (including, without limitation, any conversion of any or all of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code), the Liquidating Debtors, and all other parties in interest, (d) any amounts paid at any time to the Lender Group and their respective professionals (i) prior to the Petition Date, (ii) pursuant to the Financing Order, (iii) pursuant to the Sale Order, or (iv) as otherwise permitted under the Plan or any order of the Bankruptcy Court, shall be in each case deemed final and irrevocable and shall be retained in full by the Lender Group and their respective professionals. Except as expressly amended by the Plan to effectuate the terms and provisions of the Plan, the terms and provisions of the Financing Order are affirmed and shall remain in full force and effect.

(b)    Releases

(i)    The Debtors' Release

On the Effective Date, the Debtors and their respective Estates shall release and be permanently enjoined from any prosecution or attempted prosecution of any and all litigation or potential litigation which they have or may have against the Lender Group and all Released Affiliate Parties; provided, however, that the foregoing shall not operate as a waiver of or release from any litigation or potential litigation against the Lender Group or any Released Affiliate Party arising out of the willful misconduct or gross negligence of any such Released Affiliate Party in connection with, related to, or arising out of the Chapter 11 Cases, the pursuit of Confirmation of the Plan, the consummation of the Plan, the administration of the Plan, or the property to be distributed under the Plan.

(ii)    Other Releases.

Each person or entity voting to accept the Plan, for itself and its respective successors, assigns, transferees, current and former officers, directors, agents, members, financial advisors, attorneys, employees, partners, affiliates, representatives, in each case in their capacity as such, shall, by virtue of its vote shall be deemed to have released any and all claims and causes of action against (A) the Debtors, the Liquidating Debtors, the GUC Trustee and the Released Affiliate Parties in respect of any matter relating to the Debtors, (B) the Lender Group, and (C) the members of the Committee in their capacity as such, and their respective officers, directors, managers, employees, agents, advisors, accountants, attorneys and representatives and their respective property, arising prior to the Effective Date. Nothing in the previous sentence shall be deemed to release the Debtors, the Liquidating Debtors, the GUC Trust and the GUC Trustee from liability for (i) Claims filed before the Administrative Claims Bar Date or the Bar Date and (ii) Claims scheduled by the Debtors that are not contingent, disputed or unliquidated; provided, however, that, notwithstanding clause (i) above, the Debtors, the Liquidating Debtors or

31606-001\DOCS_DE:146418.8

the GUC Trustee, as appropriate, may object to the allowance of any Claim on any ground.

The Debtors, their Estates, the Liquidating Debtors, the GUC Trust, the GUC Trustee and the former and current members of the Committee in their capacity as such, for themselves and each of their respective successors, assigns, transferees, current and former officers, directors, agents, shareholders, members, financial advisors, attorneys, employees, partners, affiliates, and representatives, in each case in their capacity as such, shall be deemed to have released and discharged any and all claims, causes of action, demands, losses, whether known or unknown, in law or equity against the Lender Group and their respective property based in whole or in part upon any act or omission arising from or in connection with or in any way relating to the Debtors including without limitation any action or proceeding arising from or otherwise relating to any or all of the transactions contemplated by the Pre-Petition Credit Documents or the DIP Credit Documents.

Each party to which Section 7(A) of the Plan applies shall be deemed to have granted the releases set forth herein notwithstanding that it may hereafter discover facts in addition to, or different from, those which it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such party expressly waives any and all rights that it may have under any statute or common law principle, including section 1542 of the California Civil Code, which would limit the effect of such releases to those Claims or causes of action actually known or suspected to exist at the time of Confirmation. Section 1542 of the California Civil Code generally provides as follows: "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

(iii)     Additional Injunction.

In implementation of the Plan, except as otherwise expressly provided in the Confirmation Order or the Plan, and except in connection with the enforcement of the terms of the Plan or any documents provided for or contemplated in the Plan, all entities who have held, hold or may hold Claims against or Interests in the Debtors, the Liquidating Debtors, the GUC Trust, the GUC Trustee or the Estates that arose prior to the Effective Date are permanently enjoined from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against the Debtors, the Liquidating Debtors, the Estates, the GUC Trust, the GUC Trustee or any property of the Debtors, the Liquidating Debtors, the GUC Trust, the GUC Trustee or the Estates, with respect to any such Claim or Interest; (b) the enforcement, attachment, collection or recovery by any manner or means, directly or

25

indirectly, of any judgment, award, decree, or order against the Debtors, the Liquidating Debtors, the GUC Trust, the GUC Trustee, the Estates, or any property of the Debtors, the Liquidating Debtors, the GUC Trust, the GUC Trustee, or the Estates, with respect to any such Claim or Interest; (c) creating, perfecting or enforcing, directly or indirectly, any Lien or encumbrance of any kind against the Debtors, the Liquidating Debtors, the GUC Trust, the GUC Trustee, the Estates, or any property of the Debtors, the Liquidating Debtors, the GUC Trust, the GUC Trustee or the Estates, with respect to any such Claim or Interest; (d) asserting, directly or indirectly, any setoff, right of subrogation, or recoupment of any kind against any obligation due the Debtors, the Liquidating Debtors, the GUC Trust, the GUC Trustee, the Estates, or any property of the Debtors, the Liquidating Debtors, the GUC Trust, the GUC Trustee or the Estates, with respect to any such Claim or Interest; and (e) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan with respect to such Claim or Interest. Nothing contained in Section 6(D) of the Plan shall prohibit the Holder of a timely-filed Proof of Claim from litigating its right to seek to have such Claim declared an Allowed Claim and paid in accordance with the distribution provisions of the Plan, or enjoin or prohibit the interpretation or enforcement by the Holder of any of the obligations of the Debtors, the Liquidating Debtors or the GUC Trustee under the Plan.

### 3.     The Creditor Settlement is Fair and Reasonable.

In general and as described above and in the Plan, the Debtors and Lender Group seek to resolve any possible claim against the Released Affiliate Parties by (i) redistributing to the GUC Trust an amount equal to $425,000 of the Lender Group's cash collateral, (ii) funding $20,000 towards payment of expenses of the GUC Trust and (iii) assigning to the GUC Trust the Preserved Avoidance Actions and other Causes of Action.

The Debtors, Committee and Lender Group believe that the proposed settlement is fair and reasonable under the circumstances. The Debtors are unaware of any meritorious (or even alleged) claims that are being released. Additionally, (i) the Agent's liens on all of the Pre-Petition Collateral were properly perfected, (ii) all proceeds generated from consummation of the transactions contemplated by the Sale Order constitute collateral proceeds of the Agent and Lenders, and (iii) all such proceeds should be immediately distributed to the Agent for the benefit of the Lender Group. Absent the Creditor Settlement, it is unlikely that general unsecured creditors would receive any distribution from the Debtors' estates because the Lender Group asserts that all of the Debtors' Cash on hand constitutes Cash Collateral and that the Lender Group Postpetition Claim must be paid before any amounts are paid to general unsecured creditors, including from proceeds of Avoidance Actions. Therefore, in an effort to conserve resources of the Estate, as well as the Court, bring finality to the Debtors' Chapter 11 Cases and expedite distributions to all Holders of Allowed Claims and in the exercise of the Debtors', Committee's and Lender Group's reasonable business judgment, the parties believe that the proposed Creditor Settlement is fair and reasonable under the circumstances and recommend that

Holders of Allowed Claims vote in favor of the Plan. The Confirmation Order shall contain a provision deeming the Creditor Settlement approved.

## IV.
## DESCRIPTION OF THE PLAN

A DISCUSSION OF THE PRINCIPAL PROVISIONS OF THE PLAN AS THEY RELATE TO THE TREATMENT OF CLASSES OF ALLOWED CLAIMS AND INTERESTS IS SET FORTH IN ARTICLES V THROUGH XIII BELOW (IN ADDITION TO THE DISCUSSION OF THE CREDITOR SETTLEMENT DISCUSSIONS IN ARTICLE III ABOVE). THE DISCUSSION OF THE PLAN THAT FOLLOWS CONSTITUTES A SUMMARY ONLY, AND SHOULD NOT BE RELIED UPON FOR VOTING PURPOSES. YOU ARE URGED TO READ THE PLAN IN FULL IN EVALUATING WHETHER TO ACCEPT OR REJECT DEBTORS' PROPOSED PLAN OF LIQUIDATION. IF ANY INCONSISTENCY EXISTS BETWEEN THIS SUMMARY AND THE PLAN, THE TERMS OF THE PLAN CONTROL. ALL CAPITALIZED TERMS NOT OTHERWISE DEFINED HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.

## V.
## ADMINISTRATIVE CLAIMS, PROFESSIONAL
## FEES AND PRIORITY TAX CLAIMS

### A.     Introduction

Certain types of Claims are not placed into voting Classes; instead they are unclassified. They are not considered Impaired and they do not vote on the Plan because they are automatically entitled to the specific treatment provided for them in the Bankruptcy Code. As such, the Debtors have not placed the following Claims in a Class:

### B.     Administrative Claims (Other Than Professional Fees)

The Lender Group has stipulated that the Lender Group Postpetition Claim shall be deemed satisfied on the Effective Date.

With respect to all other Administrative Claims (excluding Professional Fee Claims) accrued and not paid as of the Effective Date, the Liquidating Debtors shall retain on the Effective Date and deposit into the Administrative Claims/Priority Claims Account an amount equal to the aggregate amount of asserted Administrative Claims (whether or not subject to dispute, but other than Administrative Claims that are disallowed on or before the Effective Date pursuant to a Final Order of the Bankruptcy Court). The Liquidating Debtors shall pay each Holder of an Allowed Administrative Claim in full in the amount of its Allowed Claim from the Administrative Claims/Priority Claims Account, without interest, in Cash promptly on the later of (i) the Effective Date, or (ii) the date on which the Claim becomes an Allowed Claim, or on